1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3

4    United States of America,    )
                                  )
5                  Plaintiff,     )
                                  )
6    vs.                          )   CR-19-01094-TUC-JGZ-JR
                                  )
7    Isaias Delgado,              )
                                  )   Tucson, Arizona
8                  Defendant.     )   August 9, 2021
     _____)   9:17 a.m.

9

10

            PARTIAL TRANSCRIPT OF JURY TRIAL – DAY ONE
11               OPENING STATEMENTS AND TESTIMONY
            BEFORE THE HONORABLE JENNIFER G. ZIPPS
12               UNITED STATES DISTRICT JUDGE

13

14   For the Plaintiff:
          Ms. Angela W. Woolridge
15        U.S. Attorney's Office
          405 West Congress Street, Suite 4800
16        Tucson, AZ  85701

17   For the Defendant:
          Mr. Brad Roach
18        Mr. Trevor Hill
          Roach Law Firm, LLC
19        101 East Pennington Street, Suite 201
          Tucson, AZ  85701

20

21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23
                      Aaron H. LaDuke, RMR, CRR
24               Federal Official Court Reporter
                      405 W. Congress St.
25                 Tucson, Arizona  85701

```
 1                          I N D E X

 2                                                    Further
                  Direct   Cross   Redirect   Recross   Redirect
 3
    WITNESS FOR THE
 4  PLAINTIFF:

 5  STACY CUNNINGHAM

 6  BY MS. WOOLRIDGE......11

 7

 8  EXHIBIT:                                      ADMITTED:

 9  43.....................................................51
    44.....................................................51
10  45.....................................................51
    46.....................................................51
11  47.....................................................51
    77.....................................................54
12

13                      *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2      (Proceedings were had and recorded but not transcribed.)

3          MS. WOOLRIDGE:  Thank you, Your Honor.

4      May it please the Court; counsel; ladies and gentlemen of

5  the jury.  Good afternoon.

6      There is one thing that all of us up here agree on:

7  Isaias Delgado likes guns.  In fact, you'll hear him say it.

8  And there's nothing wrong with liking guns.  It's not illegal

9  as a hobby, as a collector, for sports shooting, for hunting,

10  for self-protection; but that's not why Isaias Delgado likes

11  guns.  He likes guns as a commodity, something he can buy and

12  sell in hopes of making a profit.

13      You'll hear that he spent over $111,000 in just a few

14  months to buy at least 39 guns, guns he no longer has because

15  he turned around and sold them to others.  The problem with

16  this and the reason we're here today is that he bought and

17  sold all of these guns without a license; and that, ladies and

18  gentlemen, is against the law.

19      As the Judge instructed you, the defendant is charged

20  with engaging in the business of dealing in firearms without a

21  license, which means, one, to willfully deal firearms and,

22  two, to do so without a license.  But this means more than

23  just an occasional sale made by a hobbyist or a collector.  It

24  means devoting time and attention to repeatedly buying and

25  selling firearms with the intent to make a profit.

1        See, the firearms business is regulated because while

2   firearms may be a business commodity, they're also deadly

3   weapons.  You'll hear that regulations are in place to ensure

4   that gun buyers undergo background checks, that records are

5   kept of gun purchases, that people don't just indiscriminately

6   sell guns to just anyone so they can make money, regulations

7   that help protect our communities by keeping guns out of the

8   wrong hands.

9        You'll hear that there's a legal way to get into the

10  firearm business and to make a profit legally from buying and

11  selling guns.  Lawful firearms dealers adhere to these

12  regulations.  They help prevent gun crime and protect our

13  communities.

14       But Isaias Delgado didn't do things the legal way.

15  You'll hear that he specifically bought and sold guns for the

16  purpose of making money and he didn't get a license.  He spent

17  more on guns in just two months than he made in the previous

18  three years combined.  You'll hear that he sold these guns,

19  almost 40 of them, soon after he bought them.

20       You'll hear that he didn't conduct background checks on

21  the people he sold the guns to.  He didn't keep records of his

22  gun sales, didn't report his income from his gun sales, didn't

23  pay taxes on his gun sales, didn't comply with all the

24  regulations that legitimate gun dealers have to comply with;

25  and that, ladies and gentlemen, is against the law.  That's

1  why we're here.

2      What's more, Isaias Delgado knew that what he was doing

3  was wrong, and you'll hear about the efforts he took to cover

4  up his crime, to disguise his gun sales, trying to make all

5  his purchases look like just a hobby, but it wasn't a hobby.

6      You'll hear that he spent over 11 -- I'm sorry, over

7  $111,000 on almost 40 firearms in just a few months, many of

8  the same firearms at one time, such as six Barrett .50 caliber

9  rifles, each worth about 7 to $8,000, and then sold them.  We

10 submit to you that isn't a hobby.  That's a business.

11      Fortunately, ATF agents learn about Isaias Delgado's

12 unlicensed firearms dealing.  They learn of two particular

13 guns he bought and sold that were recovered outside of Arizona

14 in two separate incidences, and they begin investigating.

15 These agents learn about all the firearms that Isaias

16 Delgado's been buying, high-caliber, high-dollar firearms,

17 several at a time.  They discover that he no longer has these

18 firearms.  In fact, he has a storage locker with nothing

19 inside of it but several empty firearm boxes with the serial

20 numbers removed because he sold all of these guns after he got

21 them, all to make money.

22      The agents learn that Isaias Delgado currently has an

23 order pending for two .50 caliber rifles and three belt-fed

24 rifles, an order for a total of more than $34,000, more than

25 he reported making that entire previous year, and this order

1  is to be shipped to N&N Firearms, a licensed firearms dealer

2  in Tucson.

3      So the agents go to N&N on April 4th, 2019, and they talk

4  to the defendant when he goes to pick up the five rifles, the

5  two .50 caliber and the three belt-fed rifles he had

6  purchased.  Isaias Delgado tells the agents he had sold these

7  firearms that he had been buying, that he knew he should have

8  gotten a license, and that he knew he was going to

9  get arrested for it.  He knew he wasn't doing things the right

10  way.

11      And now he claims that it's all just a hobby, but you'll

12  hear and see all the evidence, ladies and gentlemen, over the

13  next few days, evidence about the 39 firearms he bought for

14  over $111,000 in just a few months and then turned around and

15  sold them right after he got them; evidence proving that his

16  primary intention was to make repeated firearms sales in hopes

17  of earning a profit; evidence that he needed to get a firearms

18  dealers license in order to make these sales legal, that he

19  could have gotten a firearms dealer license, that he knew he

20  should have gotten a firearm dealers license, but he didn't,

21  plain and simple.  He chose to break the law instead.  Was it

22  to make more money, to avoid paying taxes, to avoid having to

23  go through the regulations that lawful firearms dealers have

24  to comply with?  He made that choice.

25      Once you hear and see all of this evidence throughout the

1  course of this trial, you'll find the government has proven

2  beyond a reasonable doubt that the defendant is guilty of

3  engaging in the business of dealing firearms without a

4  license.

5         Thank you in advance for your time and attention.

6         THE COURT:  Thank you, Ms. Woolridge.

7     Mr. Roach.

8         MR. ROACH:  Isaias Delgado, now, in 2019, in 2018, in

9  2017, in 2016, in 2015 -- actually, we don't know how far this

10 goes back -- has always engaged in the business of computers.

11 He's a web designer for companies here in town and elsewhere.

12 He is an IT guy that works with small companies here in town.

13 He does security and cyber security issues for people here in

14 town.  This is the business that he is in that he's very good

15 at and that he gets paid for.  That's what the evidence is

16 going to show.  He's in the business of computers.

17     The evidence will show, though, he does like guns.  Back

18 in 2018, 2019, he was not a married guy.  He didn't have a

19 mortgage.  He lived with family.  He didn't have any

20 dependents at the time, and he made good money.  And you know

21 what he did with his good money?  Bought guns.

22     I ask you, please, please remember the things that the

23 government told you in their opening.  Remember the things

24 that she was going to prove to you.  Now is the time for me to

25 talk to you about the evidence that you will hear.  So I'm

1    not -- now is not the time for me to tell you or to argue

2    about what the evidence is going to be.  I'm just going to

3    tell you what the evidence is here.  But remember the things

4    that you were told by the government that they said they were

5    going to prove to you because I'm going to come back to that

6    in the closing.  I'm going to ask how much of that happened.

7        Isaias Delgado has been a successful computer guy for

8    over ten, 15 years.  He started off because his father was in

9    the business of computers, and then he kind of did computers

10   with his father, started 15 years ago refurbishing computers

11   and selling them at the swap meet and moved up from that to be

12   doing much more sophisticated computer stuff.  So he made good

13   money.  He had his own business.

14       So in 2017, 2018, he was -- his income -- so again a guy

15   with no house, no kids, no family.  His income, after writing

16   off all his taxes -- and I know that this is why you were

17   asked has anybody here owned their own business, because you

18   can write off a bunch of your expenses.  So after writing off

19   all his expenses, he was making between 30 and $40,000 in

20   those years, which is good money.  2019 was a really good

21   year.  The entirety of 2019, he made about $199,000 in income

22   through his business, the business of buying and selling and

23   making a profit from computer-related activity.

24       What he did was take some of this money, like a kid in a

25   candy store, and buy some pretty outrageous guns.  He would

1  buy them in different colors.  He would buy them in -- some

2  were in a shorter barrel, and he didn't like that.  He wanted

3  a longer barrel because he had the money, and he bought them.

4  The government doesn't like that.  They came in, took his guns

5  that they could find, tried to find more guns, and then

6  indicted him.  Here we are.

7       The evidence will show beyond a reasonable doubt that my

8  client bought, sold, and made a profit from computers.  The

9  government has to prove that he bought, sold, and made a

10  profit from, in order to have a livelihood or to live off --

11  well, that he bought, sold, and made a profit from, for the

12  purposes of a business of selling guns.

13      So listen to the words that the government uses.  So

14  listen to not only the words that they use, listen to

15  emotions.  If you're being talked to or encouraged to feel a

16  certain way about some of this evidence, think about that and

17  pay attention to that when you're being presented evidence.

18  Are you being presented evidence because it factually matters,

19  or is it there to frighten you or to get you to feel a certain

20  emotion?

21      Ladies and gentlemen, at the end of this trial, I will

22  come back to you and say how much have I told you turned out

23  to be correct and how much have I told you is true.  And what

24  you will say is I believe beyond a reasonable doubt Isaias

25  Delgado is a good computer guy and I believe he's a young

1   kid -- everyone's young to me now -- but he's a young kid who

2   made a lot of money, didn't have any responsibilities, and

3   spent money on guns.

4        You might even think, well, that's ridiculous.   I

5   wouldn't spend that amount of money on guns.   It's fine.   He

6   was never, was not then, was never in the business of buying

7   and selling guns because he wanted to make a business out of

8   it.   He bought some guns.   He liked them.   He sold them.   He

9   kept some.   This is all legal.   He was not engaged in a

10  business of buying and selling guns.   He had no need for a

11  federal firearms license because he is not in that business.

12  He's in the business of computers.

13       So once you hear all the evidence, I will ask you to

14  return a not guilty verdict.   Thank you.

15            THE COURT:   Thank you, Mr. Roach.

16       Ms. Woolridge, if you'll bring in as many witnesses as

17  you have here, we'll have them sworn at one time and I'll

18  inform them on the rule of exclusion.

19            MS. WOOLRIDGE:   Your Honor, given the government's

20  schedule -- I'm sorry.   Given the anticipated witness

21  schedule, we only have our first witness present today as it's

22  believed that that testimony will take up the rest of this

23  afternoon.

24            THE COURT:   All right.   Then I'll direct counsel to

25  inform your witnesses that they're not to be in the courtroom

Cunningham – Direct

1  when another witness is testifying or to be talking about the

2  case.

3          MS. WOOLRIDGE:  Thank you, Your Honor.  And, Your

4  Honor, as its first witness, the government will call Special

5  Agent Stacy Cunningham.

6          THE CLERK:  Do you solemnly swear or affirm that the

7  testimony you are about to give in the matter now on trial

8  before the Court shall be the truth, the whole truth, and

9  nothing but the truth, so help you God?

10          THE WITNESS:  I do.

11          THE CLERK:  Thank you.  Please be seated.  You may

12  remove your mask.

13          THE WITNESS:  Thank you.

14          THE CLERK:  Please state your full name and spell

15  your last name for the record.

16          THE WITNESS:  My name is Stacy Cunningham, S-T-A-C-Y,

17  C-U-N-N-I-N-G-H-A-M.

18          MS. WOOLRIDGE:  Thank you, Your Honor.

19          STACY CUNNINGHAM, PLAINTIFF'S WITNESS, SWORN

20                      DIRECT EXAMINATION

21  BY MS. WOOLRIDGE:

22  Q    Good afternoon, ma'am.  We've gotten to meet you briefly

23  this morning, but if you could please tell the jury a little

24  bit more about yourself.  Specifically I would like to go

25  through your professional background.  Start with your

Cunningham – Direct

1  professional background and education.

2  A    Yes.  I'm a special agent with the Bureau of Alcohol,

3  Tobacco, Firearms, and Explosives.  I started my career with

4  them in 2007.  I was assigned to the Reno field office until

5  2012 and transferred to Tucson from 2012 until January of this

6  year.

7  Q    And as of January of this year, have you still been

8  employed with the Bureau of Alcohol, Tobacco, Firearms, and

9  Explosives?

10 A    Yes.  I transferred to our headquarters in Washington,

11 D.C. during that month.

12 Q    And is that where you are currently assigned or currently

13 employed?

14 A    Yes.

15 Q    And can you describe your position at headquarters in

16 Washington, D.C. for the ATF.

17 A    I'm a program manager in our Legislative Affairs

18 Division.

19 Q    And you mentioned that you were a field agent previously

20 both in the Reno and the Tucson offices, correct?

21 A    That is correct.

22 Q    I want to talk a little bit about your experiences as a

23 field agent, but before we do, can we back up a little bit.

24 Do you have some law enforcement experience prior to becoming

25 a special agent with the ATF?

Cunningham – Direct

1   A    I do.  I was a police officer in the city of Tyler,

2   Texas.

3   Q    And from about what time period did you have that

4   occupation?

5   A    From January of 1996 until January -- or, excuse me,

6   February of 2000.

7   Q    And did you go straight from that employment then to

8   becoming a federal agent with the ATF?

9   A    I did not.

10  Q    And what did you do in between then?

11  A    In February of 2000, I started Baylor Law School in Waco,

12  Texas.

13  Q    And did you obtain your juris doctor degree from Baylor?

14  A    I did.

15  Q    And were you employed as an attorney then following

16  receiving that degree?

17  A    I did.  In 2002, I was hired by the Smith County District

18  Attorney's Office.

19  Q    And then how long did you hold that position?

20  A    Until about two weeks before I left for the ATF academy

21  in 2007.

22  Q    I want to talk a little bit about the ATF academy and the

23  training that you've had to be, first of all, a law

24  enforcement agent and then specifically an ATF agent.  First

25  of all, the beginning of your law enforcement career in Tyler,

Cunningham – Direct

1   Texas, did you go through any sort of law enforcement

2   training?

3   A    I did.  I attended a regional police academy from January

4   of '96 until I think it was mid-April of '96.

5   Q    And how about specifically to be an ATF agent?

6   A    I attended the academy, it's FLETC, Federal Law

7   Enforcement Training Center, in Glynco, Georgia.  I entered

8   the academy in August of 2007.  For the first three months,

9   it's kind of a general academy that all federal law

10  enforcement criminal investigators attend, and then the next

11  three months I attended the ATF specific academy.

12  Q    And with regard to the ATF specific academy, is there a

13  special type of education and training for the type of

14  investigations that you do as an ATF agent?

15  A    Yes.  Once we attend the general criminal investigator

16  training program and we go to the ATF specific, then we learn

17  about ATF specific related firearms laws, laws that we have

18  jurisdiction over.  We also are the federal arson agency.  We

19  investigate explosives post blast.  We also investigate

20  alcohol and tobacco.

21  Q    And does that education and training also encompass laws

22  regarding and regulating the firearms industry?

23  A    That is correct.

24  Q    Now can you generally describe your duties as an ATF

25  field agent just generally throughout your career but also

Cunningham - Direct

1  specifically when you were assigned to the office here in

2  Tucson.

3  A    So generally speaking, as a field agent, my primary

4  duties were to investigate potential offenses of federal

5  firearms violations.  I did that both in Reno and in Tucson.

6  Q    And can you give us just a very broad overview -- oh, and

7  did you also have any sort of collateral duties as a case

8  agent when you were either in the Reno or the Tucson office?

9  A    I did.  Some of the collateral duties we do hold as field

10 agents are things like vault custodians.  We have things

11 called agent cashier, which are -- it's almost like petty cash

12 that we use for certain expenses, like undercover purchases

13 and things like that.  I also had a collateral duty with our

14 special response team as the crisis negotiation team leader

15 for our Dallas, Texas team.

16 Q    And when you were assigned to the office here in

17 Tucson -- I believe you said beginning in 2012 and then up

18 until this past year; is that correct?

19 A    Yes.  I arrived in Tucson in July of 2012.

20 Q    Okay.  And did you operate as a case agent in charge of

21 various investigations involving firearm offenses here in

22 Tucson?

23 A    Yes, I did.

24 Q    Did those include offenses with regard to regulations

25 that govern the firearm industry or firearms dealing?

1  A     Certain ones, yes.

2  Q     And were there also a number of other types of

3  firearms-related investigations that you either were assigned

4  to as a case agent or assisted other agents with?

5  A     Yes.  Primarily those are things like, most people

6  recognize them as prohibited purchasers or like felons in

7  possession of firearms and ammunition.  We call them the

8  922(g) offenses.  Those were a large part of my

9  investigations.

10     Several of my other investigations involved the movement

11  of firearms, what you guys probably know as gun trafficking.

12  Those were a large part of my investigations.  And then I've

13  also taken a small part of investigations in

14  multi-jurisdictional, like with DEA, HSI, and FBI.

15  Q     Okay.  And specifically were you assigned as a case agent

16  into a particular investigation involving suspected offenses

17  of dealing with firearms without a license in early 2019?

18  A     Yes.

19  Q     And who was the subject of that investigation?

20  A     Isaias Delgado.

21  Q     Do you see that individual in the courtroom here today?

22  A     I do.

23  Q     And can you describe where he's sitting and an article of

24  clothing so we may know who you're speaking of.

25  A     Yes.  He's sitting with the attorneys over here on the

Cunningham – Direct

1  table.  He's wearing a dark blue suit.  He's in the middle

2  with a blue and white face mask.

3           MS. WOOLRIDGE:  May the record reflect that the

4  witness identified the defendant, Your Honor?

5           THE COURT:  The record will show the identification.

6  BY MS. WOOLRIDGE:

7  Q    And how was it that this particular suspected offense and

8  this suspect came to your attention?  Was there something

9  concerning or something that triggered you to begin your

10 investigation?

11 A    I received information that there was a suspicious

12 purchase that had occurred.  The intelligence was that two

13 Barrett .50 caliber firearms were purchased by an individual,

14 along with some of the additional intel and databases that had

15 been run, to indicate that this was a red flag.  And this is a

16 red flag.  It is not the be-all and end-all.  People purchase

17 Barrett .50 cals for their own personal possession, but the

18 purchase of repetitive firearms, especially these types of

19 firearms, when you buy more than one or you buy several at the

20 same time, it's just a red flag.  So I began an investigation.

21 Q    So what exactly -- when you say a Barrett .50 caliber,

22 for those of us that don't know anything about firearms or

23 that specific information about firearms, can you describe

24 what type of weapon this is and why it's something that might

25 just catch your attention.

Cunningham – Direct

1  A    So in specific, Barrett .50 cals, which is a .50 caliber

2  BMG, it fires a .50 caliber BMG round.  It's not only a very

3  large, very heavy, very powerful weapon, but it's extremely

4  expensive.  For many hunting enthusiasts, who are a lot of my

5  friends, your typical hunting rifle or your shotgun isn't

6  going to run into, you know, the 7, $8,000 range.

7      In addition, having this particular firearm is also very

8  expensive to shoot.  Depending on when you're looking at

9  ammunition prices, which can fluctuate based on certain

10 factors, these rounds typically go from, I've seen them from

11 about 6 to as high as 10, $12 per round to fire.  So it

12 becomes a --

13 Q    And when you say round, for those of us that again might

14 not be familiar with the vernacular, what does that mean, a

15 round?

16 A    So an ammunition round is how we look at the bullet, the

17 casing, the powder, the primer, the entire unit that you would

18 put into a firearm and shoot.  That's what we call a round.

19 Q    Okay.  So if I may just break it down, every time you

20 would shoot this particular firearm and a bullet comes out of

21 it, that costs typically around 6 or $7 for each, essentially

22 each bullet that's fired from the firearm?

23 A    Yes, depending on the price, at the time, of ammunition;

24 yes.

25 Q    And I hear you refer to it as a .50 BMG caliber.  Again,

1  for those of us that aren't familiar with that particular

2  terminology, what does that mean, a .50 BMG caliber?

3  A    So calibers of ammunition are, I guess you would say are

4  labeled based on certain physical aspects of a round of

5  ammunition or ammunition in general.  Calibers are typically

6  the diameter of the bullet, and then from there on it can

7  change or be labeled to specific calibers.  And when I say

8  calibers, you may have a 9 millimeter round, but that 9

9  millimeter round also comes in 9 millimeter short, 9

10 millimeter Luger, which is the most common that we know in

11 firearms and pistols here, and various other measurements.

12 It's the same thing with big caliber firearms.  Like .50

13 caliber may mean the diameter of the actual round, but the BMG

14 will be very specific, sometimes to that casing, sometimes to

15 that powder, length, things like that.

16 Q    So is a .50 caliber rifle in and of itself, is that

17 illegal in the United States?

18 A    No, it's not.

19 Q    How about having two of them?

20 A    No, not illegal.

21 Q    And you mentioned that each of these firearms cost about

22 7 to $8,000.  Did I understand that correctly?

23 A    Sure, roughly.

24 Q    And again is it illegal to spend that much money on

25 firearms?

Cunningham – Direct

1  A     No.

2  Q     At that point, did you know that a crime was committed?

3  A     No, I did not.

4  Q     Were you concerned?

5  A     Yes.

6  Q     And what did you -- what steps did you take to either

7  assuage or confirm the concerns you had about receiving this

8  information?

9  A     So I started just an investigation.  I wanted to look

10 into the background of the individual, just some of the basics

11 initially, like background, criminal history, income, where

12 this person lived, if this person was indeed like a resident

13 of Arizona, anything to kind of justify those type of

14 purchases.

15 Q     Did you find any reported income for this individual,

16 Isaias Delgado?

17 A     I did not.

18 Q     And for how long of a time period?

19 A     I did not find out that this individual or that

20 Mr. Delgado had made any type of income until I believe it was

21 maybe mid-2020, maybe the latter part of 2020.

22 Q     So when you began this investigation, do you recall

23 roughly about the month that you began this investigation?

24 A     I began this investigation toward the end of March, I

25 believe, of 2019.

Cunningham – Direct

1  Q    And as of March of 2019, could you find any records of

2  any reported income by Mr. Delgado?

3  A    I could not.

4  Q    And was that concerning to you given the types and prices

5  of these firearms?

6  A    It's another red flag.

7  Q    And so what other information did you try to gather, what

8  other steps did you take to determine whether or not a crime

9  had been committed?

10 A    So I started looking into, well, were there other

11 purchases similar to this, and I was able to locate additional

12 firearms purchases that Mr. Delgado had made or was in the

13 process of making.

14 Q    And can you just give us a brief overview of the types of

15 purchases, the dates, the frequencies, the firearms involved,

16 just, roughly speaking, amounts of money.

17 A    During that time, the end of March and the beginning part

18 of April, I believe I located roughly 12 other firearms that

19 he had purchased or was purchasing; and then I looked at the

20 amounts of what was being spent with these, and I believe that

21 those 12 were approximately 50-something thousand dollars.

22 Q    And that was all within that general time period?

23 A    Yes.

24 Q    And can you give us just a rough estimate of a range of

25 what time period we're talking about where you found these

Cunningham – Direct

1 approximately 12 firearms for over $50,000?

2 A    I can't speak to specifics without having my report and

3 information in front of me, but I believe that it was March

4 and April.  It could have been as far back as February 2019,

5 but I think the bulk of it was March and April.

6 Q    And we'll talk a little bit more in specifics in just a

7 moment, but I just want to give a bit of an overview of why

8 you conducted this or began this investigation.  But I'm

9 curious, how do you find out about these firearm purchases?

10 Is there some sort of database that ATF keeps every time a

11 firearm is bought or sold?

12 A    Actually, the federal government, Congress prevents ATF

13 from tracking purchases of firearms, but there are certain

14 protocols and regulations that firearms dealers must comply

15 with.  One of those is called a multiple sales report.  So if

16 an individual purchases two or more firearms within I believe

17 it's five days, they must list that as a report.

18      My intelligence resource specialist was able to assist me

19 in finding some of these other reports, and then I just began

20 doing a typical firearms investigation and started contacting

21 various dealers that I thought might be involved to see

22 whether Mr. Delgado had purchased additional firearms through

23 them.

24 Q    Okay.  And did you -- how is it that other licensed

25 firearms dealers would be able to tell you whether or not a

Cunningham – Direct

1    certain individual had bought or sold firearms through them?

2    A    So generally speaking, if I as a private individual go to

3    a licensed firearms dealer -- and you'll hear me use the term

4    FFL.  It's a federal firearms licensee.  So if I go to a

5    licensed dealer to buy a firearm, I'm required to fill out

6    what's called a Form 4473.  It's an over-the-counter transfer

7    form for firearms.  I put down my personal information.  I put

8    down certain questions, whether it's yes or no, such as have

9    you ever been convicted of a crime punishable by more than,

10   greater than or more than a year, answer those, sign it,

11   verify that my answers are true and correct.

12        The firearms licensee will then take my information, run

13   my information through NICS, which is called the National

14   Instant Criminal Background Check System that the FBI

15   operates, to make sure that I am able to legally possess that

16   firearm, that I'm not a convicted felon or such.  If NICS

17   comes back and says it's proceed and that there were no --

18   that I was not a convicted felon, then the firearms, the

19   licensee could transfer the firearm to me.

20   Q    And do all federally licensed firearms dealers have to

21   conduct that background check for every purchaser of a

22   firearm?

23   A    That is correct.

24   Q    Does every licensed firearms dealer have to keep records

25   of those sales for every purchase of a firearm that someone

Cunningham - Direct

1  makes?

2  A    Correct.  One of the regulations they have to comply with

3  is they have to maintain what comes into their shop and what

4  goes out of their shop as far as firearms.  We call that an

5  acquisition and disposition.

6  Q    Now as an ATF special agent, are you responsible for

7  personally regulating the firearms industry?  Do you inspect

8  licensed firearms dealers?

9  A    I do not.

10  Q    Are you familiar with the requirements that they comply

11  with when it comes to making sales of firearms to individuals?

12  A    I am with several of them.

13  Q    And with regard to firearm sales made by licensed

14  firearms dealers, you also mentioned that they must report

15  when an individual purchases more than one firearm within five

16  months -- I'm sorry, within five days, correct?

17  A    Correct.

18  Q    And is that a report that comes to the ATF?

19  A    It is.

20  Q    Did you receive any such reports in this case, the

21  multiple sales report?

22  A    So myself, not directly.  Those reports actually go to

23  our industry branch up in I believe it's Martinsburg, West

24  Virginia.  So as field agents, we're part of the criminal

25  investigation, we call it the criminal enforcement side.  But

Cunningham – Direct

1  we also have a regulatory side, and that's where -- that's the

2  side who works with gun dealers and things like that.  So

3  whenever they have somebody who does fit that category, makes

4  a multiple purchase, that form that they are required to fill

5  out then goes to our Martinsburg facility where they keep that

6  record.

7  Q    And did you also receive from these licensed firearms

8  dealers that you spoke with the paperwork that you were just

9  referring to that a purchaser must fill out when they purchase

10 a firearm?

11 A    Yes.  Once I make a request to the FFL, then they look

12 through their records and they provide me with copies of the

13 4473 and the multiple sale listing.

14 Q    And can you -- is the 4473, just so I make sure I

15 understand correctly, the report you -- or, I'm sorry, the

16 record that you mentioned that the purchaser fills out saying

17 whether or not they've been convicted of a felony offense and

18 things like that?

19 A    Yes.

20 Q    And did you obtain a number of copies of these 4473 forms

21 that had been filled out by the defendant in this case,

22 Mr. Delgado?

23 A    Over the course of my investigation, I located several of

24 them.

25 Q    And again, were these things that you had in some

1  database, or did you receive them by actually going and

2  contacting each of these licensed firearms dealers?

3  A    So like I said, we're not allowed to keep a gun database

4  of purchasers.  So what I did is I contacted the federal

5  licensed -- federal firearms licensees, made the request, and

6  they provided me with copies.

7  Q    Okay.  And did you find out that Mr. Delgado had been

8  purchasing firearms from a number of different licensed

9  firearms dealers throughout the Tucson area?

10  A    Yes.

11  Q    Did you determine that he had acquired a number of

12  firearms?

13  A    I did.

14  Q    And did you see any sort of pattern with the types of

15  firearms that he was acquiring?

16  A    So when looking at his purchases and starting to see the

17  different firearms that he was purchasing, I noticed on

18  several occasions there were multiples of the same make and

19  model of firearms.  They weren't all the same make and model,

20  but there were several of one make and model, several of

21  another make and model, and so on.  And that was another red

22  flag to me.

23  Q    Why is that a red flag?

24  A    Because when I see --

25        MR. ROACH:  Objection, relevance.

1           THE COURT:   Overruled.

2           THE WITNESS:   Because when I see several, when I see

3   several firearms that fit that type of a history, then it

4   raises a red flag to me that this person is engaging in

5   something illegal, and it's typically one of several, of a few

6   different offenses.

7           When you look at somebody who is purchasing multiples, in

8   my experience, somebody who is an enthusiast, somebody who is

9   a collector, they don't typically buy, for example, and this

10   is not in this case, but five Glock 19Ms or five Glock 43Xs.

11   People who are serious collectors, in my experience and in my

12   personal knowledge, typically collect, you know, one or two,

13   depending on what they are, one or two different types of

14   firearms.

15          So if you compare that to somebody who is really into car

16   collecting, you don't typically find somebody who buys, you

17   know, five Corvettes.   You typically have somebody who buys a

18   specific, you know, maybe a Mustang Bullet or a '69 Camaro,

19   and their collection is pretty varied.   When I see these types

20   of firearms and I see them purchased in the number that they

21   are purchased, then it raises another red flag.

22   BY MS. WOOLRIDGE:

23   Q     Now without more, would it be illegal just to buy

24   multiple firearms that are the same make and model?

25   A     No.

1  Q    Would it be illegal to do so if one did not intend to

2  keep the firearms but intended to turn around and sell them?

3  A    Correct, that would be illegal.

4  Q    And can you give us just a broad overview of -- you

5  mentioned, you talked about the types of purchases raising a

6  red flag and that there were several times purchases of

7  multiple of the same firearms.  Was there a specific type of

8  firearm that you saw being purchased, or was this anywhere

9  from, let's say, shotguns to revolvers to rifles, things like

10 that?

11 A    So I didn't see a wide variety of things.  I saw some

12 pistols.  I saw some bolt-action rifles.  I saw what was

13 probably the most concerning to me, if you will, large,

14 belt-fed firearms.

15 Q    Now what is a belt-fed firearm?

16 A    So if you're familiar with pistols, semiautomatic pistols

17 and even machine guns, you know that there is in certain

18 models, certain makes, you have a magazine.  A magazine holds

19 a certain number of rounds of ammunition in it.  A magazine is

20 placed in the firearm and that's what -- the firearm takes the

21 top round, loads it, and then when you pull the trigger,

22 simplistically, the gun fires, and it does that from that

23 magazine until the magazine is empty.

24      In a belt-fed, that's something you commonly see with

25 like military, where there is all these rounds linked together

Cunningham - Direct

1  in almost like a chain, you know, almost like a bicycle chain,

2  and those rounds are often carried.  For example, in the

3  military, you have somebody who actually carries those linked

4  rounds separately from the person who has got the firearm

5  because, theoretically, I guess, you could shoot as many times

6  from those belt-fed or that linked ammunition until you run

7  out of the ammunition that's linked.

8  Q    And again, were any of these firearms in and of

9  themselves illegal weapons?

10 A    No, they were not illegal.

11 Q    So at this point, you've learned about a lot of

12 purchases, you've learned about some red flags, and you've

13 learned about some certain concerning type of firearms.  How

14 do you determine whether -- first of all, did you suspect any

15 particular type of offense or were you concerned about any

16 particular type of offense going on?

17 A    There were a few that I was concerned with that I thought

18 this activity might fall under.

19 Q    And did that include the possible offense of engaging in

20 the business of dealing firearms without a license?

21 A    Yes.

22 Q    To further that investigation into that offense, did you

23 look to see whether this purchaser, Isaias Delgado, had a

24 license?

25 A    I did check.

Cunningham – Direct

1  Q     And what was the result of your inquiry?

2  A     I checked with our regulatory people, and there was no

3  record of him ever having an application processed or having

4  been granted at any point in the past a license.

5  Q     And so what is the distinction of or what is the purpose

6  of having a license, to be a licensed firearms dealer?

7  A     So people who obtain a federal firearms license to deal

8  in firearms, they have to comply with certain regulatory law

9  in engaging in that type of commerce.  Because these are, like

10 you had mentioned, deadly weapons, there are a number of

11 things that they have to follow in order to conduct their

12 business.

13 Q     And are you familiar with what some of those, just as a

14 broad overview, what those things are?

15 A     So federal firearms licensees must keep track of their

16 inventory.  They must list the firearms that come in, where

17 they come from, when they get them.  And then once those

18 firearms are sold, they also have to notate in their records

19 who those firearms are sold to, when those firearms were sold.

20       They also must keep track of the 4473s.  So those don't

21 come to ATF.  When a purchaser buys a firearm and fills and

22 completes a 4473, that's a record that must be kept by the FFL

23 in their records, and they must maintain those records

24 diligently.  So they must -- they're charged with or they must

25 follow getting accurate information, making sure that that

Cunningham - Direct

1   buyer is indeed a legal buyer, and they keep -- they obtain

2   the necessary identification or documents from that purchaser,

3   and then they keep that.

4   Q    And do they have to report their sales and report the

5   income from their sales?

6   A    They do that not to us necessarily, but, yes, they must

7   have records of all of that.

8   Q    Is it considered essentially business income, that they

9   also have to comply with normal tax regulations?

10  A    Yes.

11  Q    And you mentioned that in this instance your suspect,

12  Isaias Delgado, did not have any such license; is that

13  correct?

14  A    That is correct.

15  Q    Now what about a person that just likes firearms and buys

16  a lot of firearms and at some point says, you know what, I

17  don't want this firearm anymore?  Do they have to go get a

18  license to sell it?

19  A    They do not.

20  Q    So then why were you -- I mean, here you have a lot of

21  firearm sales, but you said that you were worried about a

22  potential criminal offense.  What's the distinction here?

23  A    So when an individual devotes time, attention, and effort

24  into acquiring firearms and then disposing of them, with the

25  principal objective of livelihood or profit, that's when it

Cunningham - Direct

1  bleeds over into an illegal activity.  We already have a legal

2  activity, and it's called being licensed as a dealer in which

3  if you are -- if you engage in that so repetitively that you

4  are a dealer and you can get a license from or apply to have a

5  license from ATF to deal in those firearms.

6  Q    But what if you already have a job?  Do you have to quit

7  that job so then you can become a firearms dealer?  I mean,

8  that doesn't seem very fair.

9         MR. ROACH:  Objection, Your Honor, opinion and legal

10  testimony.

11         THE COURT:  Restate the question, please.

12  BY MS. WOOLRIDGE:

13  Q    Does getting a firearms license, does that require that

14  that be your only source of income or your only business?

15  A    Oh, no.  We have several people who have home-based FFLs.

16  Q    And can you describe what you mean by that.

17  A    What I mean by home-based FFLs, it doesn't require you to

18  have a brick-and-mortar store where it's open to the public

19  for you to come in and out and purchase firearms.

20  Q    Are you aware of FFLs that also have a different

21  full-time job but just perhaps make additional income on the

22  side, if you will, by buying and selling firearms?

23  A    Yes.  I have a very good acquaintance who does exactly

24  that.

25  Q    And does that individual still conduct a different job, a

1  full-time job, aside from selling firearms?

2  A    He has a full-time job and he has a license to deal in

3  firearms, which he does on the side and on the weekends.

4  Q    Okay.  And is there some sort of percentage, for

5  instance, if you obtain, let's say, 10 percent or 50 percent

6  or 90 percent of your income from firearms sales, that that

7  designates whether or not you need a license?

8       MR. ROACH:  Objection, Your Honor, opinion and legal

9  testimony.

10       THE COURT:  Ms. Woolridge.

11       MS. WOOLRIDGE:  Your Honor, it's asking the agent as

12  to her knowledge of what is the regulation or what the law

13  requires with regard to this area that I believe is in her,

14  well within her experience and ability to investigate and

15  testify.

16       THE COURT:  Would you restate the question in that

17  manner then, please.

18  BY MS. WOOLRIDGE:

19  Q    Ma'am, you mentioned your knowledge with regard to the

20  laws that regulate purchases and sales of firearms or firearms

21  dealing.  Is there any sort of percentage of income or amount

22  of income that one must make in order to obtain a firearms

23  license?

24  A    No.

25  Q    So at this point, do you recall about how many different

1  4473 forms you've obtained from the licensed firearms dealers

2  documenting purchases that Mr. Delgado had made from them?

3  A    I don't know an exact number, but I would -- I believe

4  30-something.

5  Q    And did you find any other, through your investigative

6  efforts, find any other documentary evidence of his firearms

7  purchases or sales?

8  A    I'm sorry.  Could you ask that again.

9  Q    Through your investigation, did you acquire any other

10  documentary evidence either suggesting or confirming firearms

11  purchases or sales that he had made?

12  A    I did.

13  Q    Okay.  Can you describe what type of evidence or what

14  type of documentation you found.

15  A    In many of those purchases, I was able to find receipts

16  of his actual purchase.  I also searched through records of

17  Armslist.com and Gunbroker.com.

18  Q    I want to talk about Armslist.com and Gunbroker.com in

19  particular.  But before we get into that, generally did you

20  find that in addition to what we talked about with a

21  brick-and-mortar gun store that the defendant had also been

22  making purchases from other licensed firearms dealers using

23  the Internet or online purchases?

24  A    Yes.

25  Q    Can you explain to us how that works.  I mean, can I

1  just, you know, hop online right now and order a bunch of guns

2  to be shipped to my house?

3  A    Not to be shipped to your house.  So now with technology

4  and the age of technology, there's a lot of e-commerce out

5  there, and one of the biggest e-commerce stores out there for

6  firearms is Gunbroker.com.  What that is, it's almost like an

7  eBay.  If I wanted to find a firearm and I wanted to look

8  online for one, I would go there, see whether there was a

9  listing or a posting advertising what it is.  I could contact

10 that seller through Gunbroker, negotiate or talk to them, find

11 out when, where, what and all the details, and if I made the

12 decision to purchase that firearm, what they would then do is

13 they would transfer it to a local FFL.

14      If I lived in Arizona, if I was an Arizona resident, it

15 would have to be an Arizona FFL.  And for a small fee, they

16 would transfer that firearm to me.  As a purchaser, that

17 requires me to fill out the 4473, over-the-counter record of

18 firearm purchase, with the local FFL, who then has to maintain

19 that record, go through a background check, and if I cleared

20 and there was a proceed issued, then I could take possession

21 of that firearm.

22 Q    And did you find out that Isaias Delgado had made a

23 number of firearm purchases online in this manner, where he

24 ordered firearms online and then the licensed firearms dealer

25 from whom he bought them would ship it to a dealer here in

1  Tucson who for a fee would then transfer it to Mr. Delgado?

2  A    I did.

3  Q    Did you obtain records, either receipts or order forms or

4  things like that, to document those purchases?

5  A    Yes.

6  Q    And did Mr. Delgado then still have to go into the

7  physical FFL store here in Tucson to fill out the Form 4473?

8  A    That is correct.

9  Q    And did you obtain those forms as well?

10  A    I did.

11  Q    And as you were continuing to find out about more of

12  these purchases, did the number of firearms that you learned

13  about, did that number expand?

14  A    It did.

15  Q    Did the amount that he was purchasing on firearms also

16  expand -- that he was spending, I'm sorry, on firearms also

17  expand?

18  A    It did.

19  Q    And did you find out that he was also paying a lot

20  of additional costs associated with these purchases, such as

21  taxes, shipping fees, credit card fees, things like that?

22  A    That is correct.

23  Q    Did you obtain documentation of all these costs, or at

24  least in every instance where you could, did you request the

25  documentation to verify that?

Cunningham – Direct

1  A    Yes, I did.

2  Q    Can you give us -- again, we'll get into more specifics

3  later.  But can you give us kind of an overview of what we're

4  talking about now, you know, about how many firearms, kind of

5  just rough estimates of amounts, types of firearms, things

6  like that?

7  A    So I was able to locate 40 firearm purchases or orders

8  that Mr. Delgado made in a relatively short period of time.

9  When I compiled this list and I started to look at it, I

10 realized that several of these were online purchases.  So I

11 was able to reach out to the original seller, which was, these

12 were sellers located all over the United States.  In many

13 cases, I was able to obtain the original purchase information

14 from them, and then when they transferred it to a local FFL

15 here, I was able to contact that FFL and obtain the 4473.

16      And I would take that information from the original

17 seller and the transferor, which is the local-based FFL, and

18 determine, one, the firearm make and model, typically the

19 amount of price that they had paid, that he had paid, any

20 associated fees, and a lot of times any firearms-related

21 items, and then I was able to compile kind of a chart to keep

22 track of this.

23      I was able to locate firearms purchases back from I think

24 May 25th of 2019, and then I had a lone purchase that I was

25 able to locate in May, I believe -- I'm sorry, May 25th, 2018,

Cunningham - Direct

1   and then a lone purchase that was May, I believe it was May of

2   2017.  And those are just known firearms purchases that I was

3   able to find.

4   Q    And you said that the bulk of the firearms purchases

5   began on May 25th -- I just want to make sure I got the year

6   correctly -- May 25th of 2018, correct?

7   A    Yes, that's correct.

8   Q    And did they continue more or less until the time you

9   began your investigation in March of 2019?

10  A    Yes, they did.

11  Q    And you mentioned there was a lone firearm purchase, and

12  I just want to make sure.  Are we talking loan, L-O-A-N, like

13  a loan on consignment, or lone, L-O-N-E, like a sole, single

14  firearm purchase back in 2017?

15  A    L-O-N-E, a single firearm purchase back in 2017.

16  Q    Did most of these purchases start, as far as just their

17  frequency and recurrence, in approximately May of 2018?

18  A    Yes.

19  Q    And again do you recall if there was any sort of just

20  pattern or kind of just a trend or anything that you noticed

21  with regard to the type of firearms?

22  A    So when I compiled my list, I started looking and then I

23  saw that there were multiple, there were repetitive purchases

24  of several different firearms.  So, for example, there was a

25  Savage rifle.  There were several purchases of a Savage; Smith

Cunningham – Direct

1   & Wesson, 9 and .40 caliber, several purchases of that;

2   several purchases of Barrett .50 caliber firearms; several

3   purchases of AR platforms.  I think there were some AK-47s in

4   there, but that's -- when I started looking at those patterns,

5   then I realized that these were other red flags.

6   Q    And what were some of the red flags?  And explain to us

7   why they were concerning to you.

8   A    It was concerning --

9          MR. ROACH:  Objection, relevance.

10          THE COURT:  Overruled.

11          THE WITNESS:  It was concerning to me because there

12   were not just a very wide variation in the type of firearms

13   that Mr. Delgado was purchasing.  When I see collectors and I

14   talk to my friends who are collectors --

15          MR. ROACH:  Objection to opinion testimony, Your

16   Honor.

17          THE COURT:  Sustained.

18   BY MS. WOOLRIDGE:

19   Q    Do you have experience in firearms collection, either

20   just on a personal level or in investigation?

21   A    Both.

22   Q    And how did this -- just talking about the patterns that

23   you saw in this particular case, the purchase history, was

24   that similar to such behavior, from your experience, or were

25   there differences?

1          MR. ROACH:  Same objection, Your Honor, opinion,

2    expert testimony.

3          THE COURT:  Sustained.  You need more foundation.

4    BY MS. WOOLRIDGE:

5    Q    Can you tell us specifically about what type of

6    experience you have when it comes to firearms collection.

7    A    I am a gun enthusiast.  I grew up in Texas.  Most of my

8    friends and associates and people I work with are gun

9    enthusiasts.  I also go down and teach, at our academy,

10   firearms under the GCA and the NFA.

11   Q    And I'm sorry.  For those of us who aren't familiar with

12   those acronyms?

13   A    I'm sorry.  The GCA is the -- oh, my gosh -- the Gun

14   Control Act; and the NFA is the National Firearms Act.  NFA is

15   what typically covers firearms, specialty firearms, such as

16   short-barreled rifles, short-barreled shotguns, machine guns,

17   silencers, grenades, things like that.

18        The GCA is what we are talking about here.  So it doesn't

19   prohibit the purchase of firearms, but it regulates who can

20   and cannot have firearms.  Plus it does provide for certain

21   penalties for FFLs who fail to comply with their

22   responsibilities and regulations.

23   Q    So are you familiar with the GCA, or Gun Control Act,

24   both as a special agent conducting investigations and as

25   someone who instructs other agents about the parameters and

Cunningham – Direct

1    what is legal and not legal under the GCA?

2    A    That is correct.

3    Q    And how about then with regard -- you briefly talked

4    about yourself being a gun enthusiast and having many

5    associates who are gun enthusiasts.  In that, are you familiar

6    with both your own behavior and their behavior when it comes

7    to firearms?

8    A    Yes.

9    Q    Are you also familiar with what the GCA permits when it

10   comes to, for instance, the activities of a gun enthusiast?

11   A    Yes.

12   Q    Is there anything illegal about amassing a collection of

13   a large number of firearms?

14   A    No.

15   Q    And are you familiar with, just from your personal

16   experience, individuals who amass as a hobby or a collection a

17   large number of firearms?

18   A    I'm sorry.  What was that, am I familiar?

19   Q    Are you familiar, have encountered in your own personal

20   experience individuals who lawfully amass large quantities of

21   firearms as a collection or as a hobby?

22   A    Yes.

23   Q    And have you also, in a professional capacity, have you

24   investigated incidences which involve, end up involving lawful

25   activity where individuals are amassing large amounts of

Cunningham – Direct

1  firearms?

2  A    Yes.

3  Q    And was there anything in this particular purchase

4  history that stood out for you, based on your knowledge of the

5  Gun Control Act in addition to your personal experience both

6  learning about, teaching, and enforcing the parameters of the

7  Gun Control Act?

8           THE COURT:  Just a moment.

9           MR. ROACH:  Objection, Your Honor, same objection.

10  It's expert testimony.  Not enough foundation has been laid.

11          THE COURT:  Why don't we go ahead and take our

12  afternoon break at this time so that we can address this legal

13  issue.  So we'll take a 15-minute break.  I'll excuse the

14  jurors.

15     I'm going to remind you of the admonition:  Don't talk

16  about the case, don't do any independent investigation, keep

17  an open mind.

18     And we'll resume in 15 minutes.  If you'll wait in the

19  jury room, Ms. Coronado will come and get you.  Thank you.

20        (Jury out, 2:18 p.m.)

21          THE COURT:  Special Agent, you can step down.  Thank

22  you.

23          THE WITNESS:  Thank you.

24          THE COURT:  So I think the issue, Ms. Woolridge, is

25  to lay the foundation or basis for the conclusion.  I don't

Cunningham – Direct

1    have a sense of how much of this is anecdotal or kind of what
2    volume that we're talking about, so I sustained the objection
3    because I've not seen the basis for a conclusion as to why
4    this would be a red flag based on the experience that's been
5    described.
6           MS. WOOLRIDGE:  Your Honor, I think that -- first of
7    all, I do understand a concern for opinion testimony.  I
8    certainly, I don't believe I worded the question and I
9    certainly don't intend to elicit an opinion of, you know,
10   whether this purchase activity is that of a lawful collection
11   or hobby versus unlawful dealing in firearms.  However, I
12   think that the agent is qualified and experienced to testify
13   that the type of purchase behaviors here were concerning to
14   her because they are not typical of both in her anecdotal
15   experience, which she has observed and learned of and
16   experienced with regard to lawful hobby and collection
17   activity, as well as through her familiarity of the Gun
18   Control Act, that such behavior, the purchase behavior in this
19   case is indicative of violations of the Gun Control Act, as
20   opposed to what she has been experienced and knowledgeable of
21   as lawful behavior.  I do think she has the experience and
22   knowledge to make that not ultimate conclusion but certainly
23   to explain for the jurors how there are things here that
24   indicate a different type of behavior.
25           THE COURT:  What's the answer that you're expecting?

Cunningham – Direct

1          MS. WOOLRIDGE:  That the number of the purchases, the

2     frequency of the purchases, and the fact that many of these

3     purchases involve identical, multiple identical weapons over

4     the course of a very short period of time are not typical

5     collection, not typical collection activity, as well as the

6     type of firearms are not typical collector items, based on her

7     experience.

8          THE COURT:  All right.  And what's the type of

9     professional experience that supports that conclusion?  How

10    many cases are we talking about?

11         MS. WOOLRIDGE:  I would have to ask the witness as

12    far as the number of cases.

13         THE COURT:  I mean, if there were one or two cases,

14    you can see where I would have concern --

15         MS. WOOLRIDGE:  I understand.

16         THE COURT:  -- that that would be a sufficient basis

17    to reach that conclusion.

18         So at this point, I've sustained the objection.  Let's

19    resume in ten minutes, and if there's any further discussion

20    about this objection, then I'll hear it at that time.

21         MS. WOOLRIDGE:  Thank you, Your Honor.

22         THE COURT:  All right.  Thank you.

23         (Court recessed from 2:22 p.m. to 2:39 p.m.)

24         THE CLERK:  All right.  We're back on the record.

25    Counsel is present, Mr. Delgado.

1    So I was looking over the transcript of the questions

2  that we've just been discussing, and it's not exactly clear to

3  me exactly what's being asked.  I guess my concern is what's

4  being asked is if this conduct looks like it's a crime.  Is

5  that what you're asking, Ms. Woolridge?

6         MS. WOOLRIDGE:  No, Your Honor.  And I'm sorry.  I

7  tried to make my response to the objection, I tried to

8  distinguish that.  I'm certainly not asking for her opinion of

9  whether the conduct looks like a crime but how this conduct

10 differs from what, in her training, experience, and knowledge

11 of the law, would be considered collection or hobby activity.

12        THE COURT:  All right.  And Mr. Roach.

13        MR. ROACH:  How this conduct differs from what, in

14 her opinion, would be a collector's activity, in other words,

15 is this a crime?  Is this not a collector, therefore a crime?

16    One, this witness was not disclosed as an expert.  Two,

17 she has to be an expert through reliable methods reliably

18 applied.  So, for instance, I could go to gun sales and I

19 could say I watched 10,000 gun sales, and I never saw a legal

20 gun sale to a man in a blue blazer with a black vest, so

21 therefore I must assume that this is illegal behavior because

22 I never saw that.

23    What she's testified is, I have friends in Texas who

24 collect guns, and even in a professional aspect I've seen gun

25 collections.  Just anecdotal, that doesn't look like

Cunningham - Direct

1  collections that I have seen because the conclusion is

2  therefore this does not -- is not a collection, as far as her

3  as an agent of the ATF is concerned, and therefore he is a

4  criminal.

5      And it goes to other things that we had done in pretrial

6  motions where, for instance, Ms. Woolridge asked now -- or the

7  answer to a question about what was your opinion about seeing

8  these types of guns, pistols, bolt-action, and loose-belt

9  firearms.  Well, there are a few offenses that could have been

10  involved with those kind of guns, again getting close to what

11  I talked about at the beginning of trying to infer to this

12  jury that there's different kinds of crimes going on.  So

13  that's, one, not disclosed as an expert; two, not appropriate

14  expert testimony because there's no proper foundation; and,

15  three, trying to imply other criminal activity that has not

16  been indicted.

17      So for all these reasons, this witness should not be able

18  to say, well, I have seen a bunch of different collections and

19  this is a red flag to me.  She keeps on testifying about a red

20  flag.  Red flags don't matter.  It doesn't matter what is a

21  red flag to her.  What matters is what is more or less likely

22  to prove one of the elements in this case.  So her opinion

23  about what constitutes an expert or a collection for a gun

24  expert, she doesn't have a basis to make that; and even if she

25  did, her opinion doesn't matter.  So for all those reasons, I

1  object to this line of questioning.

2         THE COURT:  All right.  Ms. Woolridge asked, as she

3  questioned Special Agent Cunningham, about the investigation

4  and why she took certain steps that she did, and Special Agent

5  Cunningham mentioned that there were some red flags that

6  caused her to take further steps and to conduct further

7  investigation.  And I don't see a problem with that type of

8  testimony, as in describing what happened and why.  And Ms.

9  Woolridge asked Special Agent Cunningham many times if what

10  she saw was in and of itself illegal, and Special Agent

11  Cunningham said that it was not.  So I don't think there's a

12  problem with that type of testimony.

13     I do think there's a problem to the extent that there's a

14  question that's now asking for Special Agent Cunningham to say

15  whether or not what she has seen is a collection or not.  You

16  know, there is a question about whether there's a sufficient

17  basis for it, and that is really the issue that the jurors are

18  going to decide based on argument which is being set up during

19  this testimony as to what types of guns, how much they cost,

20  whether they were distinct or not distinct.

21     So I don't see a problem with the questions that have

22  been asked so far except for the last set of questions, which

23  appeared to be asking for Special Agent Cunningham's opinion

24  as to whether or not Mr. Delgado's purchases were a collection

25  or not.

Cunningham – Direct

1      Are we ready to proceed, counsel?

2          MS. WOOLRIDGE:  Yes, Your Honor.  And as I move on to

3  the next subject of inquiry, I believe that the parties have

4  an agreement with regard to foundation for a number of

5  exhibits, to include the different forms.  I just wanted to at

6  least make sure that it wouldn't be an issue, but I am going

7  to present a number of documents to Agent Cunningham, and I

8  will move for their admission kind of in bulk so that she can

9  refer to them.

10         MR. ROACH:  Yes, Judge.  We have discussed things.

11  We are not going to have objections to foundational issues for

12  forms, tax records.  I think those are the two major areas

13  that we talked about.

14         THE COURT:  All right.

15         MR. ROACH:  So all of the FFL forms I do not object

16  to.  Oh, and bank records, I'm not going to object to

17  foundational introduction of those items.

18         THE COURT:  All right.  I'm going to ask that the

19  jurors be brought in.

20      And, Special Agent Cunningham, if you'll take the stand.

21  Thank you.

22      (Jury in, 2:48 p.m.)

23         THE COURT:  All right.  We're back on the record.

24  The jury is present, counsel, and Mr. Delgado.

25      Ms. Woolridge.

Cunningham – Direct

1    MS. WOOLRIDGE:  Thank you, Your Honor.

2  BY MS. WOOLRIDGE:

3  Q    Ma'am, I believe before we took our break, we were

4  speaking about some of the documentation that you obtained to

5  confirm and get additional details about the firearm purchases

6  from Mr. Delgado.  Do you recall that testimony?

7  A    Correct.  Yes, I do.

8  Q    And did you maintain copies of those, particularly the

9  4473 forms that you obtained documenting these purchases?

10  A    Yes.

11    MS. WOOLRIDGE:  May I approach the witness, Your

12  Honor?

13    THE COURT:  You may.

14  BY MS. WOOLRIDGE:

15  Q    Ma'am, I have just handed you a number of exhibits,

16  specifically Exhibit Numbers 21 through 39.  If I could ask

17  you just to take a moment and just flip through those until

18  you are able to determine whether or not you recognize them.

19  Do you recognize those documents?

20  A    I do.

21  Q    And what do you recognize them to be?

22  A    These are copies of the documentation I obtained during

23  the course of my investigation.

24  Q    And specifically what type of documentation?

25  A    These are copies of the ATF 4473, the firearms

1  transaction record that I spoke about earlier, as well as

2  some additional documentation, such as receipts and purchase

3  information.

4  Q    And do all of those documents confirm and record the

5  purchases made by Mr. Delgado of firearms that he bought from

6  licensed dealers within the time frame we've been referring

7  to?

8  A    They do.

9         MS. WOOLRIDGE:  By stipulation of the parties, the

10  government moves to admit Exhibits 21 through 39.

11         MR. ROACH:  No objection.

12         THE COURT:  Exhibits 21 through 39 are admitted.

13  BY MS. WOOLRIDGE:

14  Q    Now, ma'am, I don't want to go through every one of these

15  several forms in detail.  Did you use the information in those

16  forms to help you create a compilation of all of the different

17  purchases you were able to discover in this case?

18  A    I did.

19  Q    Did you also rely on some additional documentation to

20  assist you with the information in the purchase compilation?

21  A    I did.

22  Q    You mentioned that you also obtained things from

23  different firearms dealers from whom the defendant purchased

24  firearms, including things like invoices and receipts; is that

25  correct?

Cunningham – Direct

```
 1   A     Yes.

 2   Q     Did you maintain copies of those in your file as well?

 3   A     I did.

 4         MS. WOOLRIDGE:  May I approach the witness again,

 5   Your Honor?

 6         THE COURT:  You may.

 7   BY MS. WOOLRIDGE:

 8   Q     Ma'am, I've just handed you Exhibits 43 through 47.  If

 9   you wouldn't mind taking a moment to go through those

10   documents.  And do you recognize those documents as well?

11   A     I did.

12   Q     And what do you recognize them to be?

13   A     These are additional documentation.  This is additional

14   documentation of firearms that he had purchased, Mr. Delgado

15   had purchased.

16   Q     And did you use this information to compile your summary

17   of all of his purchases?

18   A     I did.

19         MS. WOOLRIDGE:  And also upon -- I'm sorry.  Upon

20   stipulation of the parties, Your Honor, the government moves

21   to admit Exhibits 43 to 47.

22         MR. ROACH:  No objection, Your Honor.

23         THE COURT:  43 through 47 are admitted.

24   BY MS. WOOLRIDGE:

25   Q     Through the course of your investigation, did you
```

Cunningham – Direct

1  receive additional information regarding two of the firearms

2  that you confirmed the defendant had purchased?

3  A    I did.

4  Q    And can you just in a very brief summary tell us what

5  type of information that was.

6  A    The two firearms were recovered by -- outside of Tucson

7  in two separate instances.

8  Q    And did both of those recoveries take place outside of

9  the state of Arizona?

10 A    They did.

11 Q    Were both of these recoveries involving possession of the

12 firearms by two separate individuals?

13 A    They did.

14 Q    And were both of those individuals, did either of them

15 bear any apparent relationship to the defendant?

16 A    They did not.

17 Q    Were you able to confirm through these documentations

18 that with regard to both of these firearms that were recovered

19 outside the state of Arizona that they had previously been

20 purchased by the defendant?

21 A    That is correct.

22 Q    And did you include that information in your

23 documentation?

24 A    I did.

25 Q    Did you create -- with regard to that documentation, did

1    you create a summary chart that essentially reflects all of

2    the information in the various documents that are in front of

3    you as well as additional documentation or things that you

4    learned through your investigation with regard to the firearms

5    purchased by the defendant?

6    A    Yes.

7    Q    I'm going to show you on the screen, if we can -- I'm

8    going to show you -- right now I'm just showing you the first

9    of a four-page document, and I'll ask you if you recognize

10   from the first page, do you recognize what this document is?

11   A    I do.

12   Q    And what is -- can you briefly describe -- we can't see

13   it yet, but can you describe to us what this document is.

14   A    So I made this table or chart based on the information

15   contained in the documents that I just reviewed, these

16   exhibits, and I compiled them in a way that I could track them

17   chronologically.

18   Q    And does this document chronologically track each of the

19   firearm purchases that you became aware of that were made by

20   Isaias Delgado as reflected in all of the documentation that

21   you did obtain?

22   A    Yes.  These were the ones that I discovered.

23   Q    Did you ensure that all of the documentation in here, all

24   of the various items of data are accurate as reflected in the

25   documents that we've just referred to?

1  A    It is.

2           MS. WOOLRIDGE:  Your Honor, move to admit and publish

3  Exhibit 77.

4           MR. ROACH:  No objection, Your Honor.

5           THE COURT:  77 is admitted.

6  BY MS. WOOLRIDGE:

7  Q    So, ma'am, rather than going through all of the different

8  forms that we were just speaking of, I would like to instead

9  go through this document that kind of in a more concise manner

10 sets forth these purchases.

11      So if you don't mind just taking us through, starting

12 with Item No. 1, taking us through these various firearms that

13 the defendant purchased that you were able to discover through

14 the course of your investigation.

15 A    Sure.  So Item 1 is the one that I had spoken about

16 earlier was kind of the lone purchase in 2017.  I was able to

17 find out that the defendant had, or Mr. Delgado had purchased

18 several of these firearms on these dates.

19      These dates are the purchase, unless they're notated

20 otherwise, on the left-hand column.  The item that he

21 purchased is in the center, which are the firearms.  The

22 seller or the FFL, transferor FFL, or both, are listed under

23 the third column.  The fourth column are where any of these

24 firearms were recovered, if they were recovered.  In the next

25 column is the purchase price that was either on the receipt or

Cunningham – Direct

1  that I could verify was listed for sale and bought.  And then

2  in the notes, it's any additional related information to those

3  specific purchases.

4  Q    Okay.  And so you said something that caught my

5  attention.  You said that either the seller FFL or the

6  transfer FFL in that third column from the left there.  What

7  did you mean by that?

8  A    So we had discussed about some online purchases and

9  having to send those to a local FFL for the transfer.  If

10  there was an online purchase that I was able to locate where

11  the transfer occurred here locally at the FFL, it will note

12  both of those names, so it will list the seller FFL as well as

13  the transferor FFL.

14  Q    And so you mentioned that the first item there, we'll

15  just start by way of example, was the kind of outlier purchase

16  that you were aware of that happened in 2017, correct?

17  A    Correct.

18  Q    And is SNG, who is listed as the FFL seller, is that an

19  FFL or licensed firearms dealer here in Tucson?

20  A    It is.

21  Q    And just for those that are not familiar with what a

22  Century Model RAS 7.62 caliber rifle might be, can you just

23  very, very briefly describe this type of weapon.

24  A    This would be your AK-type rifle.

25  Q    And again for those of us who aren't really familiar with

1  the vernacular, what's an AK rifle?

2  A    An AK rifle is probably what you see a lot in movies,

3  especially if it's movies that are taking place outside of the

4  United States.  It's a rifle that, and I don't want to go into

5  the weeds, but I think originally was called Automatica

6  Kalashnikov or Kalashnikova.  It's a Russian-designed rifle.

7  These rifles are extremely popular, and there are probably

8  millions of them that exist in the world to this day.

9       Many of these were imported into the United States.

10  There are also parts kits.  And I won't go into the whole

11  importation part of it, but it's a very popular rifle.  And

12  the specific ammunition or round that it fires is a 7.62-by-28

13  millimeter round.  That's a pretty economical round.  These

14  days, most of them now are steel-cased ammunition, which I

15  think further reduces the cost, and just very popular.

16  Q    Moving on, I see in Items 2 through 5 that these are all

17  Savage Arms Model 93 firearms?

18  A    Correct.

19  Q    And a .22 mag rifle.  What does that mean?

20  A    So that is a caliber of ammunition that it shoots.  It's

21  a .22 magnum.  It's -- these right here, I think I may have

22  mentioned this earlier, is -- you know, one of the things that

23  I notice is where you have an example of a multiple purchase

24  of the same make and model.

25  Q    So am I correct in interpreting with the purchase dates

Cunningham - Direct

1  we have one of these Savage Arms Model 93s that was purchased

2  on May 25th, two on May 31st, and one on July 27th of

3  essentially the same rifle?

4  A    Yes.  And if memory serves me correctly, I believe that

5  one or two were purchased initially with a purchase and

6  advance payment of a third.

7  Q    And is Second Amendment also a licensed firearms dealer

8  here in Tucson?

9  A    Yes.

10 Q    Then moving on to Item No. 6, can you describe that type.

11 I see it's another 7.62 caliber rifle, so is that something

12 that we would call essentially an AK-47 type rifle as well?

13 A    That is correct.

14 Q    And what about the make and model?  Anything, I guess --

15 and I'm sorry.  I should be referring to 6 and 7.

16 A    So again it's another multiple purchase of the same type

17 of rifle.  And when we say AK type, it's because there are

18 several variations and model names and importers and, to a

19 certain extent, manufacturers.  I think a large number of

20 these are of Chinese origin and Russian origin.  And so we use

21 that term, or I use that term to describe what's essentially

22 the same type of firearm, regardless of who made it.

23 Q    And were both of these Romarm Model WASR-10 AK-type

24 rifles bought on the same date of October 12th of 2018?

25 A    That is correct.

1  Q    And I see something as far as the recovery date.  Is

2  that -- is this one of the recovered firearms that was

3  recovered outside of the state of Arizona at some later date?

4  A    Yes.  You can tell from the purchase date of October the

5  12th of 2018 that this was recovered and traced back on June

6  the 20th of 2019 outside of the state of Arizona.

7  Q    So June 20th, 2019 is the date it was found in someone

8  else's possession outside of Arizona?

9  A    It was, or it could be the trace date.  I can't recall

10 off the top of my head.

11 Q    And when you say a trace, for those of us who are

12 unfamiliar with that term, what does that mean?

13 A    So tracing firearms is something that ATF provides to

14 local law enforcement.  For example, if a police department in

15 Oakland, California finds a firearm, they can run that firearm

16 in our eTrace system or they can have us do it, and what that

17 will do is we will conduct the research kind of on the back

18 end by contacting the manufacturer, distributor, wholesaler,

19 and ultimately the retailer.

20     We talked about those 4473 forms being kept by the

21 dealers, the FFLs, the federal firearms licensees, as part of

22 the regulated activity that they engage in.  And then they

23 would go through their records and pull that information,

24 provide it to our tracing center.  Our tracing center puts

25 that into a document and then sends it back to the trace

Cunningham – Direct

1  requester.

2  Q    And so can a trace tell you everyone who's ever possessed

3  a firearm?

4  A    No.

5  Q    Can it tell you the last person who's possessed a

6  firearm?

7  A    No.

8  Q    Why is that?

9  A    Because of the limitations that we have in place from

10  Congress on what we can and can't keep on the information, as

11  far as not having a nationwide database of firearms by owners

12  or purchasers.  What that does is it only provides us

13  information that the FFL, the retail FFL had in that 4473 for

14  that purchaser.  So, for example, in traces, you're going to

15  get the first purchaser who bought that gun as a retail sale.

16  Q    What if that person who bought it as a retail sale turned

17  around and resold it and that person wasn't a licensed

18  firearms dealer?  Would there be any sort of record kept of

19  that?

20  A    No.

21  Q    And so what does this trace tell you about who -- about

22  the purchase history of this firearm?

23  A    I'm sorry.  Can you say that one more time.

24  Q    What does this trace tell you about the purchase of this

25  firearm?

Cunningham - Direct

1  A     So this trace tells me who was the first retail

2  purchaser, when this firearm was actually put into, I guess

3  you would say, the stream of commerce from the manufacturer to

4  a wholesaler or distributor and ultimately to a retailer and

5  then the first retail purchaser.

6        There's data on this form, and one of the things that I

7  extracted from that form was that this recovery date was on

8  June the 20th of 2019, which tells me that this firearm has

9  transferred hands from the original retail purchaser in a

10 relatively short amount of time.

11 Q     And just to clarify, was Mr. Delgado that original retail

12 purchaser?

13 A     He was.

14 Q     And how about moving on from the two Romarm Model

15 WASR-10s, one of which was recovered?  What was the next type

16 of firearm that we see here?

17 A     You mean after No. 7?

18 Q     Correct.

19 A     Okay.  So there's a Beretta pistol that was purchased

20 back on October the 26th, 2018 by Mr. Delgado from SNG, or

21 Smoke & Glory, a local Tucson-based FFL.

22 Q     And that was on October 26th?

23 A     Correct.

24 Q     And did you then see also two additional pistols

25 purchased the following day?

Cunningham – Direct

1  A      I did.

2  Q      And what type of pistols are those?

3  A      So there's a Smith & Wesson pistol again with Smoke &

4  Glory or SNG, and then on the same day he went to a different

5  FFL at Second Amendment, which is also a Tucson-based FFL, and

6  purchased a Kimber .380 pistol -- .380 is the caliber.

7  Q      And then in December, do you have another kind of

8  multiple purchase on the same date?

9  A      I do.  So the documentation I received here, it was

10 Mr. Delgado had made a purchase of three Smith & Wesson SD

11 pistols.  Two of them were in a 9 millimeter caliber.  One was

12 in a .40 caliber.

13 Q      And was that all on December 17th of 2018?

14 A      That is correct.  It was what we call a multiple

15 purchase.

16 Q      And a few days later, do you see another one, another of

17 those Romarm WASR-10s purchased?

18 A      I do.  On December 20th, 2018, Mr. Delgado purchased an

19 AK-47 type rifle from SNG again on that date.

20 Q      And is that the same make and model firearm as we see up

21 in Items 6 and 7?

22 A      Yes.

23 Q      And then how about Item 15?

24 A      Item 15 was -- now we're going into February of 2019 --

25 was another Savage rifle, this time from Second Amendment, the

Cunningham – Direct

1   local-based FFL.

2   Q    And Savage Arms, is that the same, exact same firearm as

3   that in Items 2, 3, 4, and 5 above?

4   A    It's going to be a slightly different model.

5   Q    Is it similar?

6   A    It is similar.

7   Q    And then let's talk about for a little bit Item 16.  Is

8   this one of those .50 caliber rifles that you were describing

9   before?

10  A    Yes.

11  Q    And how much did this rifle cost, according to the

12  documentation?

13  A    The rifle itself was over $8,000, and then he paid

14  additional monies.

15  Q    And what was the additional monies?

16  A    $488.69 in tax.

17  Q    So I guess $8,500 even with the price and the tax?

18  A    Yes.

19  Q    And how did he pay for this?

20  A    This was paid for in cash.

21  Q    So this particular type of firearm, did he -- was he able

22  to pay for it right away?

23  A    No.  The initial purchase was on February the 11th.

24       MS. WOOLRIDGE:  I think we went to sleep.

25       THE COURT:  Selina, can you check our display?  Thank

Cunningham – Direct

1  you.  Thank you.

2  BY MS. WOOLRIDGE:

3  Q    Okay.  And I'm sorry.  You're talking about this

4  particular purchase?

5  A    But my screen went blank.

6  Q    Oh.

7  A    My screen -- okay.  There it is.  So on that particular

8  purchase, he made the original purchase on February the 11th

9  and then paid the remaining balance on the 19th of that same

10  month and year.

11  Q    Did you learn something happened to this firearm -- and

12  I'm sorry.  Let me talk about the layaway process a bit.  Is

13  then the day that he pays the remaining balance the date that

14  he then takes possession of the firearm?

15  A    I could check to verify that, but I believe so.

16  Q    And what would you need to check to verify that?

17  A    The 4473.

18  Q    And do you know if that is contained in the documentation

19  in front of you?

20  A    May I look?

21  Q    Certainly.  And if it helps, I believe it's Exhibit 28.

22  A    That's very helpful.  Yes.

23  Q    And after looking at that exhibit, can you tell what day

24  Mr. Delgado actually took possession then of that Barrett .50

25  caliber rifle?

Cunningham – Direct

1  A    He signed for it on February the 19th of 2019.

2  Q    Okay.  And when you say he signed for it, so that's the

3  day the FFL actually transferred it to him?

4  A    Yes.

5  Q    So the very next --

6        THE CLERK:  Sorry.

7        MS. WOOLRIDGE:  It's okay.  That's all right.  It

8  wouldn't be a trial without some sort of technical difficulty.

9  BY MS. WOOLRIDGE:

10 Q    The very next day after Mr. Delgado takes possession of

11 this .50 caliber rifle that he just finished paying off for 8

12 and a half thousand dollars, did you find out that he did

13 something else with it the very next day?

14 A    I saw that he had posted an Armslist ad for this rifle on

15 February the 20th, 2019.

16 Q    And when you say he listed an Armslist ad, for those of

17 us who aren't familiar with Armslist, is that somewhere where

18 individuals or businesses can sell firearms?

19 A    So I guess the best way to kind of describe Armslist is

20 almost like a virtual bulletin, where people can buy and sell

21 things not necessarily through this, as opposed to Gunbroker,

22 but it's kind of almost like a virtual classified ad, if you

23 will.

24 Q    And so did he put out essentially an online classified ad

25 to sell this firearm the day after he actually got it?

1  A    Yes.  And to clarify, I could not determine that it was

2  exactly this same particular firearm because this Armslist ad

3  I do not believe contained a serial number; but whenever I

4  looked at the date of this purchase versus other purchases,

5  that's what I attribute it to.

6  Q    At this point, were you aware of any previous purchases

7  of Barretts by the defendant?

8  A    No.

9  Q    Okay.  Did you subsequently learn of some additional ones

10  that took place a short time after?

11  A    Yes.

12  Q    Okay.  And I'm going to now refer you to the second

13  page -- making progress -- page 2 of Exhibit 37.  In addition

14  to taking possession of the Barrett .50 caliber, the first

15  Barrett .50 caliber on February 19th, 2019, did the defendant

16  also purchase another weapon?

17  A    Yes.

18  Q    And what kind of weapon was that?

19  A    This was another Smith & Wesson pistol in a 9 millimeter

20  configuration.

21  Q    And was it the same make and model and caliber as the

22  items we saw him purchase back, Item No. 9 on October 27th and

23  Items No. 12 and 13, on December 17th?

24  A    I believe so.

25  Q    And I can show you the first page again.

Cunningham – Direct

1  A     Yes.

2  Q     And if you could just take us again -- and I'm sorry.

3  There is a recovery date here.  Did you -- and we'll talk a

4  little bit more about this recovery, but were you eventually

5  able to find this particular pistol in what the defendant had

6  listed as his residence address?

7  A     I did.

8  Q     Okay.  Looking at the price of this, this pistol, is

9  there anything, anything that stands out to you in comparing

10 to the other purchases?

11 A     So in this particular purchase, I believe there's

12 documentation where Mr. Delgado was given a substantial

13 discount for this firearm by SNG.

14 Q     And this price of 184, did you determine that this is the

15 least expensive firearm in all of the purchases you were aware

16 of?

17 A     I believe so.  I don't have this in its entirety, but I

18 believe so.  That was the cheapest one out of all of them.

19 Q     Okay.  And then moving on, I believe we're on

20 paragraph -- I'm sorry, Item 18?

21 A     Yes.

22 Q     And what type of weapon is that?  Is that in itself a

23 complete firearm?

24 A     It is not.

25 Q     What is it?

Cunningham - Direct

1   A    So what this appears to be is a listing in Armslist for

2   a .50 caliber Beowulf, as opposed to the .50 caliber BMG,

3   18-inch barrel in a specific color.

4   Q    And did you determine that the defendant had purchased

5   this, an 18-inch barrel in a specific color, OD green, a .50

6   caliber Beowulf, from SNG in Tucson on February 24th?

7   A    I don't remember if it was that color because this one

8   was never recovered, but yes.  As you see in No. 19 -- you're

9   talking about No. 19, correct?

10  Q    I'm talking about No. 18.

11  A    Sorry.  No. 18.  So there was an ad placed in a fairly

12  short period of time for what is described as an AR .50

13  Beowulf, metallic green and brown.  I believe that was how the

14  listing title was.  And that's an AR platform that appears to

15  me as an AR platform but mated to a .50 caliber Beowulf

16  barrel.

17  Q    Okay.  So I'm a little bit confused, first of all, so

18  maybe you can break it down for me a little bit.  So first of

19  all, let's just start on February 24th.  Were you able to

20  determine that on that day the defendant did in fact purchase

21  a .50 caliber Beowulf 18-inch barrel from SNG for 869?

22  A    I did.

23  Q    Okay.  Now I believe, if I understand correctly, you're

24  saying you can't be certain that it is the same barrel that

25  was used; but on March 7th of 2019, so approximately two weeks

1  later, did the defendant post an ad for a firearm that

2  included a .50 caliber Beowulf barrel?

3  A    Yes.  And it's kind of confusing the way it's written.

4  So when you have an AR-type platform like this --

5  Q    And maybe you have to dumb it down a little bit for me.

6  What is an AR-type platform?

7  A    So an AR-type platform is a specific platform, and if I

8  could show you a picture, I could show you and you would see

9  it.  It's kind of what like the old military used, kind of

10  like the M16s.  The civilian version or the semiautomatic

11  version is the AR platform or the M4 or those types.  So we

12  talked about types of AKs, you know, different manufacturers

13  making the same gun, and we called them AR type.  So we call

14  this an AR type.

15      What's unique about this or popular about this specific

16  type of firearm is that you can have -- you have two main

17  components that hold several other components, but the two

18  main components we call the lower and we call the upper, and

19  you can make those together and then you have a complete

20  firearm.  So what you can do is you can get a receiver or the

21  lower part of it, which is multi-caliber, and you can mate and

22  switch out different types of caliber barrels.

23      So, for example, if this was going to be a .223 or a 5.56

24  caliber AR platform, well, that means that the upper mated to

25  the lower is that I'm using a .223 or a 5.56 type of

Cunningham – Direct

1  ammunition to shoot through it.  However, if I take that same

2  receiver that is able to accept a different upper, I can

3  switch out -- in the simplest terms, I can switch it out, put

4  a different upper on it, and now I've got a different firearm

5  because now it shoots a .50 caliber Beowulf round.

6  Q    Okay.  So I think I'm following you.  So this barrel is

7  kind of like an upper.  It's one component of a firearm?

8  A    Correct.

9  Q    And to make a full firearm, you would need a lower or a

10 lower receiver, correct?

11 A    Correct.

12 Q    Now did you find out that on that same date of February

13 24th, the defendant had also ordered some lower receivers?

14 A    I did.

15 Q    And were these lower receivers that could be compatible

16 with a number of different barrels?

17 A    Yes.

18 Q    So tell us a little bit about these lower receivers.

19 A    So this is also somewhat of a common purchase where if

20 you look at No. 19 and 20, it says, "multical receiver."  What

21 that means is that that particular receiver can be mated to

22 different uppers to give you whatever it is that you're

23 wanting to customize or shoot.  So I could take this multical

24 receiver and mate it with a .223/5.56 upper, and now I have a

25 very typical standard AR platform gun that shoots a .223 or

Cunningham – Direct

1  5.56, a very popular round.  It can also be mated to different

2  calibers, including a .50 Beowulf.

3  Q    So is it possible that either 19 or 20 could have been

4  combined with Item 18, so one of these multi-caliber receivers

5  that was ordered on the same date the defendant purchased

6  the .50 Beowulf barrel, and combined together to make one

7  single firearm?

8  A    It could be.

9  Q    And would that be consistent with the firearm that he

10  posted for sale on March 7th?

11  A    Sorry.  March 7th, yes.

12  Q    And so what day did he actually -- so I see a transfer

13  note on Items 19 and 20.  What does that mean?

14  A    So in this particular case, on Items 19 and 20,

15  Mr. Delgado purchased these from Francis Armament, an

16  out-of-state FFL.  The out-of-state FFL was then required to

17  transfer to a local FFL, which is SNG or Smoke & Glory, and

18  Mr. Delgado paid a transfer fee for that to occur in which,

19  when he took possession of that, he had to fill out the 4473

20  and submit that before the transfer could be made to him.  So

21  he bought these two receivers on February the 24th of 2019,

22  and they were transferred to him through the 4473 on March the

23  5th of 2019.

24  Q    And so the time frame, if I can make sure that I

25  understand, the time frame is that on February 24th, he both

1    purchases the Item 18 and orders Item 19 and 20; then on March

2    the 5th, he picks up Items 19 and 20; and then on March 7th,

3    he posts an Armslist ad for an item that may, that is

4    consistent with Item 18 along with either Item 19 or 20?

5    A    Correct.

6    Q    Okay.  And then on that same date of March 7th, was there

7    another firearm he purchased?

8    A    Yes.  This firearm, the Barrett .50 caliber BMG rifle,

9    was actually purchased again online through Gunbroker from

10   SuperPawn or SPI Guns out of state.  They are an FFL who then,

11   the same procedure, transferred it to SNG for a transfer to

12   Mr. Delgado through the 4473.

13        He paid for this -- because it was an online purchase, he

14   paid for it with a debit card in the purchase price that you

15   see there.  And online brokers or online sales typically, if

16   you're using a credit card, typically charge a fee because

17   they get charged a fee by the credit cards, pass that along to

18   the buyer.  Then they also charged him a shipping fee.  And

19   then SNG charged a transfer fee, a small transfer fee to

20   transfer that firearm to Mr. Delgado.

21   Q    And is March 13th the date that Mr. Delgado then actually

22   picked up that firearm after it was transferred to SNG?

23   A    Yes.  That's the date of the 4473 that he signed.

24   Q    And on that same date that he purchased the Barrett .50

25   cal, March 7th, did he also purchase a belt-fed rifle, Item

Cunningham – Direct

1  22?

2  A    Yes.  He purchased that FN Model M249, known as the SAW

3  in common lingo, from Northeastern Firearms, another

4  out-of-state FFL, through Gunbroker, paid that.  And I don't

5  have it noted here, but because it was an online purchase,

6  that's probably some sort of debit or credit card.  Then

7  Northeastern Firearms is required to transfer that to him

8  through a local Tucson-based FFL, which is SNG again, who

9  charged a small fee.

10  Q    And is this an expensive weapon, relatively, also?

11  A    Yes.

12  Q    How much did he pay before tax and any fees for this

13  firearm?

14  A    $7,650.

15  Q    And when was he able to pick it up at SNG here in Tucson?

16  A    The 4473 has him filling out and signing for that on

17  March the 15th of 2019.

18  Q    And on that same date, did he buy the next item, Item 23

19  in our list?

20  A    Yes.

21  Q    And what kind of firearm is that?

22  A    This is -- we were talking about the AR-type firearms.

23  This is going to be your kind of typical AR-type firearm that

24  fires in a 5.56 millimeter configuration or ammunition.  So on

25  this one, what this was is this was what we consider a

Cunningham – Direct

1  multiple purchase.  So when he went to pick up his gun that he

2  ordered from Northeastern Firearms, he also purchased one

3  directly from SNG Firearms at the same time.

4  Q    Did he actually purchase another one from SNG Firearms at

5  the same time?

6  A    He did.

7  Q    Was that the Beretta 9 millimeter pistol that's listed in

8  Item 24?

9  A    Yes.

10  Q    And is this the same firearm, same model and type of

11  firearm that he also purchased -- and I'll put page 1 back to

12  refresh your recollection -- in October of 2018, as documented

13  in Item 8?

14  A    Yes.

15  Q    And so basically on March 15th, he picks up the FN

16  belt-fed rifle as well as purchases directly from SNG a

17  Diamondback 5.56 millimeter rifle and a Beretta 9 millimeter

18  pistol?

19  A    That is correct.

20  Q    And were both of these, Items 23 and 24, cash purchases,

21  cash payments made directly to SNG?

22  A    Yes.

23  Q    Now was there something interesting that you saw about

24  this particular Diamondback rifle?

25  A    So in looking through the Armslist ads attributed to

Cunningham – Direct

1   Mr. Delgado, on February the 25th, 2019, there was an ad

2   listed for a Diamondback AR-15 in the same caliber as was

3   purchased by him from SNG on March the 15th of 2019 and

4   an additional AR-15 called an ATI Omni which was posted.

5   Q    So this was essentially -- I guess 2019 could be a leap

6   year, so I'm just trying to do the math about the dates.  It

7   was essentially, I think, 18 days earlier than he actually

8   bought the Diamondback in Item 23.  Did you know of, did you

9   find any purchases of this same type of firearm prior to March

10  15th by the defendant?

11  A    Can I see the -- I don't think, I don't think there was

12  one prior to that.  No, I don't see one.

13  Q    And he also advertised for sale an ATI Omni AR-15 rifle

14  for sale.  Were you aware of that purchase prior to the

15  Armslist ad?

16  A    I was not aware of that purchase, and I never did find

17  that purchase.

18  Q    Okay.  So are there purchases then, at least based on

19  these Armslist ads, in addition to those listed in this chart,

20  that it appears that the defendant -- additional firearms that

21  he had purchased?

22  A    Yes.  And if I may explain about the information in this

23  chart, this is not a comprehensive list of everything that

24  Mr. Delgado has purchased, and the reason for that is that

25  these are only the known firearms that I could locate.  When

Cunningham – Direct

1  an individual, a private individual such as myself goes and

2  purchases a single firearm from an FFL, that record is kept by

3  the FFL.  It doesn't go anywhere unless there's a trace

4  request or some other requirement that they have to turn those

5  records over to ATF or whoever.

6      What it would take for me to locate every firearm that he

7  purchased is pretty much an impossibility.  I would have to

8  probably contact every FFL that exists in this country to be

9  able to say that there were no other purchases by him from an

10  FFL.

11      These I was able to track through either his online

12  purchases, or I contacted the FFLs that commonly do business

13  like this, who do transfers and are considered maybe high

14  volume for a local FFL, and that's how I found some of these

15  other purchases.

16  Q    Okay.  So is it possible that there are additional

17  firearms that he purchased that you simply don't know about?

18  A    Correct.

19  Q    Now were you able to find the Armslist ad?  I see that

20  what you have there is in quotes.  Were you able to get this

21  language directly off of his Armslist ad?

22  A    Correct.

23  Q    And how do you know that he was the one that posted this

24  Armslist ad?

25  A    So I contacted Armslist and had them send me customer

Cunningham - Direct

1   listings, or I shouldn't say customer because they don't sell

2   directly anything, but individuals who signed up and who have

3   created an account to list firearms through their website.

4   From the information I provided them, this was one of the

5   listings that they had sent back to me, and this is how it was

6   listed by them.

7   Q    And were both of these firearms, the Diamondback AR-15

8   and the ATI Omni AR-15, was that word "new" posted by the

9   defendant to describe those two firearms?

10  A    Correct.

11  Q    And were they both posted for sale on that same date?

12  A    Yes.

13  Q    I believe we spoke about the Beretta already, the other

14  firearm the defendant purchased on March 15th.  Let's move

15  down to Item 25.  Is this another one of those Barrett .50

16  caliber BMG rifles?

17  A    It is.

18  Q    And is Item 26 the exact same firearm?

19  A    It appears to be so.

20  Q    Do you have -- is your screen working again?

21  A    Uh-huh.  It's back up, yes.

22  Q    Were those both purchased on the same date, on March

23  14th?

24  A    Yes.  And these are the two firearms that started the

25  investigation.

Cunningham – Direct

1  Q    And was one of those firearms also ultimately recovered a
2  short time after the purchase outside of the state of Arizona?
3  A    That is correct.
4  Q    Was it purchased -- or was it, I'm sorry, recovered from
5  someone that had no apparent relationship to the defendant?
6  A    Correct.
7  Q    And so were both of these part of one single online
8  purchase?
9  A    They were.
10 Q    And I believe you already mentioned that the purchase
11 itself happened on March 14th.  Were they transferred to a
12 Tucson-licensed firearms dealer?
13 A    Yes.  This time these were transferred through N&N
14 Firearms, an FFL here in Tucson.
15 Q    Okay.  And what was the date that the defendant was able
16 to go to N&N and pick up those firearms?
17 A    The 4473 has it listed as him signing for them on March
18 the 20th of 2019.
19 Q    Can you tell us a little bit about the cost and the
20 payment for these firearms.
21 A    So these were again an online purchase from an
22 out-of-state FFL, RAT Worx, which is research and testing.
23 They -- he purchased these at the same time, but he made the
24 payment in separate, with separate methods.  He made a payment
25 of 14,000 and then also, I believe it was the next day, paid

Cunningham – Direct

1    the $693.25 balance.  Once that was paid, they transferred it

2    to N&N, and then he came in and signed for them.

3    Q    In talking about the second of these firearms that was

4    recovered on December 13th, 2019, outside the state of

5    Arizona, can you just give us a little bit of geography, an

6    idea geographically how far this firearm was not only from

7    here in Tucson, where the defendant took possession of it, but

8    also from the other firearm, Item No. 6, that was also

9    recovered outside of the state?

10   A    Yes.  So he took possession of this on March the 20th, I

11   believe, of 2019, and then in December it was being recovered

12   out of state.

13        So what I did is I looked at the two different

14   recoveries.  Now these two different recoveries are also on

15   two different dates.  So from Tucson, one was recovered 240

16   miles away from Tucson.  The other one was recovered -- can I

17   have that other page -- 360 miles from Tucson, and then each

18   of them from each other was 411 miles distance, if that makes

19   sense.

20   Q    And were these Barrett .50 caliber rifles the same make

21   and model as the Barrett .50 caliber in Item No. 21 that he

22   had bought, I guess, just one week earlier?

23   A    Yes.

24   Q    And did he actually place the order for these two new

25   Barretts or two most recent Barretts, 25 and 26, one day after

Cunningham – Direct

1  he took possession of that Barrett from a week earlier, on

2  March 13th?

3  A     Yes.

4  Q     So essentially again a chronology:  March 7th, he orders

5  the Barrett in Item 21; March 13th, he picks up that Barrett;

6  March 14th, he orders two additional Barretts; and March 20th,

7  he picks those two additional Barretts up?

8  A     Correct.

9  Q     And was that also the same make and model of the Barrett

10 that he bought, going back to the first page, Item 16 that he

11 put on layaway but that he ordered, I guess, just a month

12 earlier, February 11th, and then took possession of February

13 19th and listed it online for sale the very next day?

14 A     Correct.

15 Q     So all four of these .50 caliber rifles that cost between

16 7 and $8,000, those purchases all occurred more or less in the

17 period of a month?

18 A     Yes.  And if you'll notice in 25 and 26, another thing

19 that caught my eye is that these serial numbers are one off

20 from each other.

21 Q     And why did that catch your eye?

22 A     That just means that these two particular firearms were

23 stamped by the manufacturer sequentially.  So if you kind of

24 look at money and you have the serial numbers on money and

25 they're sequential numbers, this is a sequential number.  So

Cunningham – Direct

1  that just tells me that these firearms were probably not

2  something that was in stock at the time by the FFL, RAT Worx,

3  that they probably did order that on behalf of him.  It's just

4  another, another item that I noticed.

5  Q    And when you see serial numbers that are sequential like

6  that, is it likely that there is any variation between these

7  two firearms?

8  A    I mean, there could be.  But in this specific case, this

9  information I got was from the FFL directly, so if their

10 records were correct, these are the same make and model.

11 Q    And then the very same day he takes possession of the two

12 Barretts listed in 25 and 26, March 20th, does he then go and

13 purchase two new Barretts and take possession of them that

14 very same day of March 20th?

15 A    So not take possession.

16 Q    Sorry.

17 A    27 and 28 are again sequential numbers but from a

18 completely different FFL.  So the out-of-state FFL on this

19 particular case is Prepper Gun Shop, transferred again through

20 N&N Firearms.  At this time, I had been investigating him

21 since the last two, the two-before Barretts; and at this time,

22 I made the decision that we were going to contact him before

23 he takes possession or not let him leave with these particular

24 firearms, and we ultimately did an intercept.

25 Q    And so I do want to talk a little bit about this

Cunningham - Direct

1   intercept, and we'll go into it in more details.  But just

2   going through the timeline, so March 14th he orders Items 25

3   and 26, takes possession of them both on March 20th, and that

4   same day he places an order for two new Barretts, March 27th

5   and 28th?

6   A    Correct.

7   Q    And are those also the same make and model as the

8   Barretts that he bought on -- ordered on the 14th and took

9   possession on the 20th?

10  A    Yes.  And I just noticed on No. 28 that model number is

11  probably a typo.  I would have to go back through the original

12  documentation by the FFL, but I believe they were both Model

13  M82A1s.

14  Q    Okay.  And looking at the serial number, are these also

15  not only sequential with each other but sequential with the

16  two Barrett .50 calibers in 25 and 26?

17  A    Yes, and those were purchased from a different FFL.

18  Q    So I guess I think about like a VIN number on a car.

19  Does that mean essentially all of these four kind of came off

20  the assembly line at Barrett's plant, wherever that is, around

21  the same time?

22  A    They may not have come off of the assembly line because

23  it depends on how these firearms are actually manufactured,

24  but in the sequence of the manufacturer stamping them, yes.

25  Q    I'm sorry.  I probably oversimplify things a little bit,

Cunningham – Direct

1   but just trying to -- okay.  And so again we'll talk about the

2   intercept in just a moment, but can you tell us just a little

3   bit about the price and the payment of this order.

4   A    Yes.  So if you look at No. 27 and 28, the one thing that

5   was kind of unusual in this particular purchase was that

6   Mr. Delgado had a Vantage West cashier's check sent or wired

7   or somehow provided to Prepper Gun Shop for these two

8   firearms, and then the Prepper Gun Shop charged an additional

9   shipping fee for these items and then shipped them to N&N

10  Firearms for transfer to Mr. Delgado.

11  Q    And on that same date of March 20th, did he also buy a

12  firearm directly from N&N?

13  A    He did.

14  Q    And was that the Smith & Wesson .40 caliber pistol in

15  Item 29?

16  A    Correct.

17  Q    And I see that that one was also recovered?

18  A    Yes.

19  Q    Was that in the garage of the residence he said he was

20  residing?

21  A    Yes.  So the two Barretts, 27 and 28, were intercepted at

22  a different location than the No. 29, even though he purchased

23  all three of those at the same time.

24  Q    Is that because the ones, the two Barretts had to be

25  ordered while the March 20th, he's able to pick it up right

Cunningham – Direct

1  there at the store?

2  A    That is correct.

3  Q    Okay.  And is the one -- is this one of the two firearms

4  he had in that garage on April 4th?

5  A    Yes.

6  Q    Is this also one of the lower dollar or lower value

7  firearms listed on this chart?

8  A    Correct.

9  Q    Now five days later, on March 25th, did he purchase

10  another firearm from an FFL here in Tucson?

11  A    Yes.

12  Q    And what type of firearm was that?

13  A    So this one was from Second Amendment, a Tucson-based

14  FFL, and this is a Beretta.  They have it listed as an M9A3,

15  but it's a 9 millimeter pistol.  He bought that, paid

16  the additional tax, and paid for this one by card.

17  Q    Okay.  And is that consistent with -- I believe there

18  were two previous Berettas, 9 millimeter pistols that you knew

19  about?

20  A    I believe so.

21  Q    All right.  And then do we see some more belt-fed rifles

22  being purchased?

23  A    We do.

24  Q    Tell us about his purchases on March 27th.

25  A    So on March 27th, from Walsh Gun & Tackle, which is an

Cunningham – Direct

1    out-of-state FFL, again he purchased two FN 249s.  We talked

2    about these being belt-feds.  They're in the caliber 5.56

3    millimeter.  They were also transferred or set to be

4    transferred through N&N firearms.  Each one of these was

5    $8,000 or a little over, and they had the credit card fees,

6    when we talked about the online purchases, in addition to the

7    shipping fees.

8         These were intercepted on April the 4th, 2019, along with

9    the two Barretts and then a firearm, the Browning Model M1919,

10   which is a .308 caliber belt-fed.  That was also intercepted

11   on the same date.  And I had no previous knowledge of that

12   firearm.  When I intercepted the other four that I was

13   expecting, this was part of the order, another order.  And

14   then this one was another out-of-state FFL, All About Guns,

15   transferred through N&N.

16   Q    So you were able to intercept a total of five firearms on

17   April 4th that the defendant had previously ordered online?

18   A    Correct.

19   Q    And were all of these firearms worth between essentially

20   4 -- or purchased for essentially between 4 and more than

21   $8,000 each?

22   A    That is correct.

23   Q    And just to summarize, it was those two .50 caliber

24   rifles and three belt-fed rifles?

25   A    Yes.

Cunningham – Direct

1  Q     Were the two FN belt-fed rifles the same make and model

2  as the FN belt-fed rifle that he had purchased, it looks like

3  he had ordered or he had picked up about 12 days prior, Item

4  No. 22?

5  A     Yes.

6  Q     And then moving on to Items 34, 35, and 36, on the same

7  date that he had ordered the three belt-feds, did he also

8  order three additional firearms?

9  A     He did.

10 Q     And what kind of firearms were those?

11 A     So these are going to be the AR platforms where they're

12 mated to a different upper.  So these were mated to a

13 different upper, which is the .50 caliber Beowulf.  He ordered

14 the receiver separately and then had the matching uppers also

15 supplied by the same FFL and sent together, so you put them

16 together and you have a complete firearm.  Those were done

17 through Francis Armament again, which he had bought some

18 previous Anderson, I believe, through Francis Armament, again

19 an out-of-state FFL, transferred through N&N, and those were

20 intercepted at a later date, just four days after the

21 original, the previous five, I guess I should say.

22 Q     And so just so I understand, you educated me a little

23 while ago about how we can have a lower receiver and an upper

24 or a barrel and, putting them together, that's a complete

25 firearm.  So with regard to 34, 35, and 36, because each of

Cunningham – Direct

1  those contain a receiver and an upper or a barrel, is each of

2  those in itself, would that be a complete working firearm?

3  A    That is correct.

4  Q    Would they each be a complete working .50 caliber

5  firearm?

6  A    Correct.

7  Q    And then moving on to Item 37, do we have another

8  purchase the day after these three belt-feds and three .50

9  caliber firearms were purchased or ordered?

10  A    Yes.  So this one was a direct purchase from SNG on March

11  the 28th, the local firearm FFL.  He bought this for $509, and

12  then there was tax on top of that.

13  Q    Okay.  And was that, that being a Diamondback Model

14  D8-15, is that essentially an AR-15 type firearm?

15  A    Yes.  I think that may be DB-15.

16  Q    I'm sorry.  That was my -- I -- it's on the chart

17  correctly.  I said that incorrectly.  Is that the same make

18  and model as he purchased 13 days earlier, as reflected in

19  Item 23?

20  A    It appears to be, yes.

21  Q    And does it also appear to be consistent with a

22  Diamondback AR-15 type rifle that he had at some point

23  previously purchased and listed for sale as new back on

24  February 25th of 2019?

25  A    Correct.

Cunningham - Direct

1  Q    And then do we have another .50 caliber rifle purchased

2  on March 30th?

3  A    Yes.

4  Q    Okay.  Tell us about that one.

5  A    So this one was from Alexander Arms, another FFL out of

6  state, but at this point they had not shipped it.  And

7  Alexander Arms does not charge the client for the firearm

8  until they actually are ready to ship it out.  On this one, he

9  ordered this firearm and some other firearm-related items for

10 a total of $2193 and then canceled that at a later date, on

11 April the 13th of 2019.

12 Q    And then was there another purchase, the final purchase

13 that you're aware of, take place on April 2nd, 2019?

14 A    Yeah.  So these two firearms are AR-15 pistols with

15 stabilizing braces.  They were purchased on April the 2nd of

16 2019, did not ship out and receive and arrive here in Tucson

17 until April the 19th of 2019, at which time we intercepted

18 that.  That was purchased from yet another out-of-state FFL

19 called Guns & Roses, which transferred through N&N Firearms;

20 originally purchased those both and then later contested that

21 purchase through his bank, and the bank did a chargeback to

22 that FFL, so that FFL lost that money.

23 Q    Did you calculate -- so here we have a total of 40

24 firearms; is that correct?

25 A    Correct.

Cunningham – Direct

1  Q    And does that account for the other firearms in the
2  Armslist ads that you did not know about?
3  A    Only the ones that I was able -- that I know about.  The
4  Armslist ads were significant in that they were postings by
5  Mr. Delgado, but without specific firearm information, to
6  include date of purchase, how much they were purchased for,
7  where they were purchased from, most importantly the serial
8  number, I could not locate those firearms, and so they are not
9  contained in this chart.
10 Q    And you mentioned that because you can't contact every
11 possible FFL throughout the country that you can't say for
12 certain how many firearms were purchased in total?
13 A    I cannot.
14 Q    So as far as your known firearm purchases, did you
15 calculate a total?
16 A    I did.
17 Q    And how much did he spend on these known firearm
18 purchases?
19 A    $85,065.77.
20 Q    And does that account for all of the taxes, fees, other
21 associated expenses?
22 A    No.  Just where you can see on the chart where I was able
23 to get documentation of taxes or credit card fees or shipping
24 fees, those are an additional $2,303.64.
25 Q    And did he also make additional purchases for

Cunningham – Direct

1  firearm-related items during this time period?

2  A    Yes.  In looking at several of the receipts or invoices,

3  I was able to locate where there were sometimes purchases

4  along with that firearm, additional firearm-related items, and

5  those were an additional $23,832.53 of what I found during

6  this time period.

7  Q    So although it's not reflected here, did you add up

8  basically all of the expenses that he spent on firearms as

9  well as the related items and related fees?

10 A    I did.

11 Q    And what was that?

12 A    It was little over $111,000.

13 Q    And with the caveat of the one lone 2017 item, did all

14 of -- or 2017 firearm, did all of these purchases essentially

15 happen between the end of May, May 25th, 2018, through April

16 2nd, 2019, so essentially a little over a ten-month period?

17 A    Correct.

18       THE COURT:  Is this a good stopping point, Ms.

19 Woolridge?

20       MS. WOOLRIDGE:  I think it would be, Your Honor.

21       THE COURT:  All right.  Well, we've reached the end

22 of the trial day.  We will start tomorrow promptly at 9 a.m.

23 Thank you all for being here.  Thanks for your time

24 and attention.

25       Remember the admonition:  Don't talk about the case,

1   don't do any independent investigation, and keep an open mind.

2        Thank you and have a good evening.

3        (Jury out, 3:55 p.m.)

4        THE COURT:  All right.  Counsel, anything further for

5   the day?

6        MS. WOOLRIDGE:  Not that my mind can comprehend, no,

7   Your Honor.

8        MR. ROACH:  No.  Thank you, Your Honor.

9        THE COURT:  All right.  Well, everyone have a good

10  evening.  We'll see you tomorrow morning a little before 9:00.

11  Thank you.

12       MS. WOOLRIDGE:  Thank you.  You do the same.

13       THE COURT:  Thank you.

14       (Court adjourned at 3:56 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3              I, Aaron H. LaDuke, do hereby certify that I

 4     reported the foregoing proceedings to the best of my skill

 5     and ability, and that the same was transcribed by me via

 6     computer-aided transcription, and that the foregoing pages

 7     of typewritten matter are a true, correct, and complete

 8     transcript of all the proceedings had, as set forth in the

 9     title page hereto.

10              Dated this 26th day of October, 2021.

11

12

13                            _____s/Aaron H. LaDuke_____
                              Aaron H. LaDuke, RMR, CRR
14                            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```