```
1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3

4   United States of America,    )
                                 )
5                Plaintiff,      )
                                 )
6   vs.                          )   CR-19-01094-TUC-JGZ-JR
                                 )
7   Isaias Delgado,              )
                                 )   Tucson, Arizona
8                Defendant.      )   August 12, 2021
    _____)   8:53 a.m.

9

10

               TRANSCRIPT OF JURY TRIAL – DAY FOUR
11          BEFORE THE HONORABLE JENNIFER G. ZIPPS
                UNITED STATES DISTRICT JUDGE
12

13  For the Plaintiff:
         Ms. Angela W. Woolridge
14       U.S. Attorney's Office
         405 West Congress Street, Suite 4800
15       Tucson, AZ  85701

16  For the Defendant:
         Mr. Brad Roach
17       Mr. Trevor Hill
         Roach Law Firm, LLC
18       101 East Pennington Street, Suite 201
         Tucson, AZ  85701

19

20

21

22  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
23
                    Aaron H. LaDuke, RMR, CRR
24             Federal Official Court Reporter
                    405 W. Congress St.
25               Tucson, Arizona  85701
```

1                  P R O C E E D I N G S

2          THE CLERK:  In criminal matter 19-1094, United States

3  of America versus Isaias Delgado, on for jury trial, day four.

4      Counsel, please state your appearances.

5          MS. WOOLRIDGE:  Good morning, Your Honor.  Angela

6  Woolridge appearing on behalf of the United States.

7          THE COURT:  Good morning.

8          MR. ROACH:  Good morning, Your Honor.  Brad Roach on

9  behalf of Mr. Delgado, who is present.  Trevor Hill has taken

10  care of some other issues in another courtroom, so he will be

11  here and I will waive his presence until he gets here, and I

12  told him if the jury is here to try to come in as

13  unobtrusively as possible.

14          THE COURT:  All right.  Thank you.  Good morning.

15          THE DEFENDANT:  Good morning.

16          THE COURT:  All right.  So I did receive the

17  defendant's requested jury instruction.  Ms. Woolridge, have

18  you had an opportunity to review that?

19          MS. WOOLRIDGE:  I have, Your Honor.

20          THE COURT:  What's the government's position?

21          MS. WOOLRIDGE:  The government objects to this

22  instruction, Your Honor.  This talks about essentially the

23  elements or what are not elements to a different offense and

24  are not -- first of all, they're not supported by case law.  I

25  think it's more of a comment on the evidence rather than

1   actual legal instruction.  Certainly the defense can argue

2   what is not required, but those are not parts of the elements.

3        The Court will instruct the jury on the elements of this

4   particular charge and instruct them in accordance with the

5   case law and the model instruction.  The defense can argue

6   that certain things are not illegal or certain omissions are

7   not illegal, and certainly the government is not trying to

8   pursue any charge based on the omissions that are listed in

9   the defense's proposed instruction.  I think that at this

10  point, to instruct on things that are not crimes or that would

11  not be charged under different statutes would serve nothing

12  but to confuse the jury with regard to what the actual crime

13  is and what the elements of the actual crime are.

14       THE COURT:  So it sounds as though you're speaking

15  with some familiarity about other regulations or laws.  I'm

16  not sure what you're referring to or what the other

17  regulations are that would be at issue here.  Could you point

18  out to me what in this list would be a problem or that might

19  be a violation of law.

20       MS. WOOLRIDGE:  Your Honor, I don't believe that

21  there's anything in this list that would be a violation of

22  law, but really what it is referring to -- and there was some

23  conversation about what's referred to as a straw purchase or a

24  violation of 18 U.S.C. 922(a)(6), which is purchasing a

25  firearm on behalf of another person, and the defendant made

1  some comments about not being a straw buyer, things of that

2  nature.  And so none of these things are required for that

3  offense either.

4       But, Your Honor, it appears to me that these are

5  omissions that were proffered and the defendant talked about

6  in his statements, about not getting bills of sale or whether

7  or not he got bills of sale, whether or not he checked

8  driver's licenses.  I guess that would be another -- there

9  would be another possible violation for 922(d), any 922(d)(1)

10 through (9), if he sold, for instance, to a prohibited person.

11 And I don't know the statute off the top of my head for

12 transferring to an out-of-state resident, but that would be

13 possibly another violation, and those omissions would be

14 more applicable to whether or not that charge was committed.

15      But these omissions don't bear any weight into the charge

16 that was filed here.  Certainly the government is not going to

17 argue that because the defendant didn't have bills of sale

18 that he committed an offense.  Really, Your Honor, that goes

19 to the relevance of -- it really is more of just steps to

20 conceal what he knew was wrong with regard to willfulness.

21 But, Your Honor, certainly we're not alleging that that's any

22 sort of violation of the law, that he didn't keep bills of

23 sale or things of that nature.  I think bringing in, you know,

24 the laws that govern private transfers of firearms are just

25 confusing and misleading to the jury.

1          THE COURT:  All right.  So going to your argument

2     about steps to conceal the wrongfulness of his actions by not

3     producing bills of sales, can you elaborate on that a little

4     bit more.

5          MS. WOOLRIDGE:  Well, Your Honor, certainly if the

6     defendant was able to produce bills of sale showing that he

7     had, for instance, held on to these firearms for any length of

8     time before selling them, that certainly -- and as requested

9     by the agents during the interview and the fact that he said

10    he had, at one point said he didn't keep them and another

11    point said he had kept them but they got vacuumed up by the

12    car wash guy, first of all, I think that shows kind of an

13    evasiveness and an attempt to conceal his actions.  I think it

14    goes to his credibility.

15        But then with regard to -- so as far -- but with regard

16    to steps to conceal his actions, by not documenting it, it

17    certainly, I think -- it's the government's position that the

18    defendant was selling these weapons very quickly after he

19    acquired them.  By not having bills of sale that, for

20    instance, might reflect the exact same firearm sold in a very

21    short time period after it was obtained certainly could be

22    inferred to be concealing -- or not concealing but certainly

23    not -- you know, trying to make sure that there's no

24    documentary evidence of this crime.

25          THE COURT:  All right.  Thank you, Ms. Woolridge.

1        Mr. Roach.

2            MR. ROACH:  Judge, my requested jury instruction was

3    in large part or basically exclusively part of the curative

4    instruction that I had asked the Court about, and specifically

5    the government had elicited testimony that my client had said

6    at one point or another he had obtained bills of sale.  Okay.

7    So that's fine.  And then he had done pictures, he had gotten

8    pictures or videos, things like that.

9        But when the government intentionally elicited from their

10   witness did he ever give you those things, no, see, that's

11   where you get into the problem of the burden-shifting and the

12   curative instruction.  And so that's why that instruction is

13   necessary, to show that it's not required for him to do these

14   things, and it is not required for him or us to produce any

15   evidence to law enforcement about these things if he's a

16   private seller.  So for that reason, I believe that all

17   those -- or that jury instruction is appropriate.

18            THE COURT:  All right.  So a curative instruction as

19   to the burden of proof, I'm not sure that this does that.

20            MR. ROACH:  You know what, Judge?  I was typing that

21   really fast because you had asked that they were in before end

22   of business.  It could have been typed up as kind of three

23   separate jury instructions, I think, because the one that is

24   specific to, just specific to the curative instruction of the

25   government intentionally eliciting from their witness that my

1    client had not produced any evidence from them -- I think it's

2    the last one, and, Judge, I forgot to print out a copy, so I

3    don't have one in front of me.  But where I specifically say a

4    private seller is not required to give any evidence, any bills

5    of sale, photographs, videos, or other records to the

6    government, that's a true statement and it's curative of the

7    government's what I argued was burden-shifting to my client to

8    prove that he's not guilty.

9         THE COURT:  I guess I understood your argument to be

10   or the purpose of this instruction to be what type of

11   documentation a person who is not an FFL is required or not

12   required to have.  That's how I read it.

13        MR. ROACH:  Yes.

14        THE COURT:  Because it doesn't talk at all about the

15   burden to produce something in the Fifth Amendment context.

16   It talks about regulations and regulatory requirements and

17   that essentially private citizens may not be required to

18   comply with the same regulations as FFLs -- well, not may not.

19   They are not required to comply with those same regulations.

20        So I took what you had written in your proposed

21   instruction to be a way to buttress that argument by informing

22   the jurors that it was correct what you were saying, that the

23   law does not require these types of things, as opposed to

24   addressing the burden-shifting issue.

25        MR. ROACH:  And, Judge, yes, you said it better than

1  I did.  Yes, I agree that everything that you're saying is
2  true.  Purely statutory, none of those things is -- legally
3  it's true that none of those things are required for a private
4  person who is a private citizen not in the business of selling
5  firearms.
6      So, one, I believe it to be a correct statement of the
7  law so therefore not a statement on the evidence in this case
8  and therefore admissible by itself as a jury instruction, plus
9  I think it's especially important.  It's not necessarily to
10 mention this to the jury about what I thought was a Fifth
11 Amendment burden-shifting, but I think that makes it even more
12 important that the jury gets that instruction.
13     So I think it is a correct statement of the law.  It
14 would be accurate even if the jury instruction -- or I'm
15 sorry.  Even if my allegation of burden-shifting had not
16 occurred, I think it would still be appropriate plus its added
17 importance because of that.
18         THE COURT:  So the argument here and what the jury
19 has to decide is basically whether or not Mr. Delgado should
20 have been licensed to do what he was doing, and I'm not sure
21 that my instructing the jurors as to this information here
22 goes to that issue.  It certainly goes to some other issues,
23 what the jurors might infer from Mr. Delgado's statements to
24 agents during their interviews.  I believe it was Mr. Delgado
25 who was the one to reference bills of sales and recordings,

1   evidence that he had of the sales, and I believe there was

2   some testimony too that some of those items were not required.

3        I'll think about it a little longer.  I do believe that

4   it would be appropriate for argument.  I'm not sure that I

5   need to include it in the jury instructions, so that it

6   wouldn't confuse the issues as opposed to allow the jurors to

7   focus on really the one issue they have to decide, which was

8   whether or not Mr. Delgado is in the business of dealing in

9   firearms and willfully doing so.  So I'll contemplate that a

10  little further.

11       I do have proposed instructions that I worked on

12  yesterday that I'll pass out to counsel.

13       As far as the testimony this morning, Mr. Roach, do you

14  have more witnesses?

15       MR. ROACH:  Judge, I'm going to move to admit 201

16  into evidence, I guess in front of the jury or now.  Other

17  than that, my client, after consultation with me, has informed

18  me he is not going to testify, so we will have no further

19  witnesses.

20       THE COURT:  All right.  And so, Mr. Delgado, let me

21  just confirm with you, you know that you do have a right to

22  testify?

23       THE DEFENDANT:  Yes, I do, Your Honor.

24       THE COURT:  All right.  And you talked with your

25  attorney about whether or not you wanted to exercise that

1  right or not?

2          THE DEFENDANT:  Yes, I did.

3          THE COURT:  All right.  And you've decided that you

4  don't want to testify here?

5          THE DEFENDANT:  Yes.

6          THE COURT:  All right.  And so, of course, you're not

7  required to testify either, and we'll be informing the jurors

8  then that they can't hold your silence against you.  That's

9  how you want to proceed?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  All right.  Thank you very much.

12          THE DEFENDANT:  Thank you.

13          THE COURT:  All right.  Does the government have any

14  rebuttal or does the government intend to produce any evidence

15  or testimony in rebuttal?

16          MS. WOOLRIDGE:  No, Your Honor.

17          THE COURT:  All right.  So maybe we need to take a

18  minute here then to go through the jury instructions.

19      So I will take out Instruction 3.4, the defendant's

20  decision to testify.  And on 3.3, I'm going to take out from

21  the heading the "if applicable."

22      Selina, would you mind letting the jurors know that we

23  have a legal issue we have to resolve and that it's probably

24  going to be ten, 15 more minutes.

25          THE CLERK:  No problem.

1          THE COURT:  Thank you.

2      So, counsel, as I stated yesterday, these final

3  instructions are essentially what the parties had agreed as

4  stipulated, with the exception of the one sentence in

5  Instruction 8.53 which we discussed yesterday.

6      4.8 was one that the parties proposed if applicable, and

7  I don't know that it's applicable, so I would propose removing

8  4.8.  That's on page 15.  Any objection to that?

9          MS. WOOLRIDGE:  No, Your Honor.

10         MR. ROACH:  No objection.

11         THE COURT:  Ms. Woolridge, is it a correct statement

12  of the law that the law does not require a private seller of

13  firearms to produce documentation of sales?

14         MS. WOOLRIDGE:  Your Honor, I can't think of any law

15  that that would misstate.  I believe that, at least according,

16  at least based on my knowledge, I can't think of any law that

17  would prevent -- that would require it, so I do think it's a

18  correct statement of law.

19         THE COURT:  All right.  I would propose adding that

20  statement to support the request for an instruction as to the

21  burden-shifting and burden of proof, and I could put that

22  after 3.2, which is on page 3, that talks about the

23  presumption of innocence; or I could put that after the

24  description of the charge, which I would propose would be

25  after, on page 13, after 3.18.

1     What's your preference, Mr. Roach?

2          MR. ROACH:  Judge, I would prefer it after 8.53.

3          THE COURT:  All right.  So I won't put it after 8.5,

4     but I'll put it after the next page which refers to 8.53.  So

5     after the 3.18 description or instruction on page 13, we'll do

6     a new instruction that says:  The law does not require a

7     private seller of firearms to produce documentation of sales.

8          Ms. Woolridge, any objections to the proposed

9     instructions with those modifications?

10         MS. WOOLRIDGE:  Reserving my objection to the request

11    by the defense that the Court is adding to, following 8.53, no

12    objection with those modifications.

13         THE COURT:  All right.  Mr. Roach.

14         MR. ROACH:  No objection, noting previous arguments

15    concerning jury instructions.

16         THE COURT:  I'm sorry.  I don't know what you're

17    referring to with your objection.

18         MR. ROACH:  Sure.  So, Judge, I had requested jury

19    Instruction 8.53, to remove the second-to-the-last sentence.

20    The Court's already ruled on that.

21         THE COURT:  And that's the one that had to do with

22    the proof of a sale.

23         MR. ROACH:  Yes, Your Honor.

24         THE COURT:  Okay.

25         MR. ROACH:  And then I had asked for a more extensive

```
1   jury instruction, and the Court has ruled that you would like
2   to boil it down to one sentence, so I'm just reserving those
3   objections.  I have no other objections.
4          THE COURT:  All right.  So that we have a record of
5   your requested instruction, the one that I asked you to email
6   last night, I will order that the clerk file a copy of your
7   proposed instruction for the record.
8          MR. ROACH:  Thank you, Your Honor.
9          THE COURT:  All right.  Then we'll have a verdict
10  form prepared.
11       And, counsel, any other issues?
12         MS. WOOLRIDGE:  No, Your Honor.
13         MR. ROACH:  No, Your Honor.
14         THE COURT:  Mr. Roach, you had reserved a motion.
15         MR. ROACH:  Yes, Judge.  I would just move for a
16  motion for summary judgment or -- and I forget the number in
17  federal court -- arguing that the government has failed to
18  prove that the defendant has engaged in the crime charged and
19  that the Judge or the Court should enter a directed verdict
20  against the government and enter a not guilty finding on
21  behalf of my client -- or, I'm sorry, and dismiss the
22  indictment on behalf of my client.
23         THE COURT:  As to which element do you believe the
24  government hasn't met their burden?
25         MR. ROACH:  All of them, Your Honor.
```

1          THE COURT:  Ms. Woolridge.

2          MS. WOOLRIDGE:  Your Honor, the two elements of the

3    charge of engaging in the business of dealing firearms without

4    a license have been met by the government in this case.  I'm

5    sorry.  I should say proof of both elements.  Of course, the

6    easier of the two elements I'll address first, that the

7    defendant did not have a license to deal in firearms within

8    the date alleged was undisputed in this case.

9          Second, that he engaged in the business of dealing in

10   firearms, Your Honor, the government has provided proof of

11   repetitive firearm purchases and proof of the intent to make a

12   profit from the sale of these purchases through the fact that

13   the defendant did sell all of these firearms, through his

14   financial information that reflects the sale of these firearms

15   and, quite frankly, mirrors the sale of these firearms; his

16   statements that he was making, just by example, from one

17   firearm sale alone, $2,000 off of the sale of a firearm; the

18   fact that the defendant took steps to cover his firearms

19   dealing, such as the cases found in the storage facility with

20   the serial numbers removed.

21         Your Honor, all of those, all of that evidence, just to

22   name a few examples, is evidence of his intent and his

23   willfullness in this particular case.  And certainly the time

24   and attention and effort that was given to these measures by

25   ordering and buying the firearms, physically going to the

1    stores to pick them up, purchasing them, storing them, posting

2    ads, contacting buyers, negotiating prices, and finally

3    meeting with the buyers and transferring the firearms, all of

4    that meets the element or the definition of dealing, as far as

5    time, attention, and effort.

6         But I think most telling is the repetitive nature of

7    these purchases, especially when looking at the dates, the

8    short time frame, and the fact that a short time later the

9    defendant did not have any but two of these 40 firearms that

10   we spoke of.  And even discounting those, the ten firearms

11   that were seized and the two that he did have, that's 28

12   firearms he purchased that the government knows of through

13   documentation and he did not have a short time later.

14             THE COURT:  All right.  Thank you, Ms. Woolridge.

15        The Court has to view the evidence that's been presented

16   in the light most favorable to the government to determine

17   whether or not it's sufficient to sustain a conviction, and

18   the Court does conclude that a rational trier of fact could

19   have found the essential elements of the crime beyond a

20   reasonable doubt based on the evidence that's been presented

21   and reasonable inferences from that evidence.  So I will deny

22   the motion for a directed verdict.

23        Counsel, are we ready for the jurors to be brought in?

24             MS. WOOLRIDGE:  Yes, Your Honor.

25             MR. ROACH:  Yes, Your Honor.  Do you read the

1  instructions before or after argument?

2          THE COURT:  I was going to read them after your

3  argument.

4          MR. ROACH:  Okay.  And I just -- it would be okay if

5  I read from the proposed that we talked to, just certain

6  issues?

7          THE COURT:  Yes, if they're in the ones that we're

8  going to go forward.

9          MR. ROACH:  Yes.

10         THE COURT:  And you may show them too if they are

11 part of the instructions that we've just discussed that we're

12 going to provide.

13         MR. ROACH:  Thank you, Your Honor.

14     Your Honor, I'm sorry.  Did you want me to wait to move

15 to admit 201 in front of the jury --

16         THE COURT:  Please.

17         MR. ROACH:  -- and then rest?  Thank you.

18         THE COURT:  Right.

19     And you know, counsel, I'm sorry.  I'm looking at the

20 statement of law that I had proposed adding, "The law does not

21 require a private seller of a firearm to produce documentation

22 of sales."  I suppose that is fine.  I have some concerns

23 about giving the instruction, but --

24         MS. WOOLRIDGE:  And, Your Honor, for the government,

25 I can't say what the Court's concerns are, but of course again

1  we have concerns about, again, whether it is appropriate in

2  light of the actual law regarding, governing the offense

3  that's charged here.

4      Also, if I may, with regard to the defense introduction

5  of Exhibit 201 -- I'm sorry.  I believe it's 201.

6          MR. ROACH:  Yes.

7          MS. WOOLRIDGE:  The defense and the government do

8  have an agreement that it is being introduced with the

9  informing of the jury that the amount of tax owed, according

10 to the return that was filed, as of this date has not been

11 paid and has accrued interest and penalties.

12         THE COURT:  So do you intend to inform the jurors of

13 that stipulation during the rebuttal, or is Mr. Roach going to

14 inform the jurors of that stipulation?

15         MS. WOOLRIDGE:  Mr. -- well, it doesn't -- I would

16 prefer to make that, so I can say that.  Basically, the

17 defense can offer the exhibit and rest, and I can just offer

18 the stipulation to the jury in rebuttal and then rest.

19         THE COURT:  All right.

20         MR. ROACH:  And I have no objection to it, and the

21 stipulation will be:  The parties agree that the taxes owed

22 pursuant to the 2019 tax returns have not been paid as of this

23 date.

24         MS. WOOLRIDGE:  And have accrued interest and

25 penalties.

1          MR. ROACH:  Yes.

2          THE COURT:  Okay.  Thank you.

3      (Jury in, 9:25 a.m.)

4          THE CLERK:  In criminal matter 19-1094, United States

5  of America versus Isaias Delgado, on for jury trial, day four.

6      Counsel, please state your appearances.

7          MS. WOOLRIDGE:  Good morning, Your Honor.  Angela

8  Woolridge appearing on behalf of the United States.

9          THE COURT:  Good morning.

10         MR. ROACH:  And good morning, Your Honor.  Brad

11  Roach, Trevor Hill on behalf of Mr. Delgado for the defense.

12         THE COURT:  Thank you.  Good morning.

13         THE DEFENDANT:  Good morning.

14         THE COURT:  And good morning to the jury.

15     All right.  Counsel, are we ready to proceed?

16         MS. WOOLRIDGE:  We are, Your Honor.

17         MR. ROACH:  Yes, Your Honor.

18         THE COURT:  All right.  Mr. Roach.

19         MR. ROACH:  Your Honor, the defense would move to

20  admit Exhibit 201 into evidence.

21         THE COURT:  All right.  And I understand there is a

22  stipulation to the admission of that exhibit.

23         MR. ROACH:  Yes, Your Honor.

24         THE COURT:  All right.  I will order that Exhibit 201

25  be admitted.

1          MR. ROACH:  And with that, Your Honor, the defense

2   rests.

3          THE COURT:  Thank you.

4       Ms. Woolridge, any rebuttal?

5          MS. WOOLRIDGE:  Yes, Your Honor, briefly.  If I

6   may approach.

7          THE COURT:  You may.

8          MS. WOOLRIDGE:  Ladies and gentlemen of the jury, the

9   parties have stipulated and you may accept this stipulation of

10  fact as regards to Exhibit 201, which has just been admitted

11  by the defense.  That is a copy of the defendant's 2019 tax

12  return.  The parties agree that it is a correct statement of

13  fact that, as of today's date, the amount of tax reflected in

14  that return is still owed by the defendant and pending as a

15  debt to the IRS along with accrued interest and penalties.

16         THE COURT:  All right.  And so the parties have

17  agreed to certain facts that have been stated to you.  Those

18  facts have now been conclusively established.

19      Anything further?

20         MS. WOOLRIDGE:  And with that, the government rests,

21  Your Honor.

22         THE COURT:  All right.  Thank you.

23      So at this time, we will hear closing arguments.

24      Ms. Woolridge.

25         MS. WOOLRIDGE:  Thank you, Your Honor.  May

1    I approach?

2         THE COURT:  You may.

3         MS. WOOLRIDGE:  May it please the Court, counsel.

4    Ladies and gentlemen of the jury, good morning.  This

5    case is simple.  The defendant, Isaias Delgado, bought guns, a

6    lot of guns, with the intent to sell them and make money, and

7    all of this would have been just fine if he had just simply

8    got a license, but he didn't.  That's it.  That's all this

9    case is about.  That's all that matters here, not how many

10   guns he sold or how much money he made selling his guns or how

11   much money he made in his regular job.  So don't let all of

12   that distract you.

13   As the Judge will instruct you in just a moment, after

14   the lawyers finally stop talking and sit down, all that's

15   required to commit the crime, the crime that we submit to you

16   the defendant, Isaias Delgado, did commit, is contained in

17   this instruction, and there's two elements and they're

18   straightforward.

19   If I may.  Thank you, Selina.

20        THE CLERK:  You're welcome.

21        MS. WOOLRIDGE:  These are the elements of engaging in

22   the business of dealing firearms without a license:

23   First, that the defendant was willfully engaged in the

24   business of dealing firearms from on or about December 17th,

25   2018 to on or about April 4th, 2019; and, second, that he

1  didn't have a license for a firearms dealer.

2      Well, ladies and gentlemen, we can get rid of that second

3  element very easily.  It's undisputed that the defendant did

4  not have a license to deal firearms.  We heard undisputed

5  testimony from an industry operations inspector to that

6  regard.  The defendant himself stated as much to the agents,

7  that he was not licensed as a firearms dealer.  So that one's

8  easy.  But, ladies and gentlemen, I submit to you, so is the

9  first element, that the defendant was engaged in the business

10  of dealing firearms within those dates.

11      So what does it mean to be engaged in the business of

12  dealing firearms?  Well, we must prove to you -- and I will

13  submit to you the government does have the burden of proof,

14  and I'll talk to you in a little bit about what that burden of

15  proof means.  But the government must prove beyond a

16  reasonable doubt that the defendant engaged in a greater

17  activity than the occasional sale of a hobbyist or collector

18  and that he devoted time, attention, and labor to selling

19  firearms as a trade or business with the intent of making

20  profits through reasonable sales of firearms -- repeated

21  purchases and sales of firearms.

22      Ladies and gentlemen, we've proved all that to you.  This

23  was not the occasional sale of a hobbyist or a collector.

24  This was repetitive multiple firearm purchases of the exact

25  same make and model on multiple dates over a period of time.

1  There is nothing occasional about the defendant's conduct, so

2  we can get rid of that right there.

3       Did he devote time, attention, and labor to selling

4  firearms?  Well, yes, he did.  What are all the things that he

5  did?  He ordered the firearms.  He bought the firearms both

6  online and physically in licensed firearm dealers.  He

7  physically went to the stores to pick up those firearms,

8  completed the Form 4473, provided cash or, online, provided

9  his credit card or debit card, made those payments.  He

10  purchased them.  He took physical possession of them.

11       He stored them.  We know at least some of them he

12  actually rented a storage facility to store all these

13  firearms.  He posted ads online.  He contacted buyers,

14  negotiated prices.  Then he had to meet with those buyers to

15  take the money and transfer the firearms that he sold to them.

16  That took time and attention and effort, and he did that again

17  and again with regard to every single one of these firearms he

18  bought and sold.

19       So, ladies and gentlemen, I'll submit to you that the

20  government did prove that the defendant devoted time,

21  attention, and labor to selling firearms.  There's no question

22  he bought firearms.  There's no question he sold firearms.

23  There's no question that took some doing on his behalf.

24       So what was his intent?  Making profits through the

25  repeated purchase and sale of firearms.  These were not

1   firearms he intended to keep.  We heard how nonsensical it

2   would be to buy so many multiple of the same exact firearms,

3   firearms that he no longer has within weeks or sometimes days

4   later.  And we heard that he sold these firearms.  He talked

5   about having sold those firearms.  He talked about making a

6   profit.  We heard his statements about how in just one firearm

7   sale alone, he made $2,000 because he was getting higher and

8   higher and higher offers.  He bought it for 8,500, first offer

9   was 9,500, and eventually sold it for 10,500.  And lo and

10  behold, look at his bank account.  He's got a deposit in that

11  exact same amount to prove it.

12      This is not an occasional sale of someone who just likes

13  to buy firearms as a hobby or collection.  Now it's very

14  possible the defendant might like firearms.  There's nothing

15  wrong with that.  There's nothing wrong with liking firearms

16  at all.  There's nothing wrong with buying firearms for your

17  personal collection.  There's nothing wrong with occasionally

18  selling off, you know, some of these firearms, but not for the

19  purpose, not repeatedly for the purpose of making profits, and

20  that's what the defendant did here, 40 firearms, ladies and

21  gentlemen, 39 over the course of ten months.

22      Even just focusing on the dates of the indictment, there

23  were 15 guns he bought and sold just within that about

24  two-and-a-half-month time period.  And those are all the

25  ones -- just the ones we know about.  As you heard about, as

you heard, there's very likely other guns as well.  We heard

about Armslist postings for guns that weren't included in the

known purchases by the defendant.  We heard about statements

he made about guns in addition to those known purchases.  So

there is very likely more guns than we knew about, but just

even the ones we knew about, so repetitive, again and again,

over the course of a very short period of time.

Again, maybe the defendant does like guns.  Maybe he

likes to go shooting.  But it's interesting.  We heard from

the president of the Tucson Rifle Club that the defendant went

there once, not six times like he told Agent Bort, but once.

He never went to the .50 caliber range like he told Agent

Bort.  In fact, he never -- you have to be a member to use

that range, and he became a member but never even signed into

that range.

And he went there once, one time.  The video is the same

date as the date that we heard of the one time he did go to

the Tucson Rifle Club.  And the gun he shot was one he bought

just the previous day, a gun that he took out of a brand-new

box that still had the stickers on because, of course, he

didn't intend to keep it.  He intended to sell it.  And lo and

behold, he did sell it.  He didn't have it anymore less than

two months later.

Now, ladies and gentlemen, maybe the defendant started

his firearms sales without the intent to engage in a

repetitive business.  Maybe he was in the beginning just a
firearm aficionado that liked guns.  Again, there's nothing
wrong with that.  But we know that the defendant was
purchasing guns as early as 2017, and he was selling guns as
early as 2017.  We heard about that's when he was selling guns
on Armslist.  We heard about some of those communications of
him being on Armslist and buying and selling guns there as
early as 2017, and that's reflected in the exhibit that you
have of the Armslist information.

     Now maybe then it was just occasional.  It certainly
wasn't the volume that we saw in late 2018 to early 2019.  But
at some point, he realizes he can make money.  He can make a
lot of money, as we talked about, $2,000 off the sale of one
gun.

     So this may have started off legally enough, but at some
point it switched.  It switched from being someone who just
likes guns as a hobby, likes guns for shooting or collecting,
to someone who likes guns for making a profit.  And, ladies
and gentlemen, that's what makes the conduct illegal.

     Now the government isn't required to prove, as the
instruction will tell you, that the defendant actually made a
sale of firearms.  What is important is his intent.  Now I
submit to you we have proved sales.  We've proved several
sales and sales that happened at a significant profit for the
defendant, but the question is and the issue is what his

1  intent is.  Well, ladies and gentlemen, I submit to you that

2  the evidence leaves no question that his intent was in fact

3  making profits.  So I submit to you that the government has

4  proven that his activity met this definition of engaged in the

5  business of dealing in firearms without a license.

6      Now let's look a little bit closer at that activity, and

7  I think that one of the most helpful exhibits in this case is

8  Exhibit 77, the purchase chart.  Now, like we said, 2017,

9  there's one, we have one purchase reflected here.  We know

10 there are more from his Armslist account where he's online,

11 negotiating the purchase and sale of firearms, but only one

12 that we were able to document with forms from the licensed

13 firearms dealer.

14     Okay.  Maybe back in 2017 it wasn't as repetitive, it

15 wasn't as often, but then we get into May of 2018, and that's

16 when his firearm purchases, repetitive firearm purchases start

17 in earnest.  That is what reveals his true intent here, which

18 is buying with the intent to sell for profit.

19     We look at May 25th of 2018.  That's when he buys the

20 first known Savage Arms Model 93.  We know he no longer has

21 this gun.  We know at some point he sold it.  And we know soon

22 after that purchase he opens up a bank account, a bank account

23 which I'll talk about later, but that essentially was a

24 clearinghouse for his money that he spent buying and selling

25 firearms.  That's where he deposited his cash.  It was a

1   credit card and debit card he used for online purchases, and

2   you will see, as we'll talk about in a minute, how closely his

3   cash deposits reflected his firearm purchases during the same

4   time frames and in fact just exceeded them, showing the

5   profits that he was making.

6       So he buys one Savage Arms on May 25th, 2018.  At some

7   point, he decides to sell it.  We don't know exactly when.

8   This one wasn't recovered.  We have no record of when it was

9   sold, but we know it was sold at some point before April of

10  the following year, so before April 4th, basically within

11  those ten months.

12      But what does he do?  Whether he initially bought this

13  first Savage Arms with the intent to keep it or sell it, six

14  days later he buys two more, two more of the exact same

15  firearm.  Again, there would be no reason to do this as part

16  of a collection, to just get identical firearms.  It makes no

17  sense.  And again we know he sold these because he no longer

18  had them ten months later.  And then what does he do?  Less

19  than two months later, he buys a fourth of this same identical

20  firearm, a fourth firearm that he again no longer has now,

21  only eight months after the purchase, on July 27th, 2018.  So

22  that's the first instance of repetitive purchases that

23  evidences his intent to sell for a profit.

24      Then we look at October 12th.  October 12th, the

25  defendant buys two again identical Romarm rifles, Romarm

1   WASR-10 rifles, which are, we heard about, basically an AK-47
2   type rifle, two identical firearms.  We know he sold them both
3   because he no longer had either of them, but also we know that
4   he sold No. 6 because it's recovered out of state, outside of
5   the state of Arizona, just months later.  So we know that
6   those were sold as well.

7       But what's more, we know that approximately two months
8   after buying the first two Romarms, on December 20th, as
9   reflected in Item 14, he buys another identical rifle,
10  identical Romarm WASR-10 AK-47 type rifle, on December 20th,
11  again a firearm that he doesn't have now, just three and a
12  half months later.  So again, here we have these repetitive
13  purchases and repetitive sales for the intent to make -- and
14  we know that he intended to make a profit.

15      But there's more.  We've got three identical Smith &
16  Wesson pistols that were bought on December 17th, 2018, again
17  exactly -- and I'm sorry, two identical, the 9 millimeters as
18  well as the .40 caliber, but again three Smith & Wesson
19  pistols.  None of these are the two pistols that the defendant
20  had in his garage.  These are separate.  Again, he doesn't
21  have any of them two and a half months later.

22      Where we really get into some interesting repetitive
23  purchases for the intent of the profits, though, are the
24  Barrett .50 caliber rifles, and this isn't just because
25  they're huge weapons and high-caliber, but we look at the

1    amount, we look at the profit that are made on them, and we

2    look at how repetitive these purchases were.  There was a

3    total of six of them, each of them purchased between 6,800 and

4    $8,500.  But, as I'll get to in a minute, we'll see that the

5    defendant made a profit off of every single one of these.

6         So he orders the first one that we know about on February

7    11th, and he has to put it on layaway.  Now keep that in mind,

8    ladies and gentlemen.  The defendant wants you to believe that

9    he has so much money that he's able to spend all of this

10   money, of his own money, on firearms, these repeated

11   high-volume firearms, high-dollar firearms, but he has to put

12   this $8,000 weapon, the first really big purchase he makes.

13        Now, granted, all these other previous purchases, they're

14   not cheap.  We're going, you know, upwards of $700.  These are

15   all -- these certainly aren't cheap weapons.  But then when he

16   starts getting into the real high-dollar weapons, several

17   thousand dollars, he has to put it on layaway.  And that's

18   fine, but he picks it up on February 19th and the very next

19   day lists it for sale and in his ad claims, oh, I found

20   something else I'm interested in.

21        Well, the defendant found something else he was

22   interested in.  We already know that for quite some time he's

23   been making repetitive purchases.  If this was true, that it

24   just had to do with what he's interested in and he has so much

25   money that he can spend it on firearms at will, he wouldn't

1   have needed to sell this Barrett to buy another firearm he was
2   interested in.  I submit to you he sold it because he knew he
3   could make a profit.
4        So that Armslist ad, I think, ladies and gentlemen, that
5   shows this Barrett for sale just one day after he finished
6   paying it off.  He wants it so much that he puts it on layaway
7   and takes a week to pay it off but then turns around and sells
8   it the very next day.  We know he didn't take it shooting, but
9   he just decides he doesn't want it.  It makes no sense, ladies
10  and gentlemen, unless he bought it for the sole purpose of
11  selling it, and so he sells it.
12       We hear about how he took a Barrett he bought for
13  $8,500 -- well, let's look at this one.  With tax, exactly
14  $8,500.  He posts it online and starts getting offers, and the
15  offers get bigger and bigger and bigger.  First offer, $9,500.
16  Wow, I can sell this one gun for a $1,000 profit?  Oh, wait,
17  the offers keep getting higher, and he sells it for $10,500.
18       Look at his bank records from Vantage West for that very
19  next month, and you'll see that, lo and behold, the defendant
20  did in fact have a cash deposit for exactly $10,500 that next
21  month, in March of 2019.  There is no business income that
22  corresponds with this deposit.  There's nothing except selling
23  that firearm, which the defendant admitted to selling,
24  admitted to selling at that price, and realizes very quickly
25  that he can make really good money off of selling these

1  firearms.

2       And he doesn't stop there.  On the 19th of February, the

3  same day he picks up that Barrett, he picks up another 9

4  millimeter.  Now that's one that he still has.  And in fact,

5  as you'll look, that's the lowest dollar weapon here.  That

6  weapon was under $200.  He has -- I'm not saying that that's

7  cheap.  Certainly $184 can be considered a good deal of money,

8  but it's interesting that the one firearm he has is the lowest

9  dollar firearm.  All the others, these high-dollar firearms,

10 he can make money off of.

11      He then buys a Beowulf barrel.  Now we do see him posting

12 a Beowulf barrel for sale two weeks later.  Whether or not

13 that's the same barrel, hard to say.  The color seems somewhat

14 different.  So again that could be a repetitive purchase, but

15 certainly it's something that he's looking to sell.

16      Then on February 24th, we see the first Anderson AM-15

17 multi-caliber receiver that the defendant orders, two of them

18 as a matter of fact, and we'll see more of them later, but

19 again same identical weapons on February 24th.  And both of

20 these are, with the transfer fee, approximately $1,000.

21 Again, we're talking about high value, high values here.

22      But going back to the Barretts --

23           THE COURT:  Ms. Woolridge.

24           MS. WOOLRIDGE:  Yes.

25           THE COURT:  If you could move it down just a little

1   bit.  It was cut off.

2            MS. WOOLRIDGE:  I apologize.

3            THE COURT:  Thank you.

4            MS. WOOLRIDGE:  Thank you.

5       Moving back to the Barretts, we know that the defendant,

6   in late February, sold a Barrett for a $2,000 profit.  Then on

7   March 7th, he orders the exact same firearm, exact same type

8   of firearm, finds a bit of a better deal.  Instead of 8,000,

9   he pays $6,800, although there are some fees associated with

10  it as well.  But this time he doesn't have to put it on

11  layaway because he has all that money in the bank from his

12  previous firearm sales, so he's able to pick it up when it's

13  transferred to the local FFL on March 13th.

14       On the same date he orders the Barrett from a different

15  online FFL, he orders an FN M249.  Now we heard about the FN

16  249s.  That's the one the defendant claims is subject to

17  recall.

18       Now that's an interesting topic I'm going to just take a

19  moment to discuss.  As we heard, and this is the firearm he

20  paid even more for than the Barrett he bought on the same day,

21  almost $8,000, 7,650 plus some fees.  It's quite a bit of

22  money.  He says he got rid of it because, he sold it at a

23  profit because it was jamming and it was subject to recall.

24       Well, first of all, as we heard, this particular firearm

25  wasn't subject to recall.  The agent ran the serial number --

1   it was easy to do on the website -- found out that it wasn't

2   subject to the recall.  In fact, this happened at -- this was

3   a 2019 firearm.  The recall was back in 2017.  But he sells

4   it.  He sells it at a profit.  I believe he said he made about

5   9,000.  He was able to sell it for about 9,500, but he

6   definitely said he made a profit off of it.

7       On the same day he picks up the FN, he also picks up a

8   Diamondback 5.56 millimeter rifle.  We'll talk about the

9   Diamondback in just a minute.  This is the first of two we see

10  him purchase.  Again, keep in mind he doesn't have any of

11  these firearms except for the Smith & Wesson we just talked

12  about, Item 17.  So far he doesn't have any other of these

13  firearms we're talking about.

14      He buys another Beretta -- we've already heard about

15  three Beretta pistols he bought, two of them 9 millimeter --

16  buys a third Beretta 9 millimeter on March 15th.  March 15th,

17  the same day, he picks up that first FN belt-fed and a

18  Diamondback rifle and also on the 15th picks up his fourth

19  Beretta.

20      But the day before he had also ordered, on March 14th,

21  two more Barrett .50 caliber rifles.  Now that's significant

22  because if we look at it, if we go back, the defendant picked

23  up his second Barrett on March 13th.  Then one day later he

24  orders two more, again exact same make and model, a .50

25  caliber BMG rifle, Model M82A1.  We know he sells these both

1  not only because he doesn't have them, but again just a few

2  months later one of them is recovered outside of the state of

3  Arizona.

4      And let's look at the dates here.  Not only does he buy

5  what is now that we know about his third and fourth Barretts,

6  he orders them online one day after he picks up his second.

7  He takes the possession of them at the local FFL, N&N, on

8  March 20th.

9      So what do we know about March 20th?  That very same day,

10  he orders two more Barretts, two more identical Barretts.  In

11  fact, these four Barretts, the two that were picked up on

12  March 20th and the two more that were ordered March 20th, are

13  not only identical in make and model, they have sequential,

14  all four serial numbers are sequential.  They were made at the

15  same time.  They were stamped one right after another.

16      Now he never gets to take possession of these Barretts

17  because they were intercepted when he met with ATF, but I

18  submit to you that just like the previous four Barretts that

19  he bought and sold, he intended to sell these as well.  Again,

20  why would you?  Why would you buy these firearms when you just

21  had acquired two other of the exact same type and no longer

22  have them?  It doesn't make sense.  He's replacing firearms he

23  already bought and sold with other firearms he's going to buy

24  and sell because he's making money off of them.

25      Ladies and gentlemen, look at the defendant's March bank

1  statements, because all of these high-dollar purchases,

2  firearm purchases, other than the ones that were intercepted,

3  happened in March.  And we have -- at this point, we have five

4  high-dollar firearms before the two that were intercepted,

5  five high-dollar firearms, all between the amounts of $6,800

6  and $8,500, that were purchased in the month of March, four of

7  the Barretts and one of the FNs, one of the FN belt-feds.

8      And if we look at the defendant's March Vantage West

9  statement -- and we heard from the defendant that Vantage West

10  is in fact his bank.  If we look at the cash deposits -- and

11  I'm going to show you -- and you'll have this exhibit.  It's

12  several pages, but this is Exhibit 89, and so I would

13  encourage you to take a look at Exhibit 89 when you're back in

14  your deliberations.

15      And we see some interesting deposit activities.  We

16  see -- I'm sorry.  I'm going to back up a little bit.  We see

17  in the defendant's checking, because keep in mind -- I'm

18  sorry.  We see in the defendant's savings account, because

19  remember he has a checking and a savings account, we see that

20  he has significant deposits on certain dates.  We look at

21  March 26, for instance, and he has total deposits,

22  interestingly, made in a number of different, broken up in a

23  number of different transactions, but total deposits on March

24  26 of $10,800, again the same month where he purchased five of

25  these high-dollar firearms he no longer has.

1        We look at March 7th.  In his savings account, he has a

2   deposit of $7,980.  He also has a -- and I'll get to it in a

3   moment.  He also has a deposit the same date of over $1,000 in

4   his savings -- I'm sorry, in the checking account for a total

5   of $9,560 deposited on March 7th.  Or I apologize.  It's the

6   same account.  So if we look at -- the 7,000 you can ignore.

7   That's a transfer from one, from his checking to his savings.

8   But then we look at the 7th of March.  When we total up all

9   these three amounts, these three separate deposits, it's a

10  total of $9,560.  Again, all of these deposits combined exceed

11  the price of all of these high-dollar firearms he was selling.

12       If we look at March 14th, a deposit of $9,500 -- I

13  apologize -- a deposit of $9,500.  Again, you can ignore the

14  4,600.  That was just a transfer from one account to the

15  other, his checking to savings, both Vantage West accounts,

16  but he's got a $9,500 deposit.

17       He also has several other deposits.  We do see the one

18  check, the one check that he deposits during this time period

19  is $2,599.99, and we heard that that is consistent with what

20  he was making per month on his other job.  But again on that

21  same date, we also have a $2,000 deposit, which is consistent

22  with some of the other firearms that he was buying and selling

23  that weren't quite as high-dollar as the other.  And we'll see

24  a lot of other smaller deposits throughout this account,

25  1,000, 440, because, as we know, he was buying and selling a

1  lot more than the Barretts and the FN belt-feds.  But lo and

2  behold, we also see on March 21st the $10,500 deposit as well.

3      So you look through all these records and you can find

4  actual deposits that match up with the purchases, an $8,000

5  deposit on March 23rd, 2019, for instance.  Now which one

6  directly corresponds to which of these five high-dollar rifles

7  he sold within the month of March?  Certainly I won't claim to

8  you that the government knows exactly which one matches which,

9  but it's very interesting to note that all of these large

10  deposits exceed the price that he paid for these high-dollar

11  firearms and they match up.  There were five purchased in that

12  month.  There were five deposits or five dates with those

13  sizable deposits during the same month.

14      What's really interesting, though, when we look at the

15  defendant's income that he's making from these firearms, is

16  that there's a break in his purchase activity.  We look back

17  to this chart and, for one reason or another, he doesn't buy

18  any firearms in the month of January.  Well, if you look at

19  his bank statement for the month of January, there's not a

20  single deposit.  He doesn't buy firearms; he doesn't have cash

21  deposits.  This isn't someone who is making these tons of cash

22  deposits from their work.  January, no firearms to sell, no

23  money in the bank.

24      And what's very interesting also is the same happens in

25  April.  He did order some guns in April.  He ordered, in fact,

1  two of them on April 2nd, but he never got to take possession

2  of them.  ATF found out about what he was doing, and by the

3  time those weapons actually came in on April 19th, ATF had

4  intercepted them.

5       So in April he's not able to sell any guns.  Look at his

6  bank statements from April.  No deposits then either.  And in

7  fact this chart makes it real simple.  You have the bank

8  records to look into.  But just to sum it up, the orange is

9  the money that he spent on the purchase of firearms and

10  firearm-related purchases that we know about.  The blue are

11  the cash deposits in this account.  And not only do they match

12  up and correspond, they exceed, showing the profits that he

13  was making.

14       Now it's not necessary that the government prove that the

15  defendant was making profits, just that that was his intent to

16  make a profit, but I submit to you the fact that he was making

17  profits was his motivation to keep engaging in this type of

18  activity over this period of time because he knew he could

19  make money off of it.

20       So, ladies and gentlemen, the last thing the government

21  has to prove to you as within the definition of one of the

22  elements is the defendant acted willfully.  Now, as the Judge

23  will instruct you, willfully doesn't mean that the defendant

24  had to know of the federal licensing requirement.  Now we

25  submit to you that he did.  He talked about it.  He talked

about going online.  In fact, at the end of the interview, you

heard the statement -- I'm sorry.  At the end of his

transport, you heard the statement when one of the agents --

and I don't recall if it was Agent Sutterley or Agent Bort --

told him, "Man, you should have just got a license."  And he

said, "I know, I know.  I was thinking."  He talked about

having gone online and looked at that.  He talked about

considering getting a license.

     But in any event, we don't have to prove that he knew of

the license requirement.  We don't have to prove that he knew

exactly what he had to do to get a license.  We hear that

information is readily made available publicly, that there are

actually people at the ATF assigned to assist with that, but

that doesn't matter.  All of that's of no moment.  What we

have to prove to you is the defendant knew his conduct was

unlawful, that what he was doing was wrong.

     Well, how do we know that?  Well, let's look at all of

the evidence in this case, ladies and gentlemen.  Let's look

at the statements that he made.  Let's look at how evasive he

was with Special Agents Bort and Cunningham when they asked

him about his past firearm purchases.  Specifically look at

the exchange, and I know a lot of you took very good notes,

but you also will have the ability to listen to the recording

if you want to.  And if you don't recall it, I would urge you

to listen to it or consult your notes if you were able to take

1  notes about it.  I know it was very fast.  Some of it was hard

2  to keep up with.  But the defendant, when he was asked about

3  how many firearms he had purchased in the past two weeks, and

4  we're talking about two weeks back now from April 4th, the

5  defendant says -- "Did you purchase any firearms in the last

6  two weeks?"  He says, "No."

7       Ladies and gentlemen, two weeks prior to May -- I'm

8  sorry.  Two weeks prior to April 4th would take us back to

9  approximately March 20th.  Well, on March 20th, he picks up

10  two of the Barretts.  On March 20th, he purchased two more of

11  the Barretts.  On March 25th, he buys a Beretta.  I'm sorry.

12  Also March 20th, he buys a pistol, one of them that he still

13  had, but he didn't even tell them about that he had purchased

14  that within the last two weeks.  On March 25th, he buys

15  another Beretta again that he doesn't have.  March 27th, he

16  buys those two additional FNs, the FNs he claimed that he got

17  rid of the first one because it jammed but then bought two

18  identical of the same one just a few days later.  He also

19  bought the Browning M1919 and the three Anderson multi-caliber

20  receivers with matching uppers.  He also bought a Diamondback

21  rifle, another Diamondback rifle.  Remember, he said that he

22  bought the first one in early March.  He buys the second one

23  now March 28th, less than -- just a week before ATF agents

24  spoke with him, and this one he didn't even have.  This one he

25  actually bought physically, he picked up, and he had already

gotten rid of it in less than a week.  March 30th, he orders

another Beowulf.  And on April 2nd, he orders two more

Andersons in .50 caliber, with .50 caliber Beowulf

configuration.

So, ladies and gentlemen, if my math is correct -- I need

a second to count all these -- that's 16, 16 guns that he

bought in that preceding two weeks.  And when asked directly

did you buy any guns in the last two weeks, "No."  Why does he

say that, ladies and gentlemen?  Because he knew it was wrong.

Now there is nothing wrong with buying 16 firearms if you

don't intend to sell them.  There is nothing wrong with buying

16 firearms for your own personal possession, for your

collection, because you like them, because you want to go

shooting, whatever, for protection, to personally own them.

There's nothing wrong with that.  That is not against the law.

But to buy them with the intent to sell them, that is against

the law.  That's what the defendant did.  Otherwise, he would

have no reason not to just say, oh, yeah, I love guns.  I

bought 16 of them.  They're awesome.  Come to my house.  I'll

show them to you.

But he didn't have them.  He had no reason to say he

hadn't bought any if he knew what he was doing when he bought

those guns wasn't wrong, if he knew what he was doing when he

sold those guns wasn't wrong, if he knew what he was doing

when he repeatedly bought and sold firearms to make a profit,

1   to make money off of dealing in deadly weapons wasn't wrong.

2       Here's another interesting thing, and the defendant tried

3   to make much of this recall of the first FN that he bought,

4   and he had to -- he got rid of it right away because it was

5   jamming and somehow sold a defective firearm that didn't work

6   at a profit and told the buyer that it was jamming, but the

7   buyer was still willing to buy it at 2,000 more than retail.

8       Well, first of all, that doesn't make any sense, ladies

9   and gentlemen, but here's why the defendant brought up the

10  recall.  Remember him telling the agents when he was being

11  transported, and again you can listen to it if you need to, "I

12  knew I was going to be arrested.  I know why you guys" --

13  well, first of all, the first thing he says on April 4th,

14  "Yeah, I know why you guys are here."

15      Now the defense can make much of, well, of course, what

16  would ATF be there to talk about other than guns?  But the

17  defendant said, "Yeah, I figured.  It's a big order."  Again,

18  there's nothing wrong with a big order.  There's nothing wrong

19  with buying many weapons at a time.  There's nothing wrong

20  with spending $34,000 of weapons at one time.  And that's

21  how -- by the way ladies and gentlemen, that's how much that

22  order was that the defendant went to pick up on April 4th,

23  $34,000.

24      We heard that he made -- from his two witnesses that he

25  called, what did we hear about?  We heard about $34,000 from

one of his clients in a year, in the year 2019, and 30 -- I'm
sorry, 15, about $15,000 from the other, roughly around 50
grand.  He spends approximately -- I really should not put
myself in the position of doing math on the spot -- but over
two-thirds of his annual income that we know about on firearms
in one day.  It doesn't make a whole lot of sense unless he
knew this is something he could make a profit on.

This was a business.  Maybe it wasn't his primary
business.  Maybe he devoted most of his time to his computer
business.  It doesn't matter.  There's no percentage.  As you
heard from Industry Operations Investigator Lopez, a lot of
people get FFLs, or a federal firearms license, when they have
a full-time day job and the sales are just something that you
do on the side.  That's okay.  You can get a license to do
that, but again you need to get that license.  You need to
fill out the application.  You need to keep records.  You need
to make sure you maintain, comply with those regulations so
that, for instance, the industry is properly regulated to help
prevent guns from going in the wrong hands.  You can do that.
That's fine.

The defendant could have done that, but he chose not to,
maybe because it's easier just to buy and sell online, maybe
because he can make more profit that way.  But for whatever
reason -- maybe he didn't want to pay the $200 fee.  I don't
know.  But for him, it was a heck of a lot easier and a heck

of a lot more profitable to just buy and sell them on his own.
But whatever his motivation was, we know that his intention
was to make a profit.

But in any event -- and I'm sorry, I tend to digress --
when he goes up to pick up those five weapons in that $34,000
order, oh, which also exceeds -- if you look at his 2018 tax
records for the previous year, $34,000 is more than he claimed
to have made in 2018 total, and this is just three months into
2019 here, and within those three months, we saw one check
deposit from income.

In any event, April 4th, he goes to pick up that order
that in and of itself wasn't illegal unless the defendant
knew, unless the defendant intended to sell them.  And he
says, "I told everyone, I told my mom, yeah, I'm going to
get arrested, I told my dad I'm going to get arrested
tomorrow," talking about what he was telling everyone the day
before, the day before he went to pick up the firearms.

Well, again, the defense can make much of, well, what
else would ATF be there to talk to you about?  He didn't know
the day before that ATF would be there, but he had a feeling
he was going to get arrested.  He had a feeling because he
knew what he was doing was wrong, and he had a feeling that
with that big order -- because, as you see, his orders keep
getting bigger and bigger.  He gets bolder and bolder the more
he buys and sells without getting caught.  So this new big

order that is more than he had ever bought at one time, you
know what?  I might be flying too close to the sun.  They may
find out.  And sure enough.

    Now what did he have to be worried about?  What did he
have to be worried about getting arrested for?  Again, if he
didn't intend to sell them, he would have done nothing wrong.
And this is someone, by his own statements, he knows about the
regulations.  He knows about the laws regarding firearms.  He
had nothing to be worried about.  In fact, he talked to the
agents about other laws that he knew he wasn't violating.  And
he's not charged with violating any other laws, ladies and
gentlemen.  That's a thing.  He's charged with dealing
firearms without a license because that is the crime he
committed, and that is the crime he was worried about getting
caught with.

    So what does he do?  He has a feeling like, oh, this is,
you know, this is a big order.  What am I going to say?  What
am I going to say if they're on to me and they want to know
why I don't have any of these guns anymore?  All right.  So he
does his research and he finds out that, oh, in 2017 there was
a recall on FN M249s.  Well, one of the guns I bought was an
M249.  Two of the guns I have coming in are M249s.  So he
comes and says, "Oh, yeah, you know, that one was jamming
because of the recall, but these other two, these are post
recall."

No, ladies and gentlemen.  First of all, jamming was not
the reason for a recall; and, two, all of the three firearms,
the one he bought and sold in early March and the two he was
coming to pick up that he had bought, that he was going to
sell, all of those were post recall.  All of those were 2019
weapons that, according to FN themselves, were not subject to
that recall.

But he knew he had to have some sort of explanation, he
knew he had to have some sort of story because he did not have
a lawful explanation of why just days later, from some of
these purchases, he doesn't have $111,000 worth of guns that
he had bought, $111,000 total, ladies and gentlemen, with all
the taxes and fees and things.  It's staggering.

So he has to think of something.  He makes up the story
about it jamming.  He talks about going to the firearm range
all the time, which we find out specifically the Tucson Rifle
Club, at least six times he talks about.  We know that he was
there once.  And he talks about shooting .50 calibers at the
Tucson Rifle Club because they have a range for it.  Well,
they sure do -- again, he did his research -- but the
defendant never shot on that range.

So why is he saying this?  Because he's got to do
something to mask his conduct, conduct that he knows is
illegal, and he knows exactly what's illegal about it.  He
knows that you can't just buy guns to resell them.  You can't

1    just buy and sell guns to make a profit like he was doing,

2    because that's exactly the type of behavior he was trying to

3    mask, trying to cover up.

4         Why did he have no firearms but boxes of the firearms

5    with the serial numbers removed?  Because he didn't want the

6    agents to know about those purchases.  He didn't want them to

7    find out about these additional guns he had bought and sold.

8    Why would you cover that up if those were just your own

9    guns that you had for a while?  Why remove those serial

10   numbers?  So again all of these things, ladies and gentlemen,

11   that show that the defendant committed this crime willfully.

12        And it's interesting, he throws down the words "hobby"

13   and "collection."  Now again just saying that doesn't make it

14   so.  And you can look at his purchase history.  You can look

15   at all of these firearms he bought in such a short period of

16   time that he no longer has anymore.  You can look at his cash

17   deposits that match up with these firearm purchases, and you

18   can conclude what his intent was.

19        He knew what he was doing when he was buying those guns,

20   maybe not the first gun he bought, maybe not back in 2017.

21   Maybe he originally got into this because he just likes guns,

22   but it became -- at some point, it became more than that and

23   it became a business, and that is when it became unlawful.

24        Ladies and gentlemen, I want to talk to you about one

25   more instruction that the Judge is going to give you, and that

1  instruction has to do with the government's burden, and again

2  the government always has the burden.  It's not the

3  defendant's burden to prove he didn't commit this crime.  It's

4  the government's burden to prove that he did.  But I submit to

5  you we have.  We have proven beyond a reasonable doubt that

6  the defendant engaged in the business of dealing firearms

7  without a license.

8      And I want to draw your attention to this instruction.

9  This is another instruction you're going to hear, once I

10  finally stop talking, from the Judge.  Proof beyond a

11  reasonable doubt is not proof beyond any doubt.  It's not

12  proof beyond all possible doubt.

13      Ladies and gentlemen, one of the great things about jury

14  service is you get to be human.  You don't check your common

15  sense at that courthouse door every day when you come in.  You

16  get to bring that common sense, you get to bring in that sense

17  of reasonableness to your deliberations in this case.  It's

18  okay to have doubts.  I don't know about you, I have doubts

19  about just about everything.  But you still have to take

20  actions in life, and when you have doubts and you make a

21  decision, you make that decision based on your common sense.

22      So, for instance, yes, we can't look inside the

23  defendant's head and know his thoughts.  We're not psychic.

24  But we can infer those thoughts from his actions.  We can

25  infer his thoughts from all this evidence.  And that's called

circumstantial evidence, and the Judge will tell you that that
can be given -- that you can give that equal weight to actual
evidence.

So we can look at all the evidence that shows what the
defendant's intent was in this case, but it's okay to have
doubts.  We can think, well, you know, he said he was doing
this for a hobby.  Is that possible?  And we have to think
about that and think is that possible.  But the government
doesn't have to prove the defendant's guilt beyond all
possible doubt.

So you ask yourself is that doubt reasonable.  Is it
really reasonable that this was just a hobby when he is buying
the exact same gun again and again and again and selling them
again and again and again and profiting off of them again and
again and again?  And except for those two relatively
inexpensive handguns, he didn't have a single one.  All of
that money spent on guns, $111,000, and what he had left was
worth about 400.

So, ladies and gentlemen, it's okay to have doubts.  I
invite you to think about those doubts, discuss them with each
other, but then at the end of the day decide are they
reasonable.  Did they make sense to me?  When I look at this
chart, when I look at how many guns the defendant was buying
again and again, when I look at the types of guns and how
repetitive they were and how he's turning around the same day

1  he acquires certain guns, .50 caliber guns worth between --

2  that he's buying for more than 6, between 6 and $8,000 and

3  selling for quite a bit more online, when he's ordering more

4  the very day he's getting some of them in, is this a hobby?

5  Is this someone who just wants these guns for his collection,

6  or is this someone who is buying them to make a profit?

7       I submit to you that the only reasonable conclusion is

8  the latter.  The only reasonable conclusion is that the

9  defendant, we all know, did not have a license to deal in

10 firearms, nonetheless engaged in the business of dealing

11 firearms with the intent to make a profit off of his

12 repetitive gun purchases and sales.

13      I submit to you the government has proved that beyond a

14 reasonable doubt, and when you consider all of that evidence

15 that supports that the defendant did in fact commit this crime

16 beyond a reasonable doubt, we'll ask that you find him guilty.

17 Thank you.

18           THE COURT:  Thank you, Ms. Woolridge.

19      Mr. Roach.

20           MR. ROACH:  Red flags don't matter.  The government's

21 ideas about what is suspicious or what they don't like don't

22 matter.  The government's and ATF agents' interpretation of

23 what the law is doesn't matter.  The only thing that matters

24 is the law that was passed by the United States Congress and

25 as the Judge instructs you on that law.  That's the only thing

1   that matters.

2       So again and again throughout the course of this trial,

3   you heard these ATF agents, "Well, that was a red flag to me.

4   That was a red flag to me."  It does not matter.  The sole,

5   only question you have to answer in this trial is did

6   Mr. Delgado intentionally and willfully violate the federal

7   law.  If he did, he's guilty.  If the government does not

8   prove that beyond a reasonable doubt, he is not guilty.

9   That's it.  That's the question.

10      So the government and the ATF agents may not like a lot

11  of things that happened, and that's fine, but I don't care and

12  you shouldn't either.  The only thing that matters is, as a

13  United States citizen, we are told these are the laws, these

14  are the things to follow, right?  So if they tell you, well,

15  the speed limit on this road is 45, right, and you do 46 and

16  they say, well, we don't like that because we really think you

17  should have been doing 35, therefore you're in violation, that

18  doesn't matter.  It doesn't matter what they think should

19  happen on the road.  They've got to tell you, the government

20  has to tell you this is the law so that you know what to

21  follow and what not to follow.

22      In this particular case, this is the law as the

23  government -- as the Judge will inform you, again, not as the

24  ATF wants you to believe or not as any one of these agents

25  wants.  The key to this whole thing -- and I agree with the

1   prosecution, Mr. Delgado did not have a license to sell

2   firearms -- but proof beyond a reasonable doubt that he had to

3   buy weapons to sell them, right?

4       Sale -- let's see.  The business of firearms, sale of a

5   firearm, devoted time, attention, and labor to selling as a

6   trade or business.  So you can devote time, attention, and

7   labor to selling firearms and that's okay.  It's only a

8   violation of the law if you are devoting time, attention, and

9   labor to selling the firearms as a trade or business, so not

10  as an ancillary thing that occurs and that might occur when

11  you're doing something else.  It has to be -- to violate

12  the -- to be required to have a license, you have to devote

13  time, attention, and labor to selling the firearms as a trade

14  or business with the intent of making profit through repeated

15  sales.

16      So all these things are required.  Any one of these

17  things doesn't happen, he is not required by law to have a

18  federal firearms license and you find him not guilty.  Not

19  only that, they have to prove that he willfully did it,

20  intentionally did it, knowing that it was unlawful.

21      So let me give you an example just as an example of what

22  I was talking about, about it doesn't matter what the

23  government or any one of these ATF agents thinks is a red flag

24  or something they don't like.  You remember Agent Bort got up

25  yesterday and he said, oh, you know, if you just bought one

gun, you could, in certain circumstances, be required to have

an FFL license.  Well, the law says making profits through

repeated purchases and sales.  So that's again just one

example of what the government thinks or what they don't like

is not the law.  This is the law as given to you by the Judge.

So the government chooses to say -- and they sought an

indictment, and you heard Agent Cunningham talk about it.  She

sought an indictment that from December 17th to April 4th,

2019, he should have had a license because of all these

things.  So they bring this famous Exhibit 77 to you guys and

say, aha, this is how we prove it.

So this is my question to you.  There is some handwriting

on here that's my handwriting.  This is a photocopy of the

exhibit.  You're going to get the original exhibit.  So they

say, well, nobody in the history of the world has ever bought

more than one of the same type of gun.  That's crazy.  If you

do that, you must be buying with the intent to sell for profit

as part of a business and you must be willfully doing it

without a license, right?  That's their -- basically the whole

theme, right?

So they say that he bought four of the same guns in May,

May, May, and July of 2018.  But here's the thing.  These are

bolt-action .22 rifles.  These guns are scarier guns.  They

don't indict.  If that's the big deal, right, that's the

payoff on this thing is he couldn't be a collector, he

couldn't just be a dude who's got a bunch of money, doesn't

have anything else to do with it and likes to buy cool looking

guns, it can't be, ladies and gentlemen, because nobody ever

buys more than one type of gun.  Well, then why isn't the

indictment for that time frame?  Because it's not about him

buying the same kind of guns.  It's about the type of guns and

that they don't like the type of guns.

     Let me talk about that for a second.  You remember two

days ago when they brought in all the guns and they were all

sitting right here?  That was a pile of big guns, wasn't it?

I mean, that was a pile of big guns.  Now let me ask you a

question.  You're going to have pictures, and a bunch of

pictures have been admitted of those guns, what they look

like.  Well, why bring them in, right?  Why put them here?  We

all know they've got pictures.  Nobody's denying that these

are guns.  Because they're scary looking, right?  If he had

been accused of selling 39 cute little Derringer pistols that

shot little .22s, do you think they would have brought all

those out and laid them out on the floor for you?  No, they

wouldn't.  This is about the government not liking those

particular guns.

     So listen, the gun laws in the state of Arizona and in

the country are obviously very contentious and people have

some really strong feelings about that.  Some people really

want a lot more restrictions.  Some people think that there

shouldn't be gun restrictions.  That's fair.  And I don't care
what your personal opinion is and you're entitled to that
absolutely, right?  So you think there should be more
restrictions, great.  You think that there should be less
restrictions, great.  But we have to deal with, and when the
criminal law is talking about whether an individual person
committed a crime, we have to talk about the laws that are in
effect at that time.

So there's nothing wrong with any of those weapons.
There are probably some people -- if you showed that pile of
weapons to a group of 100 people, there will be some people
who would be scared and would be like, oh, my goodness, I
don't like that.  That looks scary.  Absolutely.  I get it.
There would also be a group of people in there who would be
like, oh, my, that looks really cool.  I would love to play
with that one.  I would love to play with that one.  Right?
That's cool too.  It doesn't matter.  But think about, and I
said this in my opening, not only what people say but why they
say it or, in this case, why they brought it in or, in this
case, why these .22 bolt actions are not part of the
indictment.  It's because the government does not like these
kind of guns.

Now a lot has been made of -- and frankly, I fell into
this fallacy right now when I was just talking to you because
I said, you know, these guns are identical.  Well, let me give

1  you an example, just like let's go back to these .22s.  I have

2  three boys.  When they were young, I bought a lever-action .22

3  rifle for them to learn how to handle firearms safely.  Could

4  I have easily bought three-lever action rifles so that when

5  I'm out with them, they all three could be shooting the

6  lever-action .22 rifles?  Yes.  Would that have been a

7  rational thing to do?  Yes.  Would it have been rational for

8  me to do that and then sell it because the kids didn't like

9  shooting?  Yes.  Right?

10      So they're saying, one, three identical guns or four

11  identical guns, automatically you're a person selling guns

12  with the intent to make a profit for a business, willfully

13  doing it knowing you should have -- knowing that it's

14  unlawful.

15      But the fallacy that I fell into is the one that the

16  government talks about or makes all the time when describing

17  these guns.  They're saying these guns are identical.  They're

18  not identical or at least they haven't proved they're

19  identical.  They often have the same base or the same

20  function, but they're not identical.

21      And let me tell you, let me show you what's been marked

22  as 96.  You saw these guns in person.  They are admitted.

23  These are the two guns, the last two guns that are on Exhibit

24  77 that were intercepted and that Mr. Delgado never got.

25  These are the same type of guns, but are these identical guns?

1   No.  They look different.

2       I have, well, not really a friend, a guy I know who is a

3   sneaker guy and pays outrageous sums of money for sneakers.

4   It doesn't make any sense to me at all.  And things that --

5   these little changes, these little things that make this gun

6   cool and this gun cool, something that he's interested in, I

7   don't get it.  But if I'm a guy who is making a lot of money

8   with basically no obligations, no house mortgage payment,

9   lives with his sister, she pays the bills, he's allowed to be

10  like, man, that's cool.  I'm going to buy a couple of these

11  weapons.  He can get them, look at them, and then say, you

12  know what?  I'm going to keep this one.  I'm not going to keep

13  this one.  I'm going to keep them both.

14      So the government will often -- well, they make

15  this assumption all the time, and what they do is they take a

16  blank, missing evidence, and then they try to shoehorn

17  or assume things that are not true or haven't been proven to

18  fill in those blanks in the evidence.

19      Example:  Repeatedly the government said in closing but

20  even in opening, Ms. Woolridge said, "You'll hear that he sold

21  these guns, almost all 40 of them, soon after he bought them."

22  That's what she said to you in opening, "You'll hear that he

23  sold these guns, almost 40 of them, soon after he bought

24  them."  Did you hear that?  No, you didn't hear anything close

25  to that.  What you heard is the government never recovered

most of these guns.  What you heard is that Mr. Delgado said

that he did sell a couple of the guns, one because it was a

20-inch barrel, he wanted a 29-inch barrel, another one

because it was jamming, whatever.

So, but the key to this is the assumptions that the

government is making.  He sold these guns.  Well, where is the

evidence he sold these 40 guns soon after he bought them?

Well, he didn't have the guns on him when he went to the gun

store to pick up the newest purchases, his big purchase.

Okay.  But you're not going to carry around those guns loaded

on you, right?  He didn't have it on him.  They searched his

house.  They weren't in his house either.

Go back, I beg you, please, listen to both of the tapes,

the audios of the interviews that have been admitted in this

case.  If you need to, listen to them a couple times, because

there are some things that the government told you in its

closing that I do not believe occurred, and I'm going to tell

you some things that I think are in those tapes.  What I say

doesn't matter.  If you want to go back in there and say, I

don't care anything that Brad said, fine.  What the government

says doesn't matter in there.  You guys, you are the jury.

You go back and listen to those tapes.  But they never asked

him, where are all the guns?

So I used to watch this show Cops, you know, and I don't

think they do it anymore, right?  So they're going to arrest

1   somebody and a couple cops go to arrest him, and they go,

2   "Don't move.  Put your hands behind your back.  Don't move.

3   Put your hands behind your back.  Don't move.  Put your hands

4   behind your back."  Well, which one is it?  Right?  If you

5   start to move, put your hands behind your back, you're moving.

6   But if you don't put your hands behind your back, you're

7   resisting their orders.

8        My point is this:  Go back and listen to the part of the

9   tape from April 4th where they're asking, as Ms. Woolridge

10  said that was so incriminating, "Oh, have you bought any guns

11  in the last three weeks, two weeks?"  You will notice that

12  between the two of them, Agent Cunningham and Agent Bort, they

13  change what they're asking three times.  "What have you bought

14  within the last two weeks?  What have you bought since the

15  beginning of the month?"  Again, this is April 4th.  "What

16  have you bought since the beginning of March?"  Go back and

17  listen.  They're changing the goal posts as Mr. Delgado is

18  trying to think of what they're asking.

19       The government makes a big deal of this, oh, he bought X

20  amount of guns in those two weeks.  Anybody would know that.

21  Well, here's the thing is the guns that she's talking about --

22  so you can purchase something, meaning you pay on Amazon for a

23  new table, right?  If it hasn't arrived at your house, so you

24  don't have it, have you purchased it?  I don't know.  But

25  that's the question, because what she's saying, oh, it's

1   incredibly obvious, they were very clear, they asked what have
2   you purchased in the last three weeks, and he wouldn't answer.
3   They wouldn't maintain what they were asking; and, two, I
4   would say when you are being grilled by ATF agents and they
5   are trying to ask you questions, you could sit there and go,
6   wait, wait, are they talking about what have I ordered or are
7   they talking about what have I purchased and picked up?

8        I mean, and think about it.  This is even true -- so me,
9   a 50-year-old guy driving down the street in my car.  We can,
10  for the purposes of this, presume I'm not doing anything
11  illegal.  I'm driving.  All of a sudden I see a police officer
12  behind me.  Uh.  What is that?  What has happened?  What has
13  happened to each of us?  Even if you're not doing anything
14  wrong, you see just a regular old police officer behind you,
15  you tighten up.  Like, if they pull you over and they're like,
16  hey, you know, your tire is flat and you should get that
17  fixed, okay, thank you, Officer.  But you're still nervous.
18  And that's me, that's me, somebody who looks like I do, not
19  doing anything wrong.

20       Now I can't -- none of us can put ourselves in somebody
21  else's shoes and what their life has been like, so I don't
22  know.  What Mr. Delgado said was, and listen to the interview
23  that was on the 4th, that he's held in custody on the 5th and
24  they're bringing him back, and listen to the change in tone
25  and how at first, the first one, on the 4th, it's more they're

talking back and forth.  And he sounds a little mad on the
5th, and what does he say?  He says, "You guys stopped me
because I'm Mexican."

Now I'm not at all saying that this is true, that that's
why they stopped him at all, but what I'm saying is, from his
point of view, that's the life that he has lived, right, of
being a person of a certain ethnicity and how he's treated by
law enforcement that might be different from somebody else.
And again I'm not saying there's anything at all here that has
to do with his ethnicity, but that's what he said after he had
been sitting in jail.  He's like, "I told you guys everything
yesterday."  And he's mad because that's how he sees it.

Again, I'm not saying that that's true or not true, but
what I'm saying is that's how he felt.  And when he's getting
interacted with by ATF, when he knows he's made a big purchase
and they're asking him questions and changing the dates, you
can't make a conviction based on him being a little confused
and trying to answer as accurately as he can under these
high-pressure situations.

Now if you -- well, not you.  Being asked a question, and
the government already addressed this, but I'm going to talk
about it anyhow, because if ATF comes up to you and says,
while you're walking into a gun store -- I'm sorry, he's
already been in the gun store -- walking out, hey, I want to
talk to you about something, they're going to be talking to

 1   you about guns.  This is not a DUI investigation.  They're not

 2   investigating if your car is stolen.  It's ATF.  Of course

 3   they're going to be talking to you about guns.  He says that

 4   he knew because Mr. Novak, the kid who was running the N&N gun

 5   store, was acting squirrely, that he thought something was up.

 6   All right.  Why does that matter?  Why does that -- why is

 7   that actually essential to this case?  Because he thought

 8   something was up because he made a big order, which is not

 9   illegal, but he made a big order, but he still showed up.

10         So he could have said, you know what?  I'm doing

11   something illegal here.  I know I'm doing something illegal.

12   This is a setup.  I'm not going to show up.  I'm not going to

13   get arrested because I'm not going to go there.  That's not

14   what he did.  He showed up, signed all the paperwork for these

15   guns, because in his mind what he was doing was lawful because

16   what he was doing was lawful, because this was his own

17   purchasing, buying, and selling or getting rid of guns that he

18   liked because he's a kid in a candy store with a lot of money.

19         So let's go through some of the timing on this when it

20   comes down to April 4th.  The government says he sold 40 guns

21   soon thereafter, with no proof.  What we do know, and even the

22   government admits this, is that he had a storage facility, an

23   access controlled storage facility, U-Haul storage facility,

24   for guns, right?  Even the government said that in their

25   closing.

1        So on the 4th, he's arrested.  On the 5th, he's brought

2    to court.  On the 11th, a federal judge from this courthouse

3    says, "You cannot possess any firearms."  He's ordered,

4    court-ordered, "You cannot possess any firearms."  So what

5    does he have to do?  Get rid of any firearms he has.

6        Now, one, you have proof of this, that that's what he

7    starts to do, because we've got the emails that he sent to

8    other people that he had ordered guns from, saying, "Hey, hey,

9    hey, stop, you know, I can't get those guns.  I'm under

10   indictment or ATF arrested me."  You got those emails.  You're

11   going to see them.  So he has got to -- he now has guns in his

12   possession.  He's got to get rid of those guns.

13       So when you're talking about selling firearms as a trade

14   or business to make profits, selling firearms or disposing of

15   firearms to comply with a court order is not for a trade or a

16   business.  So when they say on February 23rd, three weeks

17   after he's arrested, two weeks after he is ordered not to

18   possess any firearms, we don't find any firearms in his

19   firearm storage place, yeah, because if you did, he would be

20   in violation of the court order, right?

21       So what they do is they shoehorn that.  We didn't find

22   any, so therefore he must have sold them; therefore, he must

23   have sold them at a profit; therefore, he must have sold them

24   at a profit because he wants to have a business; and therefore

25   he must have sold them at a profit for a business willfully

1  knowing that he should have -- that this was unlawful.  So

2  that's the chain of assumptions they make from the fact that

3  they didn't execute a search warrant right away.

4      So again they had search warrants for phones, for the

5  car, for other things, they knew about the U-Haul place, and

6  they didn't do it until the 23rd, after he was told he can't

7  have firearms.  So again they're making assumptions, the

8  government is making assumptions, but you can't convict

9  somebody on an assumption.  You have to convict somebody with

10 evidence.

11     So let's talk about how people say things and how --

12 because I think I opened this -- in opening, I talked to you

13 about this too.  So, and I want to compare Agent Cunningham

14 and Agent Bort in terms of their testimony and how they

15 testified, right?  Because it matters and it matters in a

16 couple of ways.

17     One of the jury instructions you're going to get is

18 you're supposed to assess all witnesses the same, and the

19 Judge will tell you, you know, how you can make those

20 assessments.  So, in other words, a police officer, a priest,

21 a surgeon, a psychologist, a medical doctor, a trash man,

22 everyone when they get up there is the same, and then you try

23 to figure out, based on how they talked, if you think, all

24 right, I should believe all, some, or none of what they said

25 and how they talked.

1      So police officers, like anyone else, are humans, and let

2  me give you an example of what I mean.  Has this ever happened

3  to you?  You go out and you buy a new Toyota Highlander,

4  right, because you went to the auto store and you saw one that

5  you liked, fits your family, whatever.  So you buy a new

6  Toyota Highlander and now when you're driving through the

7  streets, all of a sudden you're seeing all these Toyota

8  Highlanders that you never noticed before.  So it is just kind

9  of human nature.  This thing is brought to your attention that

10  you wouldn't have paid attention to before.  It's not that

11  there's magically more Toyota Highlanders.  It's just that's

12  what's relevant to you.  So when these ATF agents are talking

13  to you, they are relating to you the world as they saw it

14  based on their particular views, their lenses.

15      So I'll give you an example.  Agent Cunningham was asked

16  by the prosecutor did he have or was there computers -- no.

17  This actually I think may have been a juror question.  But she

18  was asked, "Did you see any computers or any computer stations

19  in the house?"  And she said, "I didn't" -- let's see -- "not

20  that I saw."  Okay.  So that could be one of two ways.  That

21  could be, "No, there were none"; or when I went and followed

22  up, what she meant is, "Not that I saw.  I looked through the

23  pictures.  I don't remember seeing anything.  I didn't go to

24  the house."  Right?  So this is an accurate statement, "not

25  that I saw," but it is -- can be viewed in two ways.  So Agent

1  Cunningham cleared it up and she was like, "No, no.  What I

2  mean was, like, I didn't look at those pictures.  I didn't see

3  it."

4       So if I had asked Agent Bort -- you guys make your

5  decision on this.  But if I had asked Agent Bort, hey, is

6  yesterday Wednesday, he would have said, well, I mean, the

7  Gregorian calendar, or it depends on whether or not you call

8  24 hours yesterday.  Anytime I would ask him a question, he

9  would not answer it or would evade or would try to see where I

10 was going and try to go in a different direction.

11      Just I want to compare the method by which he testified

12 by the method by which Agent Cunningham testified, and this is

13 why it matters.  What I say about the evidence doesn't matter.

14 What the government says about the evidence doesn't matter.

15 You're going to have audiotapes of two interviews.  Listen to

16 them, please, because that's the evidence.  Listen to that.

17      Now Agent Bort said my client said X, Y, and Z in his

18 third interview that you do not have the audiotape for, you

19 can't go back and listen to.  Well, you know, he said it, but

20 maybe he said it in one way versus he said it in another.  Let

21 me give you some examples.

22      So Agent Bort was asked, oh, did Mr. Delgado ever say

23 that, you know, his company is doing gangbusters and he's --

24 in 2019, all of a sudden he was making a ton of money?  A

25 question like that.  And he said, "No."  And then I said,

wait, wait, wait.  Show me anywhere in the transcript that anybody said anything about 2019.  He said it's not there. And I said, so somebody asked him about the economy in general, and he said X, Y, and Z.  Then he said, "Well, I took that to mean" or "I assumed," words to that effect.  Well, that's the problem is when somebody is going through their lens, what they want, what they desire, and telling you, "I assumed."  But that wasn't my question.  He never told you.

So let's go through my client's, both his actual monetary situation and what he said in this particular case.  So April 4th, they ask him directly, "Where did you get this money?" And he goes, "I got it from work."  He tells them directly on that date, "I got it from my work."  He tells them what he does.

Why, why did nobody bother to look for his tax returns until September of 2019?  That's what Agent Cunningham said. That matters.  It does.  And I'll give you an example.  If they had just seen a piece of paper saying Bill Gates just bought these five weapons, wouldn't a wise investigator go, let me just check to make sure this is not the richest man on earth, right?  Because the richest man on earth might behave differently in terms of buying expensive things than some of the rest of us, because it does matter when they start saying, oh, he spent a lot of money.

He did spend a lot of money.  Nobody bothered to look.

1    They didn't even bother to check to see if he was making, you

2    know, 15 bucks an hour working at Burger King, what he was

3    doing, what kind of income he had so therefore it could make

4    sense that this was a collection.  This was something like a

5    kid in a candy store versus somebody who was running a

6    business.  They didn't check, just made assumptions.  But he

7    told them, "Look, man, I make money."  He said, you know,

8    "I've got a $2500 check."  On April 5th, he goes, "I've got

9    hundreds of invoices waiting for me."  Right?  But nobody

10   paid attention, nobody checked, and nobody went back to even

11   find his tax returns.

12        So tax returns, I get to talk to you -- the government

13   has the burden of proof, so they get to talk to you again.  I

14   don't get to go next.  So I don't know what they're going to

15   say.  I can have some ideas on what they're going to say, but

16   I don't know what the government is going to say.  So let me

17   try to look ahead and see if I can figure out why they're

18   going to complain about the evidence that we produced.  And I

19   use that word intentionally because every step of the way

20   evidence -- so my client says, "Look, man, I got this money

21   from work.  Look, I got this -- this is a hobby."  And they're

22   like, "Well, you know, we don't believe you."  Right?  They

23   don't believe him.  "Look, I took pictures of these guys."

24        Go back and listen to when Agent Bort was talking to him

25   and he said -- this was on April 5th, so again you can listen

to this.  He said, "I take pictures of buyers."  And Bort even

says, "Well, that doesn't even matter."  Go and listen.  He

said, "That doesn't matter.  You didn't take pictures of the

driver's license."  So it doesn't matter what evidence that he

produces or what he says.  They have a preconceived notion in

their mind, these are big guns, I don't like them, and

therefore I'm not going to listen to any of the evidence.

So we've got his tax returns, 2000 -- well, going back a

long time, but let's say 2017, 2018.  Some things that I want

you to notice, tax return 2018, on page 6 of 7 on the tax

return in 2018 -- and you'll get this -- he lists, in filing

the taxes, expenses, $17,922 for car and truck expenses.  So

he writes off -- and there's a picture of the truck that he

was driving in this case.  So he writes off the truck that he

bought in 2018, or something close to it, in an expense.

So for most of us in the world -- and that's why I asked

at the beginning, because I think there are some people who

have had their own businesses over the years.  But most of us,

you get a paycheck from somebody else.  It's X amount of

money.  But when you own your own business, you're allowed to

write off and to take other exemptions, do other things, such

that it's harder to say how much money you take home.

Because in 2018 his total income -- that means profit

that he took home -- was $33,000, which is good money, but

it's not great money.  Well, but keep in mind that he bought a

1  whole car, $17,000 he was able to write off on a vehicle, so

2  that's the kind of money he's making to be able to spend that

3  kind of money on a vehicle, with somebody, in 2018, who has no

4  dependents, no student loans, no mortgage, right?

5       So this is a kid who is making good money.  2020 rolls

6  around, he gets a few more clients, and he's making great

7  money.  He makes, and you're going to see this, $200,000 in

8  income.  He wrote off stuff for his business, other things, so

9  that's $200,000 over the course of the whole of 2019 in

10  income.

11       So I don't know what the government's going to say.

12  There's a stipulation that he still owes his income tax.

13  Yeah, he does.  You know, but if you look at 2018, 2017, those

14  tax returns, he still owed those income taxes too back then.

15  It doesn't really matter.  What he -- what this is is him -- a

16  federal document saying, "This is how much I made in 2019."

17  The government's going to say, well, that's -- you know, you

18  can't believe that.  I don't know what position they're going

19  to take.  Well, again, it's another bit of evidence that we

20  bring forward and they say, no, you can't tell anything from

21  that.

22       Well, then I bring in his clients, a couple of his

23  clients.  They talk about how much they pay him.  They talk

24  about him being a genius when it comes to computers, available

25  day and night.  He makes money.  For just a little bit of

1   time, he makes a lot of money.  Just from one client, PHCC, in

2   2019 he made 35 or more thousand dollars from that one client.

3   So all it takes is five clients, and he's up to this $200,000

4   range.  So the point being when you're trying to decide is

5   this a guy who has got a ton of money with no real obligations

6   in the world and he just likes to buy guns.

7       The pattern by which he buys guns is really interesting

8   because he'll, like, order some guns, right, and then this is

9   again and again through this.  You'll see on 77 he orders some

10  guns and goes -- and then while he's in the store, he grabs

11  another and another, right?  Is that an investor scoping out

12  all his potential properties he is going to buy and sliding in

13  to get the best possible property so he can resell it later,

14  or is that a guy who's got a lot of money who is like, he goes

15  in to buy some guns and he goes, "Oh, that one's cool too, I'm

16  going to buy that one"?  That's what it is is a guy who just

17  likes to buy guns.

18      Of interest to me, at least, is where on April -- I'm

19  sorry, on February 11th, he goes into the store and he's like,

20  "Oh, my goodness, that's a cool looking gun."  He's like, "I

21  want to buy that."  But he doesn't have the $8,000 on his

22  person.  He just sees a cool gun and he wants to buy it, so he

23  puts it on layaway and he comes back later, on the 19th, and

24  buys the gun, again a guy who is like, "Well, that's cool.  I

25  would like to have that gun."

1    Now in terms of profit, right -- because they're saying

2    if he's buying guns and selling them, that's not a problem.

3    If he's buying guns and selling them with the intent to make a

4    profit, that's when it starts getting a little more dicey,

5    right?  So they claim again from an interview that you cannot

6    hear and you will not hear, Agent Bort said that my client

7    said X, Y, and Z.  But the key is not whether or not he sold

8    guns but whether he sold them with the intent to make a

9    profit.

10    Here is Exhibit 208, which has been admitted.  This is

11    the listing that he makes for this firearm.  He lists it for

12    $8,800.  So even the government says, oh, yeah, you know,

13    that's the listing.  And they put it right here, the listing

14    that he put on Armslist.  So he pays $8,500 and he lists it

15    OBO for 8,800.  What does that mean when you take out shipping

16    and everything else that he's going to have to do or whatever

17    he's going to need to get this gun to somebody else?  That is

18    essentially no profit that he's looking for, 3 percent, 2

19    percent.  You do the math, you know, an incredibly tiny amount

20    of profit.  That's not a guy who is listing something and

21    hoping to make a profit as part of a business.  That's a guy

22    who is selling a gun that he doesn't like for one reason or

23    another, just looking to get his money back.

24    So, you know, they're saying, oh, well, maybe he listed

25    it for this, but he said that people paid more and the buying

or the bidding went up.  But, see, that's why it matters and
that's why these words that I'm talking to you, talking about
matter.  His intent, if he wanted to make a profit and thought
he could make a profit, he would have listed it for more
money.  He thought he was just going to get basically his
money back, and that's what he listed it for.  So if he got
lucky and somebody paid him more than he offered, great, cool,
but that's not somebody with the intent to buy a gun and then
sell it for a profit as part of a business.  You see, that's
why these things matter.

You also see the -- and I still didn't quite understand
exactly what the government was saying, but they were saying
there is this listing, No. 18 on 77 that was purchased for 869
bucks plus 45 in shipping, and then I think they said he
needed either 19 or 20 to resell it as he was doing.  Anyway,
the point being you're going to find an email in there where
somebody's offering either 500 or 800 bucks for it.  And the
only reason that matters is, without making assumptions,
without filling in a blank in the evidence with what the
government wants you to believe, the evidence shows that, at
least from what he's being offered, is not a profit.  He is
not making money.  So, and he's not -- and there is no
indication that he is listing these things well over whatever
it was that he bought them for to make a profit.  They want
that to be true, but it is not.

 1      I'm going to -- so a couple more things that I think it's
 2 important for you to consider.  So again Agent Cunningham is
 3 asked a question about the computers in Mr. Delgado's house
 4 and said, "I didn't look at the pictures upstairs, so I don't
 5 know."  She's also asked, "Well, did you see any videos of his
 6 gun usage in the electronics?"  So this is Exhibit 200 that is
 7 going to be back to you guys, for you guys, the pictures or
 8 video of Mr. Delgado using one of these guns, like somebody
 9 who just got a new gun, and he's like, "Hey, dudes, check this
10 out."  And he's showing somebody, taking a video of a new gun.
11      What I'm saying is they didn't look through all this
12 evidence because she didn't even recognize one of these videos
13 or barely recognized one of these videos, and that is
14 understandable because I think what she said is when you
15 download somebody's phone, there's a massive amount of
16 information there.  So I get it, you're not going to memorize
17 everything, but it's important to note, just because somebody
18 said they didn't see it doesn't mean it's not there.  You see
19 the difference?
20      She also was asked, "Do you remember him saying anything
21 about making a lot of money in his business?"  And she said,
22 "Not that I remember."  Go back -- she was there for the April
23 4th interview.  Go back and look at that interview.  And he
24 said, you know, "I'm making money.  I make money through my
25 business.  This is where it's coming from."

1          So something interesting that Agent Bort said, this is

2    one of those things that if I have my memory different than

3    yours, you go with your memory.  But I remember the government

4    asking him a question, you know, about collections, and he was

5    like -- and he said an answer that was, you know, "I've seen

6    military guys get their re-up bonus and buy five or six of

7    something."  I don't know if you guys remember that, five or

8    six of something.  So their point that nobody ever in a

9    collection would have more than one of the same type of gun,

10   it's just not accurate, and people collect things for

11   different reasons and people have things for different

12   reasons.  And just because more than one type of gun is not

13   something that the government would do or not something these

14   particular ATF agents would do is not a crime, and that

15   doesn't matter.

16         Fundamentally, ladies and gentlemen, when it comes down

17   to it -- oh, okay.  I'm sorry.  One more thing that I want to

18   clarify just because it was brought up, and maybe you guys

19   know this, maybe this has happened to you.  But there was a

20   question about a bunch of $1,000 deposits that you see in the

21   Vantage West, and I don't know if anybody's ever tried to go

22   to deposit cash in an ATM machine, whether or not they limit

23   the amount that you can do in each one.  It doesn't matter.

24   It was just one of those statements that the government made

25   that I didn't want any juror to think, oh, you know, to put

1   too much undue interest in it.

2       Again, if the government wants to say that he's

3   intentionally doing this and willfully doing it when it's

4   unlawful, why is he using his bank account?  Why is he using

5   his correct name on all these ATF forms?  You know what I'm

6   saying?  Why does he go to the actual firearms dealership when

7   he suspects, by the way that the clerk was acting, that the

8   ATF objects to his big purchase of firearms?  Because he's a

9   guy who is making good money, who buys stuff, sells stuff,

10  buys two of them, picks which one he likes, whatever.

11      All the assumptions that the government is making, that

12  he is buying with the intent to get a profit, with the intent

13  of a business and willfully knowing that this is illegal, is

14  not even close to have been proved in this case.  What they

15  did prove is he bought a lot of guns.  What I proved to you is

16  he made a lot of money and he can buy whatever he wants.  And

17  that's where we live.  That's the United States.  He has been

18  told this is the law.  He attempts to follow the law because

19  he tells them, he's like, "Look, dude, this is a hobby.  This

20  is something I do.  My business is computers, and I just like

21  guns."  And that's what the evidence has shown.  He bought a

22  lot of guns, he likes guns, and he sold a couple.  He didn't

23  try to make any profit, try to make profit -- maybe he did.

24  He didn't try to make profit from the guns that we did see

25  that he sold.

1      He is not guilty, and I ask you to consider everything.

2  Please go back and listen to these tapes to see if it's

3  consistent, if it sounds like some kid who just goes in and

4  buys cool things when he sees them.  Go back and listen to the

5  tapes, and then I ask you to find my client not guilty.

6           THE COURT:  Thank you, Mr. Roach.

7           MR. ROACH:  Thank you, Your Honor.

8           THE COURT:  We're going to take a brief morning

9  break.  I know it's been a little longer than usual.

10      I'll remind you of the admonition:  Keep an open mind,

11  don't talk about the case, don't do any independent

12  investigation.

13      And we'll do a ten-minute break just to let everyone get

14  up, walk around, use the facilities, and then we're going to

15  finish with the government's final rebuttal closing, I'll give

16  you instructions, and then we'll order lunch and turn the case

17  over to the jurors.

18      So I'll excuse the jurors at this time.  If you'll please

19  be ready to come back into the courtroom in ten minutes.

20      (Jury out, 11:07 a.m.)

21           THE COURT:  All right.  Counsel, we'll see you in ten

22  minutes.  Thank you.

23           MS. WOOLRIDGE:  Thank you, Your Honor.

24      (Court recessed from 11:08 a.m. to 11:21 a.m.)

25           THE COURT:  All right.  We're back on the record.

1    Counsel is present and Mr. Delgado.

2        I understand, counsel, there's an issue.

3        MS. WOOLRIDGE:  Yes, Your Honor.  I didn't object

4    during defense's closing statement because I think that's

5    inappropriate in most circumstances, but, Your Honor, I was

6    very concerned about the statements that were made about the

7    third recording that the jurors did not hear.

8        The jurors -- I'm sorry.  The parties did stipulate to

9    the accuracy of the transcription.  There was also a lot that

10   was redacted upon request from the defense as well as by

11   agreement from the parties.  There was information in that,

12   peppered throughout the statements, that was very prejudicial

13   to the defendant and that the government certainly did not

14   want to introduce because it felt it was improper.  Some of

15   those things were things we discussed, discussion of his

16   knowledge of destructive devices and other prohibited weapons.

17   There was quite a bit of discussion about fully automatic

18   weapons and the defendant's knowledge of that.  There were

19   certain things that the parties agreed were inappropriate,

20   such as references to Mexico and references to ammunition.

21       That's the reason that the -- because those -- because

22   things that were prejudicial -- I know at one point the

23   defendant talks about being arrested other times.  Because

24   there were things that were prejudicial throughout that

25   portion and because we felt that such a small portion of it

1  was relevant that trying to do redactions would be unwieldy

2  and would not present well due to a very choppy recording, and

3  this is something that was discussed by counsel, we introduced

4  it through the testimony and what we agreed was an accurate

5  transcription instead.

6      The defense then argues that the jury should hold against

7  the government the fact that they're hiding something, that

8  the government's hiding something by not playing the

9  recording.  I think that's absolutely improper, especially

10  given the understanding of the parties and their reason for

11  the very -- for the redactions or the use of just the

12  transcript.  Certainly we could have excised a very small

13  portion, but I think it would have left them with the same

14  impression, that obviously something was missing.  And the

15  reason those things were taken out, in large part, is because

16  they were either irrelevant or potentially unfairly

17  prejudicial to the defense.

18      My request, Your Honor, is that the jury be told that

19  perhaps -- and of course I defer to the Court as to the best

20  language to address it if the Court chooses to grant my

21  request -- but that the jury be told that the reasons that

22  certain audio was played was for other reasons and the jury is

23  not to speculate about that or to hold it against the

24  government.

25          THE COURT:  Mr. Roach, is it true that there was a

1 stipulation as to not -- as to relying on the transcript and

2 to have the testimony be brought out through Special Agent

3 Bort?

4     MR. ROACH:  No, Judge, not at all.  What counsel and

5 the government -- what I discussed with the government was the

6 transcripts that are contained in Government's Exhibits 67 and

7 68.  So those are the transcripts of the audio, 67 and 68.  We

8 explicitly talked about them.  We talked about things that

9 were inappropriate.  I told her things that I thought were

10 inappropriate and she took out.  So I had no problem with

11 that.

12     I had no idea that she planned to do anything with any

13 other statements of my defendant until the morning of trial,

14 when she handed me Exhibit 97.  I still have not gone back and

15 listened to this and compared it to the audio because I

16 haven't had time.  So, Judge, no, there was nothing about this

17 that I ever stipulated to anything.

18     Moreover, I would love to have had this audio in because,

19 if you remember, I wanted to ask detailed questions about

20 actual things that were said by my client, and the Court

21 determined that that was hearsay.  So if we had talked ahead

22 of time, I could have said, I could have argued with counsel

23 about why I think this is the whole story and then counsel

24 could have said X, Y, and Z.  But, no, I never stipulated to

25 97 nor knew that it was going to be talked about until the

1   morning of trial.

2        So that's why it was, in my mind, an intentional decision

3   by the government to talk about the other things and admit the

4   audio but not admit this.  It could have been done.  There are

5   some redactions that need to be done but not that much.  So

6   that's why it was notable to me that the government chose to

7   go in that direction, and that's why I brought it to the

8   government -- or to the jury's attention.

9            THE COURT:  How much is Mexico referred to in the

10  transcript?  Do you know?

11           MS. WOOLRIDGE:  Your Honor, I think more so than the

12  references -- and I can look, but more so than the references

13  to Mexico are references to things like ammunition that the

14  parties have agreed not to get in.  And that's -- and I'm

15  sorry.  I didn't mean to stipulate -- I didn't mean to suggest

16  that the parties had stipulated or directly discussed that,

17  hey, we're going to introduce these statements through this

18  way, but more of we stipulated to the accuracy of the

19  transcription as well as the redactions that were made.

20       So defense counsel is correct in that I did not say these

21  are the statements we are going to get in through the

22  testimony of this witness until the beginning of trial, but it

23  was my understanding that we were in agreement with regard to

24  the accuracy of the transcriptions and the redactions for what

25  was going to be introduced in the recording.

1          THE COURT:  When did you give Mr. Roach the

2   transcript that he could determine that it was accurate?

3          MS. WOOLRIDGE:  I don't recall exactly when it was

4   provided.

5          THE COURT:  Was it before trial?

6          MS. WOOLRIDGE:  Yes.

7          THE COURT:  I know that I received a copy during

8   trial.  It was passed to me.  Mr. Roach said he got it on the

9   first day of trial.

10          MS. WOOLRIDGE:  Yes, Your Honor.  The reason, because

11   we did not intend to -- so that was the thing.  We had --

12          THE COURT:  Okay.  So just as to the factual issue --

13          MS. WOOLRIDGE:  Okay.

14          THE COURT:  -- when did the transcript get given to

15   the defense?

16          MS. WOOLRIDGE:  Your Honor, the transcription itself

17   was given before trial.  The transcription as an exhibit was

18   given the morning of trial because it didn't become relevant

19   to me to introduce that statement until the defense made its

20   disclosure about the income and the taxes and I realized that

21   that was going to be an issue until the Friday afternoon

22   before trial.

23       So, yes, we originally -- this was originally redacted

24   initially, and that's why there is no recording.  So it was

25   provided.  The defense did have the transcription prior to

 1  trial, and I believed our understanding, as far as the

 2  transcription being accurate, applied to that, although

 3  agreeably that was not part of the recording we were going to

 4  get in, because again the vast majority is irrelevant.  There

 5  is some -- there is a lot of discussion about the Dark Web,

 6  you know, illegal trading, illegal weapons, things like that.

 7  There's also talk about the defendant's rights and attorneys

 8  and things like that as well that could be --

 9          THE COURT:  All right.  It sounds as though there was

10  not a stipulation, though, as to the exhibit.  So I understand

11  your argument, but I'm going to decline to give the additional

12  instruction.

13      All right.  I'll ask that the jurors be brought in.

14      Ms. Woolridge, how long do you expect your rebuttal close

15  to be?

16          MS. WOOLRIDGE:  Definitely shorter than my opening

17  close, Your Honor.  I'm really, as Your Honor knows, I'm an

18  incredibly bad judge of time.  I don't even know how long I

19  spoke on my opening close, but I would say my notes are about

20  a third of the length of my opening close, so --

21          THE COURT:  I just want to be mindful of the time,

22  given that I'm not giving the jurors a lunch break, that

23  they're not going to have had one.  So we'll have to have your

24  rebuttal close, then the instructions.  Then I would like to

25  send them to deliberate and order lunch.  But I don't want to

1  wait until too far into the noon hour to do that because it's

2  going to take another 30 minutes for their lunch to arrive.

3          MS. WOOLRIDGE:  Sure.  Your Honor, I don't think that

4  my rebuttal close will be 30 minutes, and certainly --

5          THE COURT:  All right.

6          MS. WOOLRIDGE:  -- I think it would be less than

7  that.  And certainly I am more than amenable, if the Court

8  notices that I'm approaching the 30 minutes, I don't mind --

9          THE COURT:  Well, I'm not going to encourage you to

10  speak faster, just given I know you were speaking pretty

11  quickly during the first close, so I don't want to put you in

12  that position.  But if you would be mindful of the time --

13          MS. WOOLRIDGE:  Certainly.

14          THE COURT:  -- that would be appreciated.  When I

15  sent the jurors out and didn't have Ms. Coronado pass out the

16  lunch orders, it's because I thought we were going to start

17  ten minutes ago.  I didn't realize there was another issue,

18  but that happens sometimes.

19          MS. WOOLRIDGE:  I apologize for that delay.

20      (Jury in, 11:32 a.m.)

21          THE COURT:  All right.  We're back on the record.

22  The jury is present, counsel, and Mr. Delgado.

23      The break was a little longer than anticipated.  We had

24  to resolve some logistical issues, but we're ready to proceed.

25      And, Ms. Woolridge, if you'll go ahead and give your

1  rebuttal closing.

2         MS. WOOLRIDGE:   Thank you, Your Honor.

3         Well, ladies and gentlemen, I am not only standing

4  between you and the end of your jury service or the last part

5  of your jury service, which is deliberations, but also between

6  you and lunch, so I will try to make this brief.  And as

7  you've heard, what the lawyers say is not evidence.  The only

8  thing -- and I agree with Mr. Roach -- the only thing that

9  matters here is the law.

10        Now we talk to you because we want to help you understand

11 the law and apply the evidence in the way that we believe it

12 should be applied, but really it's you, ladies and gentlemen,

13 it's your knowledge of the evidence, it's your assessment of

14 the evidence and your application of the law that the Judge

15 will instruct you on that evidence that really matters, not

16 what I say, not what Mr. Roach says, and we agree on that.

17 But I just want to talk to a few things about the evidence,

18 and then I want to talk to you about the law because the

19 evidence proves that the defendant broke the law, that that's

20 the only reasonable conclusion in this case.

21        Now again I'll try to make my remarks brief and be

22 mindful of your time so you may begin your deliberations and

23 start discussing the law and discussing the evidence.  There's

24 a few things to point out what is not required to engage in

25 the business of dealing firearms without a license.  It

1 doesn't mean that it's your sole trade or business.  As we

2 heard, it can be kind of a side job.  It can be something that

3 people just do in addition to their regular full-time job.

4 But as long as you start making repetitive firearm purchases

5 with the intent to sell, with the intent to make a profit, it

6 becomes a trade or business.  Again, it doesn't have to be a

7 certain percent of your income or a certain percentage of your

8 time.  There's no, you know, you must spend a certain number

9 of hours or make a certain number of money or even deal in a

10 certain number of guns; but if you're making repetitive

11 purchases with the intent for profit of firearms, that is

12 engaging in the business.

13      Now the defendant's sale of firearms was not just

14 incidental, as the defendant claims.  That is the reason for

15 his purchases.  Again, it may not be the reason for all of his

16 purchases.  He may have started out again as a gun enthusiast,

17 as someone that liked guns, maybe even was interested in

18 collecting them.  And that's why, ladies and gentlemen -- the

19 defense makes much about the dates in the indictment.  That's

20 why the government is not charging the defendant with all of

21 the dates of his firearm purchases, because it may be possible

22 that when he started out being interested in firearms he

23 didn't realize that, hey, this is something I can make money

24 off of too.  But it was after he started making those sales

25 and he realized how lucrative they could be that he started

1  buying specific guns with the intent to sell them for profit.

2  Even if his first, again, firearm purchases, his first firearm

3  sales were originally just something he was kind of interested

4  in as a hobby, it became a business.

5       And so, ladies and gentlemen, the defense makes a lot

6  about the dates in the indictment.  Well, I submit to you a

7  couple things to take into consideration.  We heard that the

8  defendant was charged in this case on April 24th.  That's when

9  the government sought an indictment for engaging in the

10 business of dealing firearms without a license, and the date

11 range started on December 17th, 2018, because those were the

12 purchases that the government -- the time when the repetitive

13 purchases that the government knew about became very, very

14 concerning, when we have, for instance, on that date three

15 Smith & Wessons followed by again the Romarm rifle that he had

16 purchased, similar or identical to those he had purchased

17 before.  That's when that pattern, based on what the

18 government, the purchases the government knew of at the time,

19 started to become very evident.

20      Now then, as you heard from Special Agent Cunningham, she

21 kept investigating over several months, actually over a few

22 years and found out more purchases, found out purchases, that

23 these purchases started sometime ago.  Now I will tell you --

24 talk about being damned if you do and damned if you don't --

25 had the government gone back and charged the defendant with

1  additional dealing of firearms without a license, we would

2  have heard, oh, they're just out to get him, they're adding

3  more charges.

4      No, ladies and gentlemen.  In fact, we're giving the

5  defendant the benefit of the doubt.  Even if he started this

6  firearm purchase activity just as something he was interested

7  in and not with the intent to make a profit, it certainly

8  changed when he realized how much money he could make off the

9  sale of the firearms.

10      And as the Judge will instruct you, it's not necessary

11  that the government prove the exact dates that things

12  happened.  That's why we charge on or about, as long as

13  something happened around that time frame.  So you could

14  conclude that his dealing began actually quite a bit

15  beforehand, this unlawful dealing, but it certainly

16  encompassed some of the activity, if not all of the activity,

17  in the December date range -- I'm sorry, the December to April

18  date range.

19      In fact, even if you believe that the defendant, for

20  instance, bought this first Barrett, the one he sold, posted

21  for sale the very next day after he got it, but even if you do

22  believe he got that and when he sold he had no idea he would

23  make that much money off of it and wasn't trying to make that

24  much money, once he realized that he could, those five

25  additional Barretts he bought all within the next month, those

1   were with the intent to make a profit, and his bank records

2   reflect that.  They reflect that profit and they show how

3   quickly those firearms were sold.  In fact, again, less than a

4   month after he bought them, those additional Barretts, he

5   doesn't have any of them.

6       So I'll submit to you that Exhibit 77, yes, there are

7   dates, there are firearms that start even before the date

8   range in the indictment, but that helps you understand the

9   whole picture.  It helps us to infer what the defendant's

10  intent was.  We know he's been dealing firearms for quite some

11  time now, so at least, at the very least, when we're talking

12  about on or about the dates in the indictment, he's formed

13  that intent to buy guns so that he could sell them to make a

14  profit.

15      It has nothing to do with the type of firearms, and this

16  chart is one of the best examples.  December 17th is when the

17  government alleged dealing without a license in its

18  indictment.  Those three firearms are pistols.  They aren't,

19  oh, these huge, big weapons the government is trying to stir

20  your emotion with.  No.  In fact, this entire chart throughout

21  the time includes different types of weapons.  It includes

22  pistols.  It includes AK-47 style rifles.  It does include

23  some very high-caliber weapons and high-dollar weapons as

24  well.  But really what is important, it's not the type of

25  weapons, it's not even the amount that the weapons cost; it is

the intent when making the repetitive purchases of these
weapons, especially the same type of weapons over and over.
So that's what's important, ladies and gentlemen.

     We're not asking you to convict the defendant on emotion,
in fact, quite the opposite.  We would like you to find him
guilty based on the hard facts in this case, and the guns that
you saw were the hard facts.  Those were the guns that he
bought.  Those were the guns that we brought in because those
were the guns that were intercepted.  Everything else he had
gotten rid of already.  Everything else he had sold already,
very quickly after he purchased it.

     And the government certainly has proven that and
especially when you look at the dates within the indictment
range.  Starting at December, mid-December of 2018, we're only
talking about three and a half months until ATF encountered
him.  In those three and a half months, he didn't have any of
those guns anymore.  So maybe even if he held on to the guns
from earlier in 2018 for a little more time, certainly we're
talking about within a matter of months not having any of the
firearms that are listed anywhere in this chart, but
specifically in the more recent months, so it shows you how
quickly he was turning around and selling those weapons.

     But, ladies and gentlemen of the jury, the reason that
you saw the guns in this case is because that's what he was
buying.  We didn't choose those guns.  He did.  He sought

those guns out.  He purchased those guns.  He paid money for

those guns because he knew he was going to make a profit on

them.  In fact, that one seizure, that one seizure on April

4th from an order that was placed just a few days earlier was

worth -- he spent $34,000 on that, more than he had made in

the entire previous year.  According to his 2018 tax return,

he claimed making $31,000 that year.  He spent more than he

had made in the entire year that had just ended a few months

prior on those guns.  And nowhere in his bank account, as of

March of -- in fact, even in April of 2019 was there more than

just a $2,500, a $2,599 check that he had gotten from PHCC for

non-firearm-related income.

It has nothing to do about the type of guns or that the

government doesn't like a certain type of gun.  It has to do

with dealing in those guns without a license.  And that has

nothing to do with the type of weapons they are, the caliber,

the make, the model.  It has to do with the defendant's intent

in making those repetitive purchases and sales.

So, you know, the defense argues that, oh, the defendant

just thought guns were cool.  Well, if he thought they were so

cool, why is he turning around and selling them so quickly?

Again, he may think guns are cool, he may think that all the

guns in this chart are cool, and there's nothing wrong with

that, but he never intended to keep them.  He never intended

to keep them because they were cool.  He intended to sell them

because they were cool and other people thought they were cool
and other people were willing to spend more money to buy them
than he could get them for, therefore the ability to make a
profit.  And he didn't keep them.  That's one thing, ladies
and gentlemen, that is undisputed.  Except for the two pistols
worth about $400 together, he didn't keep these $111,000 worth
of firearms that he was buying.  Even just looking at the date
range in the indictment, we're talking about I think upwards
of over $60,000 worth of purchases, and he didn't keep any of
those, didn't have any of them just a few months later.

        We see the tax returns.  They're in your -- in the
admitted exhibits.  You can take a look at them.  You can see
what the defendant reported making in 2016, '17, and '18.  The
defense makes a whole lot about Agent Cunningham not getting
those documents until September of 2019.  Remember one thing.
Agent Cunningham actually did check the defendant's tax
records.  She checked his tax records before she even had
contact with him on April 4th.  He hadn't filed a thing in his
life.  He had never filed taxes until a month after ATF comes
and speaks with him.  Oh, that's interesting.  Hmm, doesn't
look too good that I never reported any income, but I'm
spending $34,000 in a day.  So a month -- on May 6th, I
believe it was, and you can look at the returns.  May 6th he
files back taxes for 2016, 2017, and 2018.  But you put those
whole three years combined, in three years, 2016 to 2018, it

doesn't even approach the amount of money he spent on these firearms.

And then it's interesting that he files 2019 tax returns in the amount of claiming not $200,000.  He's filing married now.  I think about 33 was his wife's reported income.  The defendant says his gross receipts from his business were 166, for a 142 adjusted gross income.  Interestingly enough, 2016, 2017, 2018, he deducts significant business expenses.  He doesn't deduct a penny from his 2019 expenses.  It doesn't make a whole lot of sense.  It is interesting that he files these tax returns while he's under indictment in this case and has a reason to exaggerate his income, so he can try to show that he had a means to buy all these firearms and didn't intend to sell them.

Well, first of all, it doesn't matter if he had a means to buy the firearms.  What matters is what he intended to do with them.  He could have made -- the defendant could be a billionaire and have more than enough money to spend on these firearms, but if he bought them with the intent to sell them, no matter how much money he had, it was what his intention was to do with those firearms.  It doesn't have to be a percentage of his income.  It doesn't -- it's not even necessary that we show that he actually profit.  Even if someone was really bad at dealing in firearms, actually making a profit, actually making a sale, as the Judge will instruct you, isn't required.

But what was his intent?  And I submit to you that all the
evidence shows his intent was to make a profit.  He realizes
how much money he can make off of these, and he realizes that
if he keeps buying these guns and keeps selling them he can
make more and more money, and that is the money that's going
into his bank account.

It's also very interesting to note that he has not paid
his 2019 taxes.  He owes about $22,000.  As you heard the
stipulation, that money is still, as of this date, still owed
now along with penalties and interest.  If he had $34,000 just
of his own money lying around to spend on guns in one day, why
doesn't he have 22 grand to pay taxes?  Why is he incurring
all those penalties on his taxes if he easily has that money
to throw around on guns?  He only had that money to spend on
guns because he knew he would recoup it.  He knew he would not
only recoup it but recoup more because he could sell them for
a profit.

I do want to talk to you about the statements, about the
discussion about guns the defendant bought in the last two
weeks.  And the defense tries to blame this and say it's just
confusion that was caused by the agents.  I submit to you it
wasn't.  You heard the recording.  You can listen to the
recording again.  But the defendant never answered the
question, because they spent a painful amount of time trying
to get him to answer how many guns he bought in the last two

1    weeks and he never did.  Then they broke it down and said,

2    okay, let's take baby steps.  Let's just talk about the last

3    four days then, because he wouldn't answer the last two weeks.

4         And you have the transcript to look at in front of you.

5    It went on for a page in that transcript, a discussion about

6    the last two weeks.  Special Agent Bort starts with, "The

7    other guns, and how about the other guns you purchased

8    recently?"  "The defendant:  Ah, you've got to be more

9    specific, man."  Then Agent Bort asked him, "In the last two

10   weeks, have you purchased other firearms?"  The defendant's

11   answer:  "No."  He says no.  Why would you say no if there

12   wasn't anything wrong with those purchases?  Why would you say

13   no if you didn't intend to sell them?  That purchase, those

14   purchases would have been completely legal if he didn't intend

15   to sell them.  There is no other law he is charged with

16   violating, but he says no.  Even though he had just purchased

17   them two days, two days earlier, he says no.

18        And they go on.  In fact, Agent Bort asks him again about

19   the firearm he purchases.  The defendant, instead of

20   answering, then starts to be evasive.  "In the last two

21   weeks?"  "Uh-huh."  "Man, I've got to check my time schedule."

22   And they go on and on for some exchange.  "Okay.  We know you

23   purchased additional firearms in the last couple weeks.  Do

24   you know what they are?"  "Hmm.  Well, are you asking me if I

25   purchased or what kind?"  They go back and forth.  The

1    defendant: "Uh, I don't know.  The last two weeks?"  Again,

2    "Um, the last two weeks?"  He goes on and on for a page of the

3    transcription and doesn't answer the question.

4         So finally, finally, after several minutes, Agent

5    Cunningham says, "Okay.  Let's break it down.  Let's make it a

6    little easier for you.  Let's talk about just -- let's just go

7    back four days."  Well, again you go back four days, we know

8    that he purchased guns April 2nd, and he still starts being

9    evasive, although they eventually get him to talk about some

10   of the guns.  But that initial answer of no is what's really

11   important.  Immediately, last two weeks?  No.  There are 16 of

12   them, two within the last two days, and his initial response

13   is no.  Then finally he admits to having bought some guns when

14   confronted with the fact that the agents know about them,

15   says, "I got rid of them."  And they ask specifically, "How

16   did you get rid of them?"  And he said he sold them.  And we

17   hear other statements going on about the profits he made when

18   he sold them.

19        The defendant wasn't confused.  There's no high pressure.

20   You heard the interview.  These were not -- the defendant

21   wasn't under arrest at the time.  He wasn't threatened with

22   anything.  And in fact you hear about -- you can hear the

23   tenor and the demeanor of the conversation.

24        The defense tries to say, oh, well, he knew he was going

25   to get arrested because Roman was acting squirrely.  Well, we

heard Roman.  He was like, "No, I wasn't worried about
anything.  I had no reason to be concerned."  I mean, and he
didn't.  But even if Roman was acting squirrely, even if the
defendant noticed something seemed a little different, just
because someone else seems a little bit odd, you get worried
about being arrested?  Again, because he knew what he was
doing was wrong.  There was nothing illegal about the big
order.  What was illegal is what he intended to do with that
order.

But the defense makes more of, well, if he really thought
he was violating the law, if he really was intending to sell
them, he wouldn't have still showed up.  Oh, yes, he would
have, ladies and gentlemen.  Remember, he bought those guns
online.  He had already paid for them.  So if he doesn't show
up, not only can he not make his profits off these guns, and
he knows each one of these guns is worth about 2 grand in
profits, but he's also out 34 grand he already spent.  So of
course he's going to show up.  His whole reason for doing this
is making money.  He's not going to just not show up and
forgo, first of all, the income he could have gotten for that,
the profits he could have made, but of the money he's already
spent.  So of course he's going to show up, but he was
worried.

So he comes up armed with a story, talks about, "Oh,
yeah, well, one of those guns, I had to get rid of it because

it jammed because, you know, that recall."  And then he talks

about, "Oh, yeah, I bought these guns to go shooting.  I

bought the Barretts because I like shooting .50 cals.  I go to

the TRC every chance I get, the Tucson Rifle Club every chance

I get.  I've been there six times, been on the .50, you know,

shot .50 cals there."  We know all that's not true.  But again

he knows that he's done something wrong, he knows exactly what

it is, and so he tries to explain why he didn't have those

guns anymore.

Ladies and gentlemen, it is the government's burden, it's

the government's burden to prove this case beyond a reasonable

doubt, not the defendant's but the government's.  Again,

though, it's important to remember what a reasonable doubt is,

again not beyond any doubt, not beyond any possible doubt, but

the doubt has to be reasonable.

So consider the arguments that the defense makes,

consider what they want you to believe, and ask yourself, is

that explanation reasonable?  Does that make sense to me?  In

light of everything, I submit to you the only reasonable

interpretation of all this evidence and the only reasonable

application of the law, as the Judge is about to instruct you,

is that the defendant did engage in the business of dealing

firearms without a license.

We hear a lot about, and I could spend the rest of the

day trying to talk to you about every argument that the

defense makes.  You heard about how, for instance, "or best

offer" can be a higher offer than some things listed and

oftentimes on Armslist that happens.  People get into bidding

wars.  And that's what happened when the defendant posted that

Barrett for sale on February 20th.  He himself said the offers

kept getting higher and higher and higher and he made 20 grand

off of it, and that's reflected in his bank accounts, and he

knows that.  Again, even if that first Barrett, he didn't

realize how much money he could make, certainly when he bought

the next five within just a few weeks, he knew that he could.

And lo and behold, two of them were seized, but the other

three had already sold just like the first one, and his

deposits in his bank account reflect that.

Ladies and gentlemen, it's important to remember none of

the witnesses are on trial.  The agents aren't on trial.  The

attorneys aren't on trial.  So why does the defense spend so

much time trying to disparage what the witnesses said or

pick apart little parts in their statement when they're the

ones that aren't on trial?  Because the defendant is on trial

and all of the evidence in this case points to only one

reasonable conclusion, and that reasonable conclusion is,

beyond a reasonable doubt, when we apply our common sense and

our sense of reason, that the defendant is guilty.  He didn't

have a license to deal firearms and he engaged in the

business.  He made several repetitive purchases of firearms

over a period of time, devoting his time and attention with
the intent to make a profit.

Ladies and gentlemen, you've paid very careful attention
to the evidence in this case, and I appreciate that.  I saw
you taking notes.  I saw you paying very careful attention to
the testimony and the exhibits.  I would just ask that you
consider not the arguments, not what either party says they
want you to believe, but what you truly believe, what you
think is reasonable in this case when you look at all the
evidence, not a little bit here and there.

You know, this isn't about candy stores or shoes or cars
or Gregorian calendars.  It's about deadly weapons, about
firearms and an industry that is highly regulated because it
does involve the business of dealing in deadly weapons.  And
the defendant had the option to go about his firearm dealing
conduct legally but chose not to do that, wanted to make a
profit, wanted to be able to make as much money as he could
selling firearms online, and he did that and he knew that what
he was doing was wrong.  He knew he was going to get arrested.
"I know I'm going to get arrested tomorrow."  He knew exactly
what was going on.

Ladies and gentlemen, I submit to you that when you look
at the elements of this case, elements of the charge, when you
look at the evidence in the case and when you consider what
makes sense to you, that the only conclusion beyond a

1  reasonable doubt is that the defendant is guilty, and we ask

2  that you find him guilty.  Thank you.

3          THE COURT:  All right.  Thank you, Ms. Woolridge.

4      Ms. Coronado, I'll ask if you'll pass out the

5  instructions.

6      All right.  At this time, I'm going to give you your

7  final jury instructions.  Ms. Coronado has given you a copy of

8  the instructions.  You may follow along as I read if you want

9  to do so.

10     Members of the jury, now that you have heard all the

11 evidence, it is my duty to instruct you on the law

12 that applies to this case.  A copy of these instructions will

13 be available in the jury room for you to consult.

14     It is your duty to weigh and to evaluate all the evidence

15 received in the case and, in that process, to decide the

16 facts.  It is also your duty to apply the law as I give it to

17 you to the facts as you find them, whether you agree with the

18 law or not.  You must decide the case solely on the evidence

19 and the law and must not be influenced by any personal likes

20 or dislikes, opinions, prejudices, or sympathy.  You will

21 recall that you took an oath promising to do so at the

22 beginning of the case.

23     You must follow all these instructions and not single out

24 some and ignore others.  They are all important.  Please do

25 not read into these instructions or into anything I may have

said or done any suggestion as to what verdict you should

return.  That is a matter entirely up to you.

The indictment is not evidence.  The defendant has

pleaded not guilty to the charge.  The defendant is presumed

to be innocent unless and until the government proves the

defendant guilty beyond a reasonable doubt.  In addition, the

defendant does not have to testify or present any evidence to

prove innocence.  The government has the burden of proving

every element of the charge beyond a reasonable doubt.

A defendant in a criminal case has a constitutional right

not to testify.  You may not draw any inference of any kind

from the fact that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you

firmly convinced the defendant is guilty.  It is not required

that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and

common sense and is not based purely on speculation.  It

may arise from a careful and impartial consideration of all

the evidence or from lack of evidence.

If after a careful and impartial consideration of all the

evidence you are not convinced beyond a reasonable doubt that

the defendant is guilty, it is your duty to find the defendant

not guilty.  On the other hand, if after a careful and

impartial consideration of all the evidence you are convinced

beyond a reasonable doubt that the defendant is guilty, it is

1  your duty to find the defendant guilty.

2      The evidence you are to consider in deciding what the

3  facts are consists of the sworn testimony of any witness, the

4  exhibits received in evidence, and any facts to which the

5  parties have agreed.

6      In reaching your verdict, you may consider only the

7  testimony and exhibits received in evidence.  The following

8  things are not evidence and you may not consider them in

9  deciding what the facts are:

10     Questions, statements, objections, and arguments by the

11 lawyers are not evidence.  The lawyers are not witnesses.

12 Although you must consider a lawyer's questions to understand

13 the answers of a witness, the lawyer's questions are not

14 evidence.  Similarly, what the lawyers have said in their

15 opening statements, have said in their closing arguments and

16 at other times is intended to help you interpret the evidence,

17 but it is not evidence.  If the facts as you remember them

18 differ from the way the lawyers state them, your memory of

19 them controls.

20     Any testimony that I have excluded, stricken, or

21 instructed you to disregard is not evidence.

22     This next sentence about evidence being received for a

23 limited purpose doesn't apply here.  I don't believe that we

24 did admit any evidence for a limited purpose.

25     Counsel, do you agree?

1          MS. WOOLRIDGE:  Yes, Your Honor.

2          MR. ROACH:  Yes, Your Honor.

3          THE COURT:  All right.  So that instruction in

4    brackets you can disregard.  There was no evidence that was

5    received only for a limited purpose.

6          Anything you may have seen or heard when the court was

7    not in session is not evidence.  You are to decide the case

8    solely on the evidence received at the trial.

9          Evidence may be direct or circumstantial.  Direct

10   evidence is direct proof of a fact, such as testimony by a

11   witness about what that witness personally saw or heard or

12   did.  Circumstantial evidence is indirect evidence; that is,

13   it is proof of one or more facts from which you can find

14   another fact.

15         You are to consider both direct and circumstantial

16   evidence.  Either can be used to prove any fact.  The law

17   makes no distinction between the weight to be given to either

18   direct or circumstantial evidence.  It is for you to decide

19   how much weight to give to any evidence.

20         In deciding the facts in this case, you may have to

21   decide which testimony to believe and which testimony not to

22   believe.  You may believe everything a witness says or part of

23   it or none of it.

24         In considering the testimony of any witness, you may take

25   into account the witness's opportunity and ability to see or

1  hear or know the things testified to; the witness's memory;

2  the witness's manner while testifying; the witness's interest

3  in the outcome of the case, if any; the witness's bias or

4  prejudice, if any; whether other evidence contradicted the

5  witness's testimony; the reasonableness of the witness's

6  testimony in light of all the evidence; and any other factors

7  that bear on believability.

8      The weight of the evidence as to a fact does not

9  necessarily depend on the number of witnesses who testify.

10 What is important is how believable the witnesses were and how

11 much weight you think their testimony deserves.

12     You are here only to determine whether the defendant is

13 guilty or not guilty of the charge in the indictment.  The

14 defendant is not on trial for any conduct or offense not

15 charged in the indictment.

16     The defendant is charged in Count One of the indictment

17 with engaging in the business of dealing firearms without a

18 license in violation of Section 922(a)(1)(A) of Title 18 of

19 the United States Code.  In order for the defendant to be

20 found guilty of this charge, the government must prove each of

21 the following elements beyond a reasonable doubt:

22     First, the defendant was willfully engaged in the

23 business of dealing in firearms from on or about December

24 17th, 2018 to on or about April 4th, 2019; and, second, the

25 defendant did not then have a license as a firearms dealer.

1    The government must prove beyond a reasonable doubt that

2 the defendant engaged in a greater degree of activity than the

3 occasional sale of a hobbyist or collector and that the

4 defendant devoted time, attention, and labor to selling

5 firearms as a trade or business with the intent of making

6 profits through the repeated purchase and sale of firearms.

7 For a person to engage in the business of dealing in firearms,

8 it is not necessary to prove an actual sale of firearms

9 occurred.

10    "Willfully" requires proof that the defendant knew that

11 his or her conduct was unlawful but does not require proof

12 that the defendant knew of the federal licensing requirement.

13    The indictment charges that the offense alleged was

14 committed on or about certain dates.

15    Although it is necessary for the government to prove

16 beyond a reasonable doubt that the offense was committed on

17 dates reasonably near the dates alleged in the indictment, it

18 is not necessary for the government to prove that the offense

19 was committed precisely on the dates charged.

20    The law does not require a private seller of firearms to

21 produce documentation of sales.

22    You have heard testimony that the defendant made a

23 statement.  It is for you to decide, one, whether the

24 defendant made the statement and, two, if so, how much weight

25 to give to it.  In making those decisions, you should consider

all the evidence about the statement, including the circumstances under which the defendant may have made it.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

1    Do not communicate with anyone in any way and do not let

2  anyone else communicate with you in any way about the merits

3  of the case or anything to do with it.  This includes

4  discussing the case in person, in writing, by phone or

5  electronic means, via email, text messaging, or any Internet

6  chat room, blog, website, or other feature.  This applies to

7  communicating with your family members, your employer, the

8  media or press, and the people involved in the trial.  If you

9  are asked or approached in any way about your jury service or

10  anything about this case, you must respond that you have been

11  ordered not to discuss the matter and to report the contact to

12  the Court.

13    Do not read, watch, or listen to any news or media

14  accounts or commentary about the case or anything to do with

15  it; do not do any research, such as consulting dictionaries,

16  searching the Internet, or using other reference materials;

17  and do not make any investigation or in any other way try to

18  learn about the case on your own.

19    The law requires these restrictions to ensure the parties

20  have a fair trial based on the same evidence that each party

21  has had an opportunity to address.  A juror who violates these

22  restrictions jeopardizes the fairness of these proceedings,

23  and a mistrial could result that would require the entire

24  trial process to start over.  If any juror is exposed to any

25  outside information, please notify the Court immediately.

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes -- excuse me -- or those of your fellow jurors.

The punishment provided by law for this crime is for the Court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue with your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone, including me, how the jury stands, numerically or

otherwise, on any question submitted to you, including the

question of the guilt of the defendant, until after you have

reached a unanimous verdict or have been discharged.

The last page that is attached to the instructions is a

copy of the verdict form that the foreperson would complete if

the jury is able to reach a verdict.  You'll see that it's

straightforward.  It has Count One, the only charge before the

jury, that reads:  We, the jury, find the defendant, Isaias

Delgado, not guilty or guilty (circle one) of engaging in the

business of dealing firearms without a license, as charged in

Count One of the indictment.

So if the jury is able to reach a verdict, the foreperson

would circle the word that indicates the verdict, either "not

guilty" or "guilty," sign the form, and date it.

Counsel, any corrections or additions?

MS. WOOLRIDGE:  No, Your Honor.  Thank you.

MR. ROACH:  No, Your Honor.

THE COURT:  When you go to the jury room to

deliberate, you will have the following items with you: the

individual set of jury instructions that was just read to you;

a verdict form; any notes that you took during the trial; and

those exhibits which were admitted into evidence, with two

exceptions.  We won't be providing the guns to the jury.  If

you want to view those guns, you need to let Ms. Coronado

know.  We'll make arrangements for you to do so, and we'll

1   bring them into the courtroom and have you come into the

2   courtroom to see those.

3        The other exception is the video that's Exhibit 200.

4   That also can be played for you.  We'll make arrangements if

5   you want to see it.  That's the video at the shooting range.

6   Because of the equipment issues and because of the translation

7   issue, we'll have an agent or court personnel show you that

8   video if you let us know that that's a video that you want to

9   see.

10       If there is somebody present in the courtroom or wherever

11  you're viewing this, which there will be for either one of

12  those exhibits, the guns or that particular video, please

13  don't discuss the case or make any comments about the evidence

14  until those individuals have left and you're back among only

15  the jurors.

16       Now we can only have 12 jurors who deliberate and, Juror

17  No. 35, you are the alternate.  So the admonition

18  still applies to you to not talk about the case or do any

19  independent investigation or to reach any conclusions.  You

20  could be called back to serve on this jury.  If the jury

21  reaches a verdict, then we will let you know and the

22  admonition will be lifted.

23       I might not have another opportunity to speak with you,

24  so I want to personally thank you for being here and

25  participating in this trial so that we could do what we need

1    to do here in court.  When you are excused, I'm going to ask

2    if you'll provide a cell phone number to Ms. Coronado so that

3    we can reach you if we need to call you back to service or to

4    let you know that the admonition's been lifted and that a

5    verdict was reached.  But thank you very much for being here.

6            JUROR:  I live in Safford, about two hours away.

7    Does that mean I can go home, or do I need to hang out around

8    here?

9            THE COURT:  So you can go home.  I will ask you to

10   keep your phone nearby because we will let you know if and

11   when the jury reaches a verdict, but we won't expect you to

12   wait here while the jury is deliberating.  If you are called

13   back, we will ask you to drive back, and we appreciate the

14   burden that that imposes on you.

15       All right.  So at this time, I'll excuse the jurors for

16   their deliberations.  I understand you've agreed to use the

17   larger jury deliberation room on the side here, and Ms.

18   Coronado will take you there and also give you forms so that

19   you can order lunch that will be prepared and delivered to

20   you.

21       Thank you all for your time and attention.

22       (Jury out, 12:17 p.m.)

23           THE COURT:  All right.  Counsel, if you'll please be

24   sure and make sure that Ms. Coronado has numbers that she can

25   reach you at in case the jurors have a question or we need to

1    call you back to court.  I'm going to ask that you not be more

2    than five minutes away from the courthouse in case there are

3    questions.  And then also if you'll check with Ms. Coronado to

4    make sure that she has all the exhibits to give to the jurors.

5         Mr. Roach, was there an issue?

6         MR. ROACH:  Judge, did you say five?  Just because my

7    office is by superior court, which is probably more than that.

8    I can stay here if that's --

9         THE COURT:  Well, tell me how much time it would take

10   you to get to court if you were called.

11        MR. ROACH:  I'll park right in front of my office,

12   and I could have somebody drop me off, so we're talking eight,

13   ten.

14        THE COURT:  I think that's fine.

15        MR. ROACH:  Okay.

16        THE COURT:  All right.  Thank you.  Thank you for

17   clarifying that.  We once did wait 45 minutes for an attorney.

18        All right.  Thank you all for your presentations, and

19   we'll stand at recess right now.

20        (Court recessed from 12:18 p.m. to 2:57 p.m.)

21        THE CLERK:  In criminal matter 19-1094, United States

22   of America versus Isaias Delgado, on for jury trial, day four.

23        Counsel, please state your appearances.

24        MS. WOOLRIDGE:  Good afternoon, Your Honor.  Angela

25   Woolridge appearing on behalf of the United States.

1          THE COURT:  Good afternoon.

2          MR. ROACH:  Good afternoon, Your Honor.  Brad Roach

3  and Trevor Hill on behalf of Mr. Delgado, who is present.

4          THE COURT:  Good afternoon.

5      And good afternoon to the jury.

6      I see, Juror No. 5, that you are holding a folder.  Are

7  you the foreperson?

8          FOREPERSON:  Yes, ma'am.

9          THE COURT:  Juror No. 5, has the jury reached a

10 verdict?

11         FOREPERSON:  We have.

12         THE COURT:  All right.  I'm going to ask if you'll

13 please give the verdict to Ms. Coronado.

14     All right.  And I'll ask Ms. Coronado to publish the

15 verdict.

16         THE CLERK:  As to Count One:  We, the jury, find the

17 defendant, Isaias Delgado, guilty of engaging in the business

18 of dealing firearms without a license, as charged in Count One

19 of the indictment.

20     Ladies and gentlemen of the jury, is this the verdict and

21 the verdict of each of you?

22     (Members of the jury answer in the affirmative.)

23         THE CLERK:  Thank you.

24         THE COURT:  Does either party want the jury polled?

25         MS. WOOLRIDGE:  No, thank you, Your Honor.

1          MR. ROACH:  Yes, please.

2          THE COURT:  All right.  So Ms. Coronado just read the

3   verdict form that indicated that the jury found the defendant

4   guilty of the sole count in the indictment, the dealing in

5   firearms.  I'm going to ask each of you if the verdict as read

6   by Ms. Coronado was your verdict and the verdict of each of

7   the other jurors.

8       Juror No. 3.

9          JUROR:  Yes.

10          THE COURT:  Juror No. 4.

11          JUROR:  Yes.

12          THE COURT:  Juror No. 5.

13          JUROR:  Yes.

14          THE COURT:  Juror No. 6.

15          JUROR:  Yes.

16          THE COURT:  Juror No. 7.

17          JUROR:  Yes.

18          THE COURT:  Juror No. 8.

19          JUROR:  Yes.

20          THE COURT:  Juror No. 9.

21          JUROR:  Yes.

22          THE COURT:  Juror No. 17.

23          JUROR:  Yes.

24          THE COURT:  Juror No. 18.

25          JUROR:  Yes.

1          THE COURT:  Juror No. 19.

2          JUROR:  Yes.

3          THE COURT:  Juror No. 20.

4          JUROR:  Yes.

5          THE COURT:  And Juror No. 26.

6          JUROR:  Yes.

7          THE COURT:  Thank you.

8      I want to thank all the jurors for your time and

9  attention during the trial.  The admonition is now lifted.

10 You're free to talk about the case or not talk about the case

11 as you desire.

12     I'm going to excuse you at this time, and I'm going to

13 ask if Ms. Coronado will take you back to the jury room.  I'm

14 going to ask if you'll wait there for a minute, and then I'm

15 going to come back and have some final conversation with you.

16     Thank you.

17     (Jury excused, 3:00 p.m.)

18          THE COURT:  So, counsel, there remains the issue of

19 the forfeiture allegations.  How do you want to proceed as far

20 as those allegations?

21          MS. WOOLRIDGE:  Your Honor, the parties agreed to

22 submit that for the Court for its determination.  If the Court

23 requires any or if the Court feels that it would be helpful to

24 have any sort of briefing to assist it, we're glad to provide

25 it; but at least from the government's perspective, the issue

1  is straightforward.  We did file a bill of particulars

2  alleging the particular firearms that we believe are subject

3  to forfeiture and would ask that the Court find that the

4  government has shown that these items were involved in the

5  offense and therefore subject to forfeiture.  I don't know the

6  defense position, but if I understand correctly, our agreement

7  was to submit that to the Court for its determination.

8       THE COURT:  And I believe we did already execute a

9  waiver of the right to jury trial, so what I'm specifically

10 asking is how the parties want to present the issue of the

11 forfeiture.

12    Mr. Roach.

13      MR. ROACH:  Judge, I would submit it on the -- or I

14 have no evidence to add, no additional argument to make,

15 unless the Court would like some.  So I believe -- I don't

16 know if the government has any additional evidence.

17      MS. WOOLRIDGE:  And, Your Honor, I don't have any

18 additional evidence.  Only I would be willing to submit any

19 briefing if the Court would require it or feel that it would

20 be of use, but as with the defense, I believe that it, as far

21 as the evidence, can be submitted on the evidence presented at

22 trial.

23      THE COURT:  There are 12 different weapons that are

24 listed in the forfeiture allegation in the indictment.  That's

25 what's at issue, correct?

1        MS. WOOLRIDGE:  Your Honor, the government then filed

2   a bill of particulars alleging additional firearms.

3        THE COURT:  I have the bill of particulars.  It's

4   Document 85, and that one has 16 different weapons.

5        MS. WOOLRIDGE:  That sounds right.  I thought the

6   total was 28, Your Honor, but I did not want to misspeak from

7   memory that I wasn't sure of.  But, yes, that is consistent

8   with my recollection.

9        THE COURT:  And the basis for forfeiture that the

10  government is asserting is?

11       MS. WOOLRIDGE:  Your Honor, the basis for forfeiture

12  is that the -- and I'm sorry.  I don't know the statutory

13  authority off the top of my head.  But the basis is that these

14  are firearms that were directly involved in the offense and

15  are the fruits of the crime and that therefore, under the

16  applicable Title 18 authority governing forfeiture, they are

17  subject, and I believe that's -- I'm sorry, I'm not going to

18  try to guess as to the statute, but we did cite it in our

19  forfeiture allegation -- that they are subject to forfeiture

20  under that theory and the basis that the government has proven

21  that all 28 of these firearms were in fact involved in and

22  fruits of the defendant's unlawful dealing in firearms without

23  a license, of which he has been convicted.

24       Additionally, because all but ten of those firearms were

25  put outside of the reach -- and I'm sorry, I'm actually now

thinking 12 of those firearms were outside of the reach of the
government, so the firearms that were not seized, that the
Court issue a substitute assets for the value of those
firearms.  The government has presented evidence through
Exhibit 77 of the value of each of the firearms, but again if
the -- and would submit on those amounts, but if the Court
requires further documentation, we would be glad to provide
that as well.

THE COURT:  All right.  So I see where I can take the
bill of particulars, the 12 -- I'm sorry, the 16 items that
are listed there, and possibly tie them to your chart by
serial number to get the date of the purchase and the amount
of the purchase, using the purchase price column without tax
or other expenses.  That's what you're asking me to do,
correct?

MS. WOOLRIDGE:  Yes, Your Honor.

THE COURT:  And you're asking me to determine that
these guns are basically property constituting the offense?

MS. WOOLRIDGE:  Yes, Your Honor.

THE COURT:  And, Mr. Roach, from the defense point of
view, the Court can consider the evidence that was presented
at the trial to determine whether or not the government has
met its burden, I believe by a preponderance of evidence, of
showing that each of these guns was one that was involved in
the offense of dealing without a license.

1           MR. ROACH:  Yes, Judge.  And I probably, I'm sorry, I

2    should have argued on behalf of my client.  I think that there

3    is a reasonable argument to be made.

4           The government's argument in closing that my client's

5    purchase of Item No. 16 on Exhibit 77, the Barrett Model

6    M82A1, that there was evidence or the government alleged that

7    he sold for $10,500, I think the Court and the jury could have

8    considered, as was argued by the government, that regardless

9    of what else had happened, that was the time when they argued

10   that my client realized he could make money doing this and

11   then bought the weapons after that.

12          So I would argue that just because there is a guilty

13   verdict doesn't mean the forfeiture has to apply to all of

14   them, and if the Court is considering by a preponderance of

15   the evidence which it does apply for, I think that argument,

16   one, is the most compelling about which ones the jury would

17   have found.  That would have been Items 17 and on on Exhibit

18   77.

19          THE COURT:  I think what would be most prudent to do

20   then is to set the forfeiture aspect for tomorrow morning, say

21   at 10:00 o'clock, and give each side 30 minutes to discuss the

22   specific firearms, the specific values, and what you believe

23   the Court's finding should be so that I can make a ruling as

24   to all of the specific weapons that are listed here because,

25   Mr. Roach, as you pointed out, there have been some various

1  arguments about whether or not they were part of the dealing

2  or not part of the dealing.

3      So, counsel, can you be here at 10:00 o'clock tomorrow

4  morning for that purpose?

5          MS. WOOLRIDGE:  Yes, Your Honor.

6          MR. ROACH:  Yes.  Thank you.

7          THE COURT:  And if you have proposed forms of order

8  that you want to bring, that would be helpful.

9          MS. WOOLRIDGE:  Yes, Your Honor.  And I should point

10  out for the Court, it's not something, of course, that needs

11  to be resolved until tomorrow, but I just wanted to let

12  defense counsel know he would not have to argue with regard to

13  Items 39 or 40.  Those two firearms were seized and the

14  defendant had not yet paid for them, and so the government

15  will be returning them to the rightful owner, which is the

16  federal firearms licensee who still owns them, because the

17  defendant canceled the payment on them.

18          THE COURT:  On the bill of particulars, which

19  numbers, 1 through 16, are the same as 29 and 30?

20          MS. WOOLRIDGE:  I'm sorry.  39 and 40 on the chart,

21  they are the Alexander Arms -- I'm sorry, Anderson Arms lower

22  pistol receivers and .50 Beowulf caliber.

23          THE COURT:  So what I'm going to ask you to do is

24  come with the bill of particulars tomorrow and tell me what's

25  at issue.

1          MS. WOOLRIDGE:  Okay, Your Honor.  We will.

2          THE COURT:  Excellent.

3      I am going to order that a presentence report be

4  prepared.

5      Mr. Delgado, your sentencing is set for October 26th at 3

6  p.m.

7      You're released on conditions.  You're required to

8  continue to comply with those conditions, okay?

9          THE DEFENDANT:  Thank you, Your Honor.

10          MR. ROACH:  Can I ask my client one quick question?

11          THE COURT:  Yes.

12      (Attorney-client discussion off the record.)

13          MR. ROACH:  Thank you, Judge.

14          THE COURT:  All right.  Have a good evening.  We'll

15  see you tomorrow morning.

16          MS. WOOLRIDGE:  Thank you, Your Honor.

17          THE DEFENDANT:  Thank you, Your Honor.

18          MR. ROACH:  Thank you, Judge.

19          MS. WOOLRIDGE:  Have a nice evening.

20      (Court adjourned at 3:10 p.m.)

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I, Aaron H. LaDuke, do hereby certify that I reported the foregoing proceedings to the best of my skill and ability, and that the same was transcribed by me via computer-aided transcription, and that the foregoing pages of typewritten matter are a true, correct, and complete transcript of all the proceedings had, as set forth in the title page hereto.

Dated this 26th day of October, 2021.


_____s/Aaron H. LaDuke_____
Aaron H. LaDuke, RMR, CRR
Official Court Reporter